No. 23-30826

# In the United States Court of Appeals for the Fifth Circuit

JILL HINES, on behalf of herself & others similarly situated;
JIM HOFT, on behalf of himself & others similarly situated,
*Plaintiffs-Appellees,*

*v.*

ALEX STAMOS; RENÉE DIRESTA; BOARD OF TRUSTEES OF THE
LELAND STANFORD JUNIOR UNIVERSITY; LELAND STANFORD
JUNIOR UNIVERSITY; KATE STARBIRD, in her official and individual
capacities; GRAPHIKA; CAMILLE FRANÇOIS; ATLANTIC COUNCIL;
GRAHAM BROOKIE,
*Defendants-Appellants,*

*consolidated with*        No. 23-30916

JILL HINES, on behalf of herself and others similarly situated;
JIM HOFT, on behalf of himself and other similarly situated,
*Plaintiffs-Appellees,*

*v.*

ASPEN INSTITUTE,
*Defendant-Appellant.*

On Appeal from the U.S. District Court for the Western District of Louisiana
No. 23-cv-571 (Hon. Terry A. Doughty)

## BRIEF FOR APPELLANTS

John B. Bellinger III
Elisabeth S. Theodore
R. Stanton Jones
Stephen K. Wirth
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
john.bellinger@arnoldporter.com

*Counsel for Alex Stamos, Renée DiResta, and Stanford University*

(additional counsel listed on inside cover)

Mary E. Gately
Samantha L. Chaifetz
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
(202) 799-4507
mary.gately@us.dlapiper.com

Marie Bussey-Garza
DLA PIPER LLP (US)
1650 Market Street, Suite 5000
Philadelphia, Pennsylvania 19103
(215) 656-3300
marie.bussey-garza@us.dlapiper.com

*Counsel for Graphika and Camille François*

Alex B. Rothenberg
Makala L. Graves
GORDON, ARATA, MONTGOMERY, BARNETT,
  MCCOLLAM, DUPLANTIS & EAGAN, LLC
201 St. Charles Avenue, 40th Floor
New Orleans, Louisiana 70170-4000
(504) 582-1111
arothenber@gamb.com

Robert M. McKenna
Daniel Dunne
ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
(206) 839-4300
ddunne@orrick.com

Geoffrey Shaw
ORRICK, HERRINGTON & SUTCLIFFE LLP
355 S. Grand Ave., Suite 2700
Los Angeles, California 90071
(213) 629-2020
geoffreyshaw@orrick.com

*Counsel for Kate Starbird*

Andrew B. Johnson
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Ave. N.
Birmingham, Alabama 35203
(205) 521-8000
ajohnson@bradley.com

Karl V. Hopkins
BRADLEY ARANT BOULT CUMMINGS LLP
JPMorgan Chase Tower
600 Travis Street, Suite 5600
Houston, Texas 77002
(713) 576-0310
khopkins@bradley.com

Jon K. Guice
HAMMONDS, SILLS, ADKINS, GUICE, NOAH
  & PERKINS, L.L.P.
1881 Hudson Circle
Monroe, Louisiana 71201
(318) 324-0101
jguice@hamsil.com

Shelton Dennis Blunt
PHELPS DUNBAR LLP
II City Plaza 400 Convention St., Suite 1100
Baton Rouge, Louisiana 70802
(225) 346-0285
dennis.blunt@phelps.com

*Counsel for the Atlantic Council and*
*Graham Brookie*

Andrew J. Pincus
Archis A. Parasharami
Kevin S. Ranlett
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3000
apincus@mayerbrown.com

Elizabeth M. Carmody
COOK, YANCEY, KING & GALLOWAY
333 Texas Street, Suite 1700, P.O. Box 22260
Shreveport, Louisiana 71120-2260
(318) 221-6277
elizabeth.carmody@cookyancey.com

*Counsel for the Aspen Institute*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1, undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of these appeals. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. **Plaintiffs-Appellees Jill Hines and Jim Hoft.** The following attorneys have represented Ms. Hines and Mr. Hoft in this case:

> Gene P. Hamilton, Reed D. Rubinstein, Nicholas R. Barry, Michael Ding, Juli Z. Haller, James K. Rogers, and Andrew J. Block of America First Legal; D. John Sauer and Justin D. Smith of James Otis Law Group, LLC; and Julianna P. Parks of Langley & Parks, LLC.

2. **Defendants-Appellants Alex Stamos, Renée DiResta, the Board of Trustees of the Leland Stanford Junior University, and the Leland Stanford Junior University.** The Board of Trustees of the Leland Stanford Junior University and the Leland Stanford Junior University are the full legal names for Stanford University, a research university located in Palo Alto, California. Stanford does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock. The following attorneys have represented Stanford, Mr. Stamos, and Ms. DiResta in this case:

John B. Bellinger III, Elisabeth S. Theodore, R. Stanton Jones, and Stephen K. Wirth of Arnold & Porter Kaye Scholer LLP; and Devin Reid and James Brown of Liskow & Lewis LLP.

3.  **Defendant-Appellant Kate Starbird.**  Ms. Starbird is sued in her personal capacity and official capacity as an Associate Professor at the University of Washington located in Seattle, Washington.  The following attorneys have represented Ms. Starbird in this case:

Robert M. McKenna, Daniel Dunne, and Geoffrey Shaw of Orrick, Herrington & Sutcliffe LLP; and Alex B. Rothenberg, Ewell E. Eagan, and Makala L. Graves of Gordon, Arata, Montgomery, Barnett, McCollam, Duplantis & Egan, LLC.

4.  **Defendants-Appellants Graphika and Camille François.**  Graphika Technologies, Inc. (Graphika)[1] is a network analytics firm located in New York, New York.  Graphika does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock.  The following attorneys have represented Graphika and Ms. François in this case:

Mary E. Gately, Samantha L. Chaifetz, and Marie Bussey-Garza of DLA Piper LLP (US); and Quentin F. Urquhart, Jr., Camala E. Capodice, and Gabrielle C. Broders of Irwin Fritchie Urquhart Moore & Daniels, LLC.

---

[1]  Although identified by Plaintiffs as Graphika, the company's correct corporate identity is Graphika Technologies, Inc.

5.    **Defendants-Appellants Atlantic Council and Graham Brookie.**  Atlantic Council is a nonprofit organization located in Washington, D.C.  Atlantic Council does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock.  The following attorneys have represented Atlantic Council and Mr. Brookie in this case:

> Karl V. Hopkins and Andrew B. Johnson of Bradley Arant Boult Cummings LLP; Jon K. Guice of Hammonds, Sills, Adkins, Guice, Noah & Perkins, L.L.P.; and Shelton Dennis Blunt of Phelps Dunbar LLP.

6.    **Defendant-Appellant The Aspen Institute.**  The Aspen Institute (Aspen) is a nonprofit organization located in Washington, D.C.  Aspen does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock.  The following attorneys have represented Aspen in this case:

> Andrew J. Pincus, Archis A. Parasharami, and Kevin Ranlett of Mayer Brown LLP; and Elizabeth Mendell Carmody of Cook, Yancey, King & Galloway, PLC.

Dated:  February 26, 2024          /s/ *John B. Bellinger III*_____
                                             John B. Bellinger III

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument. These appeals involve significant and recurring legal questions relating to the enforceability of arbitration agreements under equitable estoppel doctrines, to a district court's ability to decide an arbitration motion without assuring itself of its personal jurisdiction, and to the availability of personal jurisdiction against non-resident defendants based on out-of-state communications alleged to have an effect in the forum state. Oral argument will assist this Court in resolving these and other questions.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.................................................. i

STATEMENT REGARDING ORAL ARGUMENT ........................................iv

TABLE OF AUTHORITIES .......................................................................... viii

INTRODUCTION ...........................................................................................1

JURISDICTIONAL STATEMENT..................................................................3

STATEMENT OF THE ISSUES .....................................................................4

STATEMENT OF THE CASE .........................................................................4

      A.    The Election Integrity Partnership and the Virality Project........4

      B.    Plaintiffs' Putative Class Action................................................7

      C.    The Terms of Service...................................................................9

      D.    Defendants' Motions to Dismiss and Compel Arbitration ...........12

      E.    The Decisions Below..................................................................15

SUMMARY OF ARGUMENT........................................................................16

STANDARD OF REVIEW .............................................................................18

ARGUMENT ..................................................................................................19

I.    This Court Should Order Dismissal for Lack of Personal
    Jurisdiction.............................................................................................19

      A.    The District Court Was Required to Decide Personal
          Jurisdiction Before Deciding the Arbitration Motion .................20

      B.    This Court Has Appellate Jurisdiction and Should Decide the
          Personal Jurisdiction Question.........................................................24

      C.    The District Court Lacked Personal Jurisdiction.........................26

1.      The Complaint Does Not Allege that Any Defendant
        Has Contacts with Louisiana.................................................27

2.      Group Pleading Cannot Establish Personal
        Jurisdiction .........................................................................29

3.      Even Plaintiffs' Group Allegations Are Insufficient to
        Establish Personal Jurisdiction ...........................................31

        a.      The Court Lacks Personal Jurisdiction Over
                Hines's Claims .........................................................31

        b.      The Court Lacks Personal Jurisdiction Over
                Hoft's Claims............................................................37

4.      Exercising Personal Jurisdiction Would Be Unfair
        and Unreasonable .................................................................41

II.     If this Court Reaches the Question, It Should Reverse and Order
        the District Court to Compel Arbitration......................................42

        A.      Plaintiffs Entered into Binding Arbitration Agreements............43

        B.      Defendants Are Entitled to Enforce the Arbitration
                Agreements.......................................................................44

                1.      Plaintiffs Rely on the Written Terms Containing the
                        Arbitration Provision..............................................47

                2.      Plaintiffs Allege Substantially Interdependent and
                        Concerted Misconduct.............................................53

                        a.      The Amended Complaint Alleges Substantially
                                Interdependent and Concerted Misconduct .............54

                        b.      Plaintiffs' Admissions in the Original Complaint
                                Confirm That They Allege Substantially
                                Interdependent and Concerted Misconduct .............58

                        c.      The District Court's Contrary Analysis Was an
                                Abuse of Discretion .......................................59

3. The Court's Other Rationales for Denying Arbitration Are Foreclosed by Binding Precedent ............60

4. The Arbitrator Should Decide the Enforcement Question ..................................................................62

C. Plaintiffs' Claims Fall Within the Broad Scope of the Arbitration Agreements ...............................................62

1. The Twitter Agreement Assigns Scope Questions to the Arbitrator.........................................................63

2. Plaintiffs' Claims Fall Within the Arbitration Agreements' Scope ................................................63

D. This Court Should Strike the Class Claims and Order Individual Arbitration...............................................67

CONCLUSION........................................................................67

CERTIFICATE OF SERVICE ..........................................70

CERTIFICATE OF COMPLIANCE ................................71

# TABLE OF AUTHORITIES

**Cases** Page(s)

*Acad. of Sacred Heart of New Orleans v. Certain Underwriters at Lloyd's London,*
   51 F. Supp. 3d 822 (E.D. La. 2023) ...................................................45

*Admar Int'l, Inc. v. Eastrock, L.L.C.,*
   18 F.4th 783 (5th Cir. 2021) ..............................................................39

*Advanced Neuromodulation Sys., Inc. v. Advanced Bionics Corp.,*
   2005 WL 8161795 (E.D. Tex. Jan. 28, 2005) ..........................58, 59

*Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.,*
   744 F.3d 595 (9th Cir. 2014)..............................................................58

*Am. Express Co. v. Italian Colors Rest.,*
   570 U.S. 228 (2013)............................................................................67

*In re Apple & AT&TM Antitrust Litig.,*
   826 F. Supp. 2d 1168 (N.D. Cal. 2011)......................................51, 66

*Armstrong v. Ashley,*
   60 F.4th 262 (5th Cir. 2023) ..............................................................30

*Armstrong v. Assocs. Int'l Holdings,*
   242 F. App'x 955 (5th Cir. 2007)........................................................20

*AT&T Techs., Inc. v. Commc'ns Workers of Am.,*
   475 U.S. 643 (1986)............................................................................61

*Bar Grp., LLC v. Bus. Intel. Advisors, Inc.,*
   215 F. Supp. 3d 524 (S.D. Tex. 2017) ...............................................31

*Beach Orangethorpe Hotel, LLC v. Evertrust Bank,*
   2023 WL 7320584 (Cal. Ct. App. Nov. 7, 2023) ...............................46

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)............................................................................56

*Boucher v. All. Title Co.*,
127 Cal. App. 4th 262 (2005) ............................................................. 52

*Brammer Operating Co. v. Pathfinder Expl., LLC*,
2008 WL 400352 (W.D. La. Jan. 31, 2008) ..................................... 23

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*,
582 U.S. 255 (2017) .................................................. 27, 28, 30, 38

*Brown v. Pac. Life Ins. Co.*,
462 F.3d 384 (5th Cir. 2006) ..................... 13, 19, 43, 46, 52, 53, 57

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ............................................................................ 27

*Burstein v. State Bar of California*,
693 F.2d 511 (5th Cir. 1982) ....................................................... 41, 42

*Carmona v. Leo Ship Mgmt., Inc.*,
924 F.3d 190 (5th Cir. 2019) ................................................ 27, 28, 40

*Castellanos-Contreras v. Decatur Hotels, LLC*,
622 F.3d 393 (5th Cir. 2010) ............................................................. 24

*Chow v. United States*,
2021 WL 3438365 (5th Cir. Aug. 5, 2021) ..................................... 30

*Consumer Fin. Prot. Bureau v. All Am. Check Cashing, Inc.*,
33 F.4th 218 (5th Cir. 2022) ....................................................... 24, 25

*Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*,
748 F.3d 249 (5th Cir. 2014) ........................................ 44, 46, 50, 62

*Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*,
24 F.4th 491 (5th Cir. 2022) ............................................................. 29

*Def. Distributed v. Bruck*,
30 F.4th 414 (5th Cir. 2022) ....................................................... 53, 60

*Def. Distributed v. Grewal*,
971 F.3d 485 (5th Cir. 2020) ........................................ 35, 36, 37, 38

*Dykes v. S. Star, Inc.*,
    2006 WL 8436980 (N.D. Tex. July 6, 2006) ....................................23

*Encompass Power Servs., Inc. v. Eng'g & Const. Co.*,
    224 F. App'x 329 (5th Cir. 2007)......................................................20

*First Options of Chi., Inc. v. Kaplan*,
    514 U.S. 938 (1995)...........................................................................62

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
    592 U.S. 351 (2021)..........................................................27, 28, 37

*Franklin v. Cmty. Reg'l Med. Ctr.*,
    998 F.3d 867 (9th Cir. 2021) ............................47, 53, 59, 65

*Gen. Elec. Co. v. Deutz AG*,
    270 F.3d 144 (3d Cir. 2001) ............................................................23

*Goldman v. KPMG LLP*,
    173 Cal. App. 4th 209 (2009) ...............................................46, 53

*Grigson v. Creative Artists Agency L.L.C.*,
    210 F.3d 524 (5th Cir. 2000)...................19, 44, 45, 46, 52, 53, 60, 65

*Guidry v. U.S. Tobacco Co.*,
    188 F.3d 619 (5th Cir. 1999).............................................................30

*Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*,
    921 F.3d 522 (5th Cir. 2019) .....................................................21, 22

*Hardee v. CMH Homes, Inc.*,
    2021 WL 2187932 (E.D. La. May 28, 2021)...................................66

*Hernandez v. Meridian Management Services, LLC*,
    87 Cal. App. 5th 1214 (2d Div. 2023) ............................................46

*Int'l Energy Ventures Mgmt. v. United Energy Grp.*,
    818 F.3d 193 (5th Cir. 2016)......................................................20, 22

*Int'l Energy Ventures Mgmt. v. United Energy Grp.*,
    999 F.3d 257 (5th Cir. 2021)............................................................24

*InterGen N.V. v. Grina*,
　344 F.3d 134 (1st Cir. 2003) ...................................................................23

*Jureczki v. Bank One Tex., N.A.*,
　252 F. Supp. 2d 368 (S.D. Tex. 2003) ............................................66

*Jureczki v. Bank One Tex., N.A.*,
　75 F. App'x 272 (5th Cir. 2003) .......................................................66

*Keeton v. Hustler Magazine, Inc.*,
　465 U.S. 770 (1984) ...............................................................................30

*Kindred Nursing Centers Ltd. P'ship v. Clark*,
　581 U.S. 246 (2017) ...............................................................................61

*Koenig v. Ritz-Carlton Hotel Co., LLC*,
　2021 WL 5855608 (E.D. La. June 24, 2021) ................................57

*Kramer v. Toyota Motor Corp.*,
　705 F.3d 1122 (9th Cir. 2013) ..........................................................46

*Leroy v. Great W. United Corp.*,
　443 U.S. 173 (1979) ...............................................................................25

*In re Lloyd's Reg. N. Am., Inc.*,
　780 F.3d 283 (5th Cir. 2015) .............................................................61

*Melder v. Allstate Corp.*,
　404 F.3d 328 (5th Cir. 2005) .............................................................25

*Metalclad Corp. v. Ventana Env't Organizational P'ship*,
　109 Cal. App. 4th 1705 (2003) .........................................................47

*Missouri v. Biden*,
　83 F.4th 350 (5th Cir. 2023) ...............................................................1

*Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*,
　460 U.S. 1 (1983) ....................................................................................63

*McKinney ex rel. N.L.R.B. v. Creative Vision Res., L.L.C.*,
　783 F.3d 293 (5th Cir. 2015) .............................................................60

*Newman v. Plains All Am. Pipeline, L.P.*,
  23 F.4th 393 (5th Cir. 2022) ...................................................62

*Noble Cap. Grp. v. US Cap. Partners, Inc.*,
  2021 WL 3477481 (5th Cir. Aug. 6, 2021) ......................................46

*O'Conner v. AT&T Corporation*,
  2013 WL 3107496 (M.D. La. June 18, 2013) ...........................51, 57

*Omni Tech Corp. v. MPC Sols. Sales, LLC*,
  432 F.3d 797 (7th Cir. 2005) ....................................................24

*Ottemann v. Knights of Columbus*,
  36 F.4th 600 (5th Cir. 2022) ....................................................44

*PaineWebber Inc. v. Chase Manhattan Private Bank (Switzerland)*,
  260 F.3d 453 (5th Cir. 2001) ..............................................21, 42

*Patin v. Thoroughbred Power Boats Inc.*,
  294 F.3d 640 (5th Cir. 2002) ....................................................18

*Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*,
  687 F.3d 671 (5th Cir. 2012) ....................................................63

*Pollock v. Protect My Car Admin Servs., Inc.*,
  2023 WL 6324366 (S.D. Tex. Sept. 28, 2023) ...............................22

*Reading Health Sys. v. Bear Stearns & Co.*,
  900 F.3d 87 (3d Cir. 2018) ......................................................23

*Rodriguez-Rivera v. Allscripts Healthcare Sols., Inc.*,
  43 F.4th 150 (1st Cir. 2022) ....................................................23

*Ruhrgas AG v. Marathon Oil Co.*,
  526 U.S. 574 (1999) ...............................................................25

*Rush v. Savchuk*,
  444 U.S. 320 (1980) ...............................................................30

*Ryan v. Thunder Restorations, Inc.*,
  2011 WL 2680482 (E.D. La. July 8, 2011) ....................................66

*Salas v. Universal Credit Servs., LLC*,
   2019 WL 1242448 (S.D. Cal. Mar. 18, 2019) ....................................58

*Sanders v. Univ. of Texas Pan Am.*,
   776 F. App'x 835 (5th Cir. 2019) ....................................58

*Sangha v. Navig8 ShipManagement Priv. Ltd.*,
   882 F.3d 96 (5th Cir. 2018) ....................................27, 35, 38, 40, 41

*Seiferth v. Helicopteros Atuneros, Inc.*,
   472 F.3d 266 (5th Cir. 2006) ....................................32

*Skin Consultants, LLC v. Textron Aviation, Inc.*,
   2018 WL 4621904 (N.D. Miss. Sept. 26, 2018) ....................................22

*Stinger v. Chase Bank, USA, NA*,
   265 F. App'x 224 (5th Cir. 2008) ....................................65

*Stroman Realty, Inc. v. Wercinski*,
   513 F.3d 476 (5th Cir. 2008) ....................................26

*Swiger v. Rosette*,
   989 F.3d 501 (6th Cir. 2021) ....................................62

*Uptown Drug Co. v. CVS Caremark Corp.*,
   962 F. Supp. 2d 1172 (N.D. Cal. 2013) ....................................51

*Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes*,
   336 F.2d 354 (2d Cir. 1964) ....................................20, 23

*Vujasinovic & Beckcom, PLLC v. Cubillos*,
   2016 WL 5573712 (S.D. Tex. Sept. 29, 2016) ....................................22

*Walden v. Fiore*,
   571 U.S. 277 (2014) ....................................28, 34, 40

*Weber v. PACT XPP Techs., AG*,
   811 F.3d 758 (5th Cir. 2016) ....................................60, 61

*White v. ARCO/Polymers, Inc.*,
   720 F.2d 1391 (5th Cir. 1983) ....................................58

*Williams v. City of Yazoo,*
   41 F.4th 416 (5th Cir. 2022) ....................................................26

## Statutes & Rules

9 U.S.C.
   § 3.........................................................................................3
   § 4.........................................................................................3
   § 16(a) ..............................................................................4, 24

28 U.S.C.
   § 1331....................................................................................3
   § 1367....................................................................................3

42 U.S.C.
   § 1983....................................................................................9
   § 1985....................................................................................9

Federal Rules of Civil Procedure
   Rule 12(b)(1) .......................................................................12
   Rule 12(b)(2) .......................................................................12
   Rule 12(b)(3) .......................................................................12
   Rule 12(b)(6) .......................................................................12

## Other Authorities

19 *Moore's Federal Practice* § 203.32[3][a] (3d ed. 2021).................................25

**INTRODUCTION**

Defendants are academic institutions, researchers, and nonprofits who allegedly exercised their own free speech rights to identify and speak out about mis- and disinformation on social media on two issues of public concern, the 2020 elections and COVID-19. Plaintiffs are social media users who claim that Defendants violated civil rights laws by allegedly urging social media companies to flag or remove social media posts.

Defendants vigorously deny Plaintiffs' allegations. Just as Plaintiffs may speak about elections and COVID-19, Defendants may engage in research and commentary about social media posts, including by (allegedly) advising social media companies that speech by Plaintiffs (or others) may be misleading. This Court recognized as much in a prior lawsuit raising similar allegations against the government, explaining that these Defendants are "private" actors who "may be entitled to their own First Amendment protections," and vacating aspects of the district court's injunction that affected Defendants. *Missouri v. Biden*, 83 F.4th 350, 396 (5th Cir. 2023), *cert. granted sub nom. Murthy v. Missouri*, No. 23-411. But this appeal does not involve the merits of Plaintiffs' claims. For present purposes only one thing matters: this lawsuit does not belong in the district court.

1

First, the district court lacks personal jurisdiction because no Defendant has taken any action purposefully targeting Louisiana. This lawsuit involves Defendants based in California, Washington, New York, and the District of Columbia who are alleged to have communicated with social media companies in California. Other than the fact that one plaintiff resides in Louisiana—which is categorically insufficient to support personal jurisdiction—this lawsuit has nothing to do with Louisiana. The district court did not address personal jurisdiction, as it was required to do before deciding Defendants' arbitration motions. Because the district court's lack of personal jurisdiction is clear upon the existing record and presents a pure issue of law, this Court should vacate and remand for dismissal on this ground.

Second, if the district court had jurisdiction, the court should have granted Defendants' motion to compel arbitration. Plaintiffs' suit is premised on their acknowledgment that, when they created and used their social media accounts, they entered into binding terms of service agreements with the relevant social media platforms. Plaintiffs' claims arise out of the terms of service and Plaintiffs' use of their social media accounts. Indeed, this dispute centers around the application of the terms of service by social media companies to flag or remove Plaintiffs' posts, allegedly at the behest of Defendants.

The terms of service contain arbitration agreements. And under controlling precedent, non-signatory defendants may enforce arbitration agreements in precisely these circumstances, including where (as here) a signatory plaintiff alleges that a non-signatory defendant has worked in concert with another signatory, and where (as here) the signatory plaintiff's claims rely in some way on the contract that contains the arbitration agreement. Plaintiffs cannot evade their arbitration agreements by declining to sue the social media companies themselves.

The Court should vacate and remand with instructions to dismiss for lack of personal jurisdiction. Alternatively, the Court should reverse and compel individual arbitration of Plaintiffs' claims.

## JURISDICTIONAL STATEMENT

Defendants-appellants appeal from orders denying motions to compel arbitration under 9 U.S.C. §§ 3, 4. The district court had federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367, although Defendants maintain that the court lacked personal jurisdiction and that Plaintiffs lack Article III standing to bring this lawsuit. The district court denied the *Stamos* Defendants' motion on November 15, 2023; they timely appealed on November 16, 2023. ROA.23-30826.3796-806.

The court denied defendant The Aspen Institute's arbitration motion on December 21, 2023, and Aspen timely appealed on December 22, 2023.  ROA.23-30916.4063-67.  This Court has jurisdiction under 9 U.S.C. § 16(a) to review the district court's orders, including the threshold questions they present.  *See infra* Section I.A-B.

## STATEMENT OF THE ISSUES

1.    Whether this Court should vacate the district court's orders denying the motions to compel arbitration and remand with instructions to dismiss for lack of personal jurisdiction.

2.    Whether this Court should reverse the orders below and grant the motions to compel individual arbitration of Plaintiffs' claims.

## STATEMENT OF THE CASE

### A.    The Election Integrity Partnership and the Virality Project

The Election Integrity Partnership (EIP) was an academic research project formed in July 2020 by a coalition of researchers from Stanford University's Stanford Internet Observatory, the University of Washington's Center for an Informed Public, Graphika, and the Atlantic Council's Digital Forensic Research Lab (DFRLab).  EIP aimed to identify, research, and respond

4

to misinformation on social media during the 2020 elections. ROA.23-30826.128 (Compl., Ex. 1 at vi).[2]

Documents incorporated in the amended complaint reflect that EIP "focused narrowly on content intended to suppress voting, reduce participation, confuse voters as to election processes, or delegitimize election results without evidence." ROA.23-30826.141 (Compl., Ex. 1 at 5). For example, EIP tracked "a fake viral video of ballots being burned." ROA.23-30826.185 (Compl., Ex. 1 at 49). EIP was nonpartisan and identified misinformation by both conservatives and liberals, such as claims by "liberal … influencers" that "President Trump was deliberately sabotaging the USPS to reduce the number of Democratic votes." ROA.23-30826.190-91 (Compl., Ex. 1 at 54-55).

Plaintiffs allege that "social-media platforms," including Facebook and Twitter, "participate[d] directly in the EIP" and gave EIP "privileged access" to their data. ROA.23-30826.1610 (Am. Compl. ¶¶ 143-45). Overall, EIP identified 639 "tickets" reporting potential misinformation and shared 363 of them externally. ROA.23-30826.1617 (Am. Compl. ¶ 178).

---

[2] The amended complaint reincorporated all exhibits to the original complaint. ROA.23-30826.1586.

Most often, Plaintiffs allege, the platforms did nothing when EIP alerted them to potential misinformation. Overall, "platforms took action" on only "35% of URLs that [EIP] reported to them." ROA.23-30826.1617 (Am. Compl. ¶¶ 179-81). Usually that action was simply adding a label to the post, such as "Get the facts," with a link to a trusted source. ROA.23-30826.176, 353 (Compl., Ex. 1 at 40, 217). In total, "21% of URLs" shared with platforms "were labeled, 13% were removed, and 1% were soft blocked." ROA.23-30826.176 (Compl., Ex. 1 at 40).[3]

Plaintiffs allege that, in 2021, researchers from EIP members began work on the Virality Project (VP) to analyze misinformation around COVID-19 vaccines. ROA.23-30826.1622-23 (Am. Compl. ¶¶ 207-08). VP's principal output was briefings and public blog posts. ROA.23-30826.954 (Compl., Ex. 10 at 18). It referred a total of 174 "tickets" reporting potential COVID-19 misinformation to platforms. ROA.23-30826.966 (Compl., Ex. 10 at 30). VP operated for only seven months, between February and August 2021. ROA.23-30826.1638 (Am. Compl. ¶ 281).

---

[3]   "Soft blocked" means the content "was only visible by bypassing a warning." ROA.23-30826.175-76 (Compl., Ex. 1 at 39-40).

Plaintiffs further allege that EIP and VP urged platforms to "strengthen platform standards" and policies on misinformation and pushed the platforms to "aggressively enforce" these policies. *E.g.*, ROA.23-30826.1595-97 (Am. Compl. ¶¶ 64, 70-71).

Plaintiffs do not allege that Aspen was a member of either EIP or VP. They assert only that Aspen played an unspecified "strategic and/or coordinating" role in EIP or VP's activities. ROA.23-30826.1590 (Am. Compl. ¶ 41).

## B.    Plaintiffs' Putative Class Action

Plaintiffs are Jill Hines and Jim Hoft. Hines is a Louisiana resident whose claims arise from her operation of two Facebook groups, Health Freedom Louisiana and Reopen Louisiana. ROA.23-30826.1581 (Am. Compl. ¶ 8). Hines and her organizations advocate against COVID-19 vaccines and "other prevention measures." ROA.23-30826.1655 (Am. Compl. ¶¶ 363, 66-67). Hines alleges that that her and her groups' Facebook accounts and posts were "restricted" or "censored" on Facebook in 2022 and 2023. ROA.23-30826.1662 (Am. Compl. ¶ 397).

Hoft, a Missouri resident, alleges that he owns and operates the news website The Gateway Pundit. ROA.23-30826.1581, 1663 (Am. Compl. ¶¶ 10, 405). Hoft alleges that he speaks on social media about COVID-19 and election

issues. Hoft alleges that The Gateway Pundit has experienced "censorship" on both Facebook and Twitter. ROA.23-30826.1663-64 (Am. Compl. ¶ 406).

In May 2023, Plaintiffs filed this putative class-action lawsuit in the Western District of Louisiana, bringing federal and state causes of action stemming from the alleged censorship of their online speech by non-defendant social media platforms. Instead of suing the social media platforms, they sued Stanford University and its Board of Trustees; the Stanford Internet Observatory's former director Alex Stamos and research manager Renée DiResta; the director of University of Washington's Center for an Informed Public, Kate Starbird; Graphika and its former chief innovation officer, Camille François; and the Atlantic Council and DFRLab's senior director, Graham Brookie.

In October 2023, Plaintiffs filed an amended complaint that—among other things—added Aspen as a defendant. ROA. 23-30826.1588 (Am. Compl. ¶ 37). The theory of the operative complaint is that the EIP and the VP contributed to Facebook's and Twitter's decisions to take action on Plaintiffs' posts, although Plaintiff Hines does not even allege that the VP ever flagged any of her posts to Facebook or Twitter. Instead, she alleges that the VP

targeted "health freedom groups" that are "like" her groups.   ROA.23-30826.1654 (Am. Compl. ¶ 362).

Plaintiffs bring claims under 42 U.S.C. § 1985 (Count 1), 42 U.S.C. § 1983 (Count 2), and the First Amendment (Count 3) on the theory that Defendants "engaged in government action" by becoming "entangled" with government officials.   ROA.23-30826.1673-74 (Am. Compl. ¶¶ 451, 455).   Plaintiffs also allege that Defendants "tortious[ly] interfere[d]" with Plaintiffs' "contractual relationships" with social media companies (Count 4), and that Defendants breached a "duty" not to "interfere" with Plaintiffs' rights to post on social media (Count 5).   ROA.23-30826.1674-77 (Am. Compl. ¶¶ 462, 469).   Although Plaintiffs offer conclusory allegations "on information and belief" that "Defendants" "track[ed]" speech in Louisiana and "communicat[ed] with state officials in Louisiana," ROA.23-30826.1658 (Am. Compl. ¶ 378), the complaint alleges no specific facts identifying any Defendant's contacts with Louisiana.

## C.   The Terms of Service

Plaintiffs allege that "[s]ocial-media platforms such as Facebook, Twitter, and YouTube require users and account holders to agree to Terms of Service and/or similar contractual agreements as a condition of creating an account," and that "Plaintiffs … were required to do so here to create the social-

media accounts affected by Defendants' conduct." ROA.23-30826.1592 (Am. Compl. ¶ 50). As the district court recognized, it is undisputed that Facebook's and Twitter's terms of service contain arbitration provisions to which Plaintiffs agreed. ROA.23-30826.3800.

**Facebook.** Both Hoft and Hines agreed to Facebook's Commercial Terms ("Facebook Terms"), which apply to use of Facebook "for a business or commercial purpose." ROA.23-30826.1429 (Facebook Terms, Preamble). Hoft and Hines allege that they use Facebook for business purposes and that their claims in this case arise from and relate to their use of Facebook for those purposes. Both Plaintiffs allege that, by purportedly "inducing social-media platform(s) to censor or suppress" their speech, Defendants "interfered with" their "business relations" and "business expectancies." ROA.23-30826.1675 (Am. Compl. ¶ 463).

Hoft alleges that he "operates The Gateway Pundit as a business and draws significant revenue from his ability to post freely on social media," including Facebook. ROA.23-30826.1664 (Am. Compl. ¶ 409). Hines likewise alleges that she obtains "business and economic opportunities" through Health Freedom Louisiana and Reopen Louisiana's social media activity, and she claims damages in the form of "loss of profits and economic value from the

freedom of engaging in uncensored speech on social media." ROA.23-30826.1676 (Am. Compl. ¶ 466). Moreover, she operates both of those groups as "Pages" on Facebook, *see* ROA.23-30826.1434, 1436, and the Facebook Terms define a "business or commercial purpose" to include "managing a Page," ROA.23-30826.1429 (Facebook Terms, Preamble).

By agreeing to the Facebook Terms, Plaintiffs "agree[d] to arbitrate" "any claim, cause of action, or dispute that arises out of or relates to any access or use of" Facebook "for business or commercial purposes ('Commercial Claim') between [them] and [Facebook]." ROA.23-30826.1430 (Facebook Terms §§ 5.b, 5.c). They further agreed that any claim not subject to arbitration "must be resolved exclusively" in California courts according to California law. ROA.23-30826.1430 (Facebook Terms §§ 5.c.i, 5.c.ii). And they "waiv[ed] their … rights … to participate in a class or representative action." ROA.23-30826.1430 (Facebook Terms § 5.c.ii).

**Twitter.** Hoft also alleges that he has experienced "censorship" on Twitter. ROA.23-30826.1663-64 (Am. Compl. ¶ 406). By operating The Gateway Pundit's Twitter account, Hoft "agree[d] to be bound by" Twitter's Purchaser Terms of Service ("Twitter Terms"). ROA.23-30826.1438 (Twitter Terms, Acceptance). Hoft thus agreed to "arbitrate any disputes, claims, or

11

controversies arising out of or relating to these Terms" or to his "participation in" Twitter Blue—Twitter's paid service, of which The Gateway Pundit is a part. ROA.23-30826.1440 (Twitter Terms, General Terms § 6.a); *see* ROA.23-30826.1447. Hoft further agreed to waive his rights to "seek relief on a class basis." ROA.23-30826.1441 (Twitter Terms, General Terms § 6.f). He agreed that federal law governs the interpretation and enforcement of the arbitration clause, and that California law governs "[t]o the extent" state law applies to a dispute. ROA.23-30826.1441 (Twitter Terms, General Terms § 6.k).[4]

### D.    Defendants' Motions to Dismiss and Compel Arbitration

Defendants (except Aspen, which was not yet a party) moved to dismiss the original complaint under Rules 12(b)(1), (2), (3), and (6). ROA.23-30826.1487. Defendants concurrently moved to compel individual arbitration, dismiss Plaintiffs' class action claims, and stay the litigation pending arbitration. Defendants asked the district court to decide the arbitration motion "before deciding whether the complaint states a claim upon which relief may be granted under Rule 12(b)(6)." ROA.23-30826.1487.

---

[4]    Although Hoft alleges that The Gateway Pundit has Instagram and YouTube accounts, the complaint does not allege any "censorship" of activity on those platforms.

Defendants' arbitration motion was premised on this Court's precedent and similar California precedent holding that, under principles of equitable estoppel, non-signatories to arbitration agreements (like Defendants) are entitled to enforce those agreements against signatories (like Plaintiffs) when the complaint "must rely" on the contract containing the arbitration agreement or when the complaint alleges "substantially interdependent and concerted misconduct by both the non-signatory and one or more signatories to the contract." *E.g.*, ROA.23-30826.1406 (quoting *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 398 (5th Cir. 2006)).

In their original complaint, Plaintiffs had alleged that Defendants "collude[d] with social-media platforms," including Facebook and Twitter, "to monitor and censor disfavored speakers and content." ROA.23-30826.31 (Compl. ¶ 2). In response to Defendants' motions, Plaintiffs filed an amended complaint replacing some of their allegations of "collaboration" and "collusion" with new allegations that Defendants "coerc[ed] social-media platforms" to work with them to combat mis- and disinformation. ROA.23-30826.1579 (Am. Compl. ¶ 2). Thus, for example, the original complaint's section entitled "Social-Media Platforms Collaborate Closely with the EIP to Censor Speech" was retitled "Platforms Are Coerced into Cooperating with the EIP to Censor

Speech," *compare* ROA.23-30826.55 *with* ROA.23-30826.1610, and the original section entitled "The Virality Project Collaborates and Colludes with Social-Media Platforms" was retitled "The Virality Project Forces Cooperation with Social-Media Platforms," *compare* ROA.23-30826.87 *with* ROA.23-30826.1644. Plaintiffs also deleted factual allegations reflecting the platforms' voluntary participation, such as Twitter's statement that it would "*LOVE*" to work with Defendants on COVID-19 efforts, ROA.23-30826.88 (Compl. ¶ 295), although the underlying emails remain incorporated as exhibits to the amended complaint, ROA.23-30826.1167 (Compl., Ex. 16); ROA.23-30826.1586.

The amended complaint also added Aspen as a defendant. ROA.23-30826.1588.

Plaintiffs filed an opposition to Defendants' original arbitration motion and motion to dismiss, and asserted that their new complaint had deleted the "key factual predicates" of the original arbitration motion. ROA.23-30826.2073-74, 2078, 2850. With Plaintiffs' consent, the original Defendants asked the district court to set a briefing schedule for new motions aimed at the amended complaint. ROA.23-30826.3773.

### E.     The Decisions Below

Rather than order new briefing, the district court assessed the arbitration motion based on the allegations in the amended complaint.  ROA.23-30826.3796.

The court found no dispute that Plaintiffs had entered into arbitration agreements with Facebook and Twitter.  ROA.23-30826.3800.  But the court held that Defendants could not rely on equitable estoppel principles to compel arbitration because the "Amended Complaint specifically alleges that Plaintiffs do not seek to enforce the terms of service agreements," ROA.23-30826.3801, and alleges that Defendants "coerce[d]" social media companies into moderating social media posts, ROA.23-30826.3802.  The court did not address Defendants' motion to dismiss for lack of personal jurisdiction, lack of standing, or for improper venue.

Defendants timely appealed.  ROA.23-30826.3805.

Subsequently, new defendant Aspen moved to compel arbitration and to dismiss the amended complaint, including for lack of personal jurisdiction.  ROA.23-30916.3877-4015, 4018-50.  The district court denied Aspen's arbitration motion "for the same reasons" it denied the original Defendants' motion, ROA.23-30916.4063, and Aspen timely appealed, ROA.23-30916.4065.

## SUMMARY OF ARGUMENT

**I.** This Court should vacate and remand with instructions to dismiss for lack of personal jurisdiction. The district court was required to determine whether it could assert personal jurisdiction over Defendants before deciding the motions to compel arbitration. Although the district court did not make that determination, this Court has jurisdiction to decide personal jurisdiction in the first instance, must assure itself of its jurisdiction before addressing the arbitration issue, and should do so—as it has done in past cases—because jurisdiction presents a purely legal question. This Court should hold that the amended complaint fails to allege facts establishing personal jurisdiction over any Defendant.

The amended complaint lacks any factual allegations demonstrating that any Defendant has any contacts with Louisiana, much less that Plaintiffs' lawsuit arises out of such contacts. Plaintiffs do not allege that any Defendant ever traveled to Louisiana or ever communicated with anyone in Louisiana. Instead, the complaint concerns conduct that occurred in California, Washington, Colorado, New York, and the District of Columbia: alleged actions by some Defendants' employees and students to track and flag misinformation, communications with social media platforms and government officials, and

actions by third-party social media platforms. That alleged conduct has no connection to Louisiana. Indeed, the complaint has nothing to do with Louisiana beyond the fact that one Plaintiff lives there, which is jurisdictionally irrelevant under settled precedent.

Plaintiffs try to remedy these defects with generalized assertions that undifferentiated "Defendants" engaged in a "conspiracy" that harmed social media users in Louisiana. But personal jurisdiction must be assessed as to each defendant individually; group pleading must be disregarded. In any event, the allegations about "Defendants" show—at most—that some effect (far down the causal chain) was *felt* in Louisiana, not that any Defendant has any jurisdictionally relevant contacts *with* Louisiana. The Supreme Court and this Court have made clear in case after case that mere effects in the forum cannot establish personal jurisdiction. Under Plaintiffs' theory, everyone who takes actions affecting the internet subjects themselves to personal jurisdiction in every state in the union. That is plainly wrong.

**II.** If the Court reaches the arbitration issue, it should reverse and order the district court to compel arbitration. Plaintiffs entered into arbitration agreements covering disputes arising from their use of the social media

17

accounts at issue here, and Defendants can enforce these agreements under well-settled equitable estoppel principles.

Plaintiffs expressly rely on the platforms' written terms of service and incorporated misinformation policies as the basis for their lawsuit, terms which include broad arbitration agreements encompassing this dispute. Plaintiffs allege, moreover, that Defendants engaged in concerted misconduct together with the social media platforms. Plaintiffs allege that some Defendants identified and flagged social media posts to platforms, and that the platforms decided whether to label or take down posts or suspend accounts—the very harms Plaintiffs allegedly suffered. In circumstances like these—where the suit expressly relies on terms that include an arbitration agreement and alleges substantially interdependent and concerted misconduct by a signatory and non-signatories—this Court and the relevant state courts have made clear that non-signatories are entitled to invoke the arbitration agreement.

## STANDARD OF REVIEW

"Whether in personam jurisdiction can be exercised over a defendant is a question of law subject to *de novo* review by this court." *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 652 (5th Cir. 2002). The Court reviews the denial of an arbitration motion de novo, except that application of equitable

estoppel is reviewed for abuse of discretion. *Brown v. Pacific Life Ins. Co.*, 462 F.3d 384, 396, 398 (5th Cir. 2006). An erroneous "application of the law" is an abuse of discretion. *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000).

## ARGUMENT

## I.    This Court Should Order Dismissal for Lack of Personal Jurisdiction

The district court should not have resolved Defendants' motions to compel arbitration before resolving their motions to dismiss for lack of personal jurisdiction, because a court that lacks personal jurisdiction may not act on arbitration motions. Personal jurisdiction is a purely legal question, this Court has appellate jurisdiction to decide it, and it should do so, because personal jurisdiction is so plainly wanting. No factual allegations establish that any defendant had a single contact with the state of Louisiana. Plaintiffs' claim that they (or their social media followers) felt effects in Louisiana is insufficient to support personal jurisdiction under binding precedent. This Court therefore should vacate and remand with instructions to dismiss for lack of personal jurisdiction.

### A.    The District Court Was Required to Decide Personal Jurisdiction Before Deciding the Arbitration Motion

A district court must confirm that a defendant is subject to its jurisdiction before deciding an arbitration motion because, as this Court has recognized, deciding such a motion is an "exercise [of] personal jurisdiction over the parties." *Int'l Energy Ventures Mgmt. v. United Energy Grp.*, 818 F.3d 193, 212 (5th Cir. 2016) (quoting *Armstrong v. Assocs. Int'l Holdings*, 242 F. App'x 955, 957 (5th Cir. 2007)); *Encompass Power Servs., Inc. v. Eng'g & Const. Co.*, 224 F. App'x 329, 331 (5th Cir. 2007) (same); *Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes*, 336 F.2d 354, 363 (2d Cir. 1964) ("the district court had in personam jurisdiction to enter the order compelling arbitration").

Because a court is *exercising* personal jurisdiction over the parties when it decides an arbitration motion, it must *have* personal jurisdiction.  Personal jurisdiction to decide arbitrability may result from the arbitration clause itself if the arbitration clause designates the state where the district court is located as the arbitral forum.  *Int'l Energy Ventures Mgmt.*, 818 F.3d at 212 ("When a party agrees to arbitrate in a particular state, via explicit or implicit consent, the district courts of the agreed-upon state may exercise personal jurisdiction over the parties for the limited purpose of compelling arbitration.").  In the

absence of such a provision, personal jurisdiction must rest on ordinary minimum contacts analysis.

*PaineWebber Inc. v. Chase Manhattan Private Bank (Switzerland)*, 260 F.3d 453 (5th Cir. 2001), confirms that district courts cannot act on arbitration motions absent personal jurisdiction over the parties. There, this Court vacated a decision compelling arbitration because "the district court lacked jurisdiction to enter its order compelling Chase-Switzerland to arbitrate," and "remand[ed] with instructions to dismiss [the] case for lack of personal jurisdiction." *Id.* at 464.

In *PaineWebber*, the party asserting the personal jurisdiction defense opposed arbitration. This Court's decision in *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522 (5th Cir. 2019), confirms that the same analysis applies where, as here, the party asserting lack of personal jurisdiction has alternatively moved to compel arbitration. In *Halliburton*, an insurance company defendant, Ironshore, sought to compel arbitration of a subrogation dispute under a contract that contained an arbitration clause "requir[ing] the parties to submit to binding arbitration in Texas." *Id.* at 528. This Court held that Ironshore was entitled to compel arbitration, and then

separately held that the remaining non-arbitrable claims against Ironshore should be dismissed for lack of personal jurisdiction.

With respect to the arbitrable claims, this Court observed, it was "address[ing] the arbitration question before turning to personal jurisdiction because Ironshore submitted to the [Texas] court's personal jurisdiction for the limited purpose of compelling arbitration" by accepting an arbitration clause that selected Texas as the arbitral forum. *Id.* at 529 n.2 (citing *Int'l Energy Ventures Mgmt.*, 818 F.3d at 212). This Court's explanation that it could resolve Ironshore's arbitration motion before addressing personal jurisdiction only in light of the arbitration clause's limited conferral of personal jurisdiction in the forum state makes no sense if district courts are free to act on arbitration motions even absent personal jurisdiction.

District courts within this Circuit have likewise concluded that they may only decide arbitrability after establishing personal jurisdiction. *E.g.*, *Vujasinovic & Beckcom, PLLC v. Cubillos*, 2016 WL 5573712, at *3 (S.D. Tex. Sept. 29, 2016) (court needed to "resolve[] its jurisdiction to resolve the arbitrability issues"); *Pollock v. Protect My Car Admin Servs., Inc.*, 2023 WL 6324366, at *1 (S.D. Tex. Sept. 28, 2023) ("[b]ecause this court lacks personal jurisdiction, it does not reach the issue of arbitration"); *Skin Consultants, LLC v. Textron*

*Aviation, Inc.*, 2018 WL 4621904, at *1-4 (N.D. Miss. Sept. 26, 2018) (deciding personal jurisdiction before arbitration); *Brammer Operating Co. v. Pathfinder Expl., LLC*, 2008 WL 400352, at *2 (W.D. La. Jan. 31, 2008) (same); *see also Dykes v. S. Star, Inc.*, 2006 WL 8436980, at *2 (N.D. Tex. July 6, 2006) ("jurisdictional issues come before arbitration").

Other circuits agree that "threshold disputes over venue and jurisdiction should be resolved before" arbitration, because "resolving a dispute over arbitrability requires a district court to apply its law-declaring power regarding the parties' right to arbitrate." *Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 95 (3d Cir. 2018); *see Gen. Elec. Co. v. Deutz AG,* 270 F.3d 144, 150-52 (3d Cir. 2001) (confirming personal jurisdiction before addressing district court's decision denying arbitration); *InterGen N.V. v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003) ("so long as the parties are bound to arbitrate and the district court has personal jurisdiction over them, the court is under an unflagging, nondiscretionary duty to grant a timely motion to compel arbitration"); *Rodriguez-Rivera v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 167 (1st Cir. 2022) (confirming personal jurisdiction before vacating district court decision compelling arbitration); *Victory Transp.*, 336 F.2d at 363 (addressing personal jurisdiction before arbitration).

The arbitration clauses at issue here do not call for arbitration in Louisiana, and so the district court did not have limited personal jurisdiction to decide arbitrability.  Rather, the district court lacked the power to address arbitration without first assuring itself of its personal jurisdiction under ordinary minimum contacts analysis.

### B.    This Court Has Appellate Jurisdiction and Should Decide the Personal Jurisdiction Question

This Court's appellate jurisdiction encompasses the personal jurisdiction question the district court erroneously failed to decide.  The FAA authorizes interlocutory appeals of any "order" refusing arbitration.  9 U.S.C. § 16(a).  Like a § 1292(b) appeal, a § 16 appeal confers "jurisdiction to review the district court's entire 'order,'" not just the aspect of the order addressing the arbitration question.  *Int'l Energy Ventures Mgmt. v. United Energy Grp.*, 999 F.3d 257, 263 n.1 (5th Cir. 2021).  As under § 1292(b), "it is the order, not the question, that is appealable."  *Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393, 398 (5th Cir. 2010) (en banc); *accord Omni Tech Corp. v. MPC Sols. Sales, LLC*, 432 F.3d 797, 800 (7th Cir. 2005).

This Court accordingly has jurisdiction to review "any other questions, although themselves interlocutory and not otherwise appealable, that underlie and that are inextricably involved with the order being appealed."  *Consumer*

*Fin. Prot. Bureau v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 220 n.2 (5th Cir. 2022) (quoting 19 *Moore's Federal Practice* § 203.32[3][a] (3d ed. 2021)). "This scope of review is made necessary by the fact that the circuit court must consider all the legal issues necessary to dispose of the order being appealed." *Id.*; *see also Melder v. Allstate Corp.*, 404 F.3d 328, 331 (5th Cir. 2005).

Consideration of personal jurisdiction is "inextricably involved" with and "necessary to dispose of" the orders being appealed because the district court should not have acted on the arbitration motions in the absence of personal jurisdiction. And absent personal jurisdiction, the proper outcome of these appeals would be to vacate and remand for dismissal—rather than to affirm or reverse. Indeed, the issue of personal jurisdiction is always "fairly included" in an order because "[t]he question of personal jurisdiction" "goes to the court's power to exercise control over the parties." *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979); *see Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (personal jurisdiction "is an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." (cleaned up)).

Because personal jurisdiction "is a purely legal question subject to … *de novo* review, [the Court] may address it now in the interest of judicial economy

rather than remanding." *Williams v. City of Yazoo*, 41 F.4th 416, 426 n.6 (5th Cir. 2022). This Court has decided personal jurisdiction in the first instance— and ordered dismissal on that ground—where the district court failed to consider the issue. *See, e.g.*, *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 482 & n.3 (5th Cir. 2008). Because Defendants have mounted a facial attack on personal jurisdiction, the issue is straightforward, *see infra*, and "[a]ddressing it now is the much more efficient course … as any ruling by the district court on remand would generate another appeal." *Williams*, 41 F.4th at 426 n.6. If the Court remanded—and the district court found personal jurisdiction and then re-entered its orders denying arbitration—Defendants would be entitled to another immediate appeal. And if the district court dismissed for lack of personal jurisdiction, Plaintiffs would surely appeal.

## C.    The District Court Lacked Personal Jurisdiction

Personal jurisdiction here is squarely foreclosed by numerous precedents of the Supreme Court and this Court. Plaintiffs' allegations do not establish that any Defendant has any contact with Louisiana, let alone contacts sufficient to support the exercise of personal jurisdiction in this case. The amended complaint does not allege that any Defendant engaged in any conduct in, or directed at, Louisiana. Allegations that one Plaintiff resides in

Louisiana and that Plaintiffs have social media followers in Louisiana cannot support personal jurisdiction over Defendants as a matter of law.

> 1. *The Complaint Does Not Allege that Any Defendant Has Contacts with Louisiana*

To establish personal jurisdiction, Plaintiffs must allege nonconclusory facts establishing that each defendant "has purposely availed himself of the privilege of conducting activities within the forum state," *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018), and that each Plaintiff's claims "'arise out of or relate to the defendant's contacts' with the forum," *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.* ("*BMS*"), 582 U.S. 255, 262 (2017)).[5]

That requirement ensures that defendants will not be subjected to personal jurisdiction "solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193-94 (5th Cir. 2019) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  It also ensures "that

---

[5]   Plaintiffs do not assert general personal jurisdiction.  None of the individual defendants is alleged to be a Louisiana resident, and none of the organizational defendants is alleged to be incorporated, or have its principal place of business, in Louisiana.

States with 'little legitimate interest' in a suit do not encroach on States more affected by the controversy." *Ford*, 592 U.S. at 360 (quoting *BMS*, 582 U.S. at 263).

Critically, the *plaintiff* cannot supply "the only link between the defendant and the forum." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* at 290. "[T]he 'defendant *himself*'" must make "contact with the forum," *Carmona*, 924 F.3d at 194 (quoting *Walden*, 571 U.S. at 284); that contact must be "deliberate," *id.*; and it must relate to "[an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation," *Ford*, 592 U.S. at 359-60 (quoting *BMS*, 582 U.S. at 262).

Plaintiffs do not allege facts plausibly suggesting that any Defendant directed any conduct at Louisiana, much less conduct sufficient to establish personal jurisdiction. They do not allege that any Defendant ever "traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to [Louisiana]." *Walden*, 571 U.S. at 289. They do not allege that any Defendant ever "physical[ly] ent[ered]" Louisiana, whether "in person or through an agent, goods, mail, or some other means." *Id.* at 285. Nor do they allege that

any Defendant directly communicated with anyone in the State. *See, e.g.*, *Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*, 24 F.4th 491, 498-99 (5th Cir. 2022).  Instead, the amended complaint concerns conduct that occurred in California, Washington, Colorado, New York, and the District of Columbia—*i.e.*, alleged actions taken by EIP's and VP's member organizations to track and flag misinformation, communications with social media platforms and government officials, and actions by social media platforms to flag or take down posts or suspend accounts, and—with respect to Aspen—only an unspecified "coordinating" role.

### 2.    *Group Pleading Cannot Establish Personal Jurisdiction*

Plaintiffs' amended complaint added conclusory group allegations about "Defendants," including that "Defendants deliberately monitor and track speech on social media by Louisiana residents," and Defendants "assign[ed] analyst[s] specifically to Louisiana, … track[ed] [] speech's spread from Louisiana, and communicat[ed] with state officials in Louisiana about supposed disinformation."  ROA.23-30826.1657-58 (Am. Compl. ¶¶ 377-78) (second alteration original; *see also* ROA.23-30826.1657-60 (Am. Compl. ¶¶ 375-89) (additional putative jurisdictional allegations referring to "Defendants").

These allegations about "Defendants" are jurisdictionally irrelevant. There are ten separate defendants, and Plaintiffs are required to plead non-conclusory facts showing that each of them, *individually,* purposefully availed itself of the privilege of doing business in Louisiana. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) ("Each defendant's contacts with the forum State must be assessed individually."); *BMS*, 582 U.S. at 268. In any context where a plaintiff must plead that "each … defendant, th[r]ough the [defendant's] own individual actions," has engaged in the relevant conduct, this sort of "group pleading" is "insufficient." *Armstrong v. Ashley*, 60 F.4th 262, 274-75 (5th Cir. 2023) (disregarding generalized allegations about "Defendants" in the § 1983 context). It is "plainly unconstitutional" for a court to "consider[] 'defending parties' together and aggregat[e] their forum contacts." *Rush v. Savchuk*, 444 U.S. 320, 331-32 (1980).

Plaintiffs' allegation on "information and belief" that Defendants "acted in concert," ROA.23-30826.1660 (Am. Compl. ¶ 389), does not save their improper group pleading. Courts must evaluate "whether the plaintiffs ha[ve] made a prima facie case of specific personal jurisdiction" as to "each particular defendant," "individually and not as part of a conspiracy." *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 625 (5th Cir. 1999); *see also Chow v. United States*,

2021 WL 3438365, at *2 (5th Cir. Aug. 5, 2021) (explaining that *Thomas v. Kadish*, 748 F.2d 276 (5th Cir. 1984), "implicitly recognized that personal jurisdiction over one defendant conspirator is not sufficient to establish personal jurisdiction over a nonresident coconspirator"); *Bar Grp., LLC v. Bus. Intel. Advisors, Inc.*, 215 F. Supp. 3d 524, 539 (S.D. Tex. 2017) ("Allegations of conspiracy will not establish a prima facie case of personal jurisdiction[.]").

Because there is not a single allegation that identifies any contact with Louisiana by any specific, individual Defendant, the amended complaint fails to allege personal jurisdiction over any Defendant.

### 3.  *Even Plaintiffs' Group Allegations Are Insufficient to Establish Personal Jurisdiction*

Even if Plaintiffs' group pleading allegations could be considered, they would be insufficient to establish personal jurisdiction.

#### a.  *The Court Lacks Personal Jurisdiction Over Hines's Claims*

Hines alleges that she resides in Louisiana, runs two medical freedom groups, and operates Facebook groups with "followers" in Louisiana. Hines alleges that the Virality Project "tracks and flags 'medical freedom' groups" generally and "directly interferes with" these groups' efforts to protest

COVID-19 prevention measures "by pushing [social media] platforms to censor them."  ROA.23-30826.1657 (Am. Compl. ¶ 374).[6]

These allegations fall far short.  First, Hines does not actually allege facts suggesting that the VP monitored her posts or her groups' posts, flagged those posts to anyone, or even *knew* about her or her groups.  Rather, she alleges that VP targeted health or medical freedom groups "like" hers.  ROA.23-30826.1654 (Am. Compl. ¶ 362).  Thus, for example, when Hines alleges that, "[a]ccording to the VP report's taxonomy," she is a "'medical freedom influencer[]' who engages in the 'tactic' of Organized Outrage' because" she organizes events "to oppose mask and vaccine mandates," ROA.23-30826.1655 (Am. Compl. ¶ 364), what she is actually alleging is that the VP report describes such activities generally, and that she believes herself to fall in that category.  She is not alleging that the VP report described *her* as a medical freedom influencer; the VP Report does not mention Hines or her groups at all.  ROA.23-30826.930-1161.

---

[6]    Allegations about EIP's contacts are not relevant to Hines because she did not engage in election-related speech. *E.g.*, *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 275 (5th Cir. 2006) (contacts are irrelevant unless they are claim-specific).

Hines does allege that she experienced "censorship" and was "restricted" on Facebook in January 2022, May 2022, and April 2023. ROA.23-30826.1661-62 (Am. Compl. ¶¶ 394, 397). But she alleges that VP ceased its monitoring operations in August 2021—long before Hines was allegedly "censored." ROA.23-30826.1638 (Am. Compl. ¶ 281). In other words, even if facts alleged in the complaint would support an inference that the VP had contacts with Louisiana (they do not), no facts would support an inference that such contacts relate to Hines's claims.

Second, even if VP had flagged Hines's posts, binding precedent forecloses personal jurisdiction because no Defendant is alleged to have had any purposeful contacts with Louisiana. The complaint contains many conclusory allegations about "targeting Louisiana," but it alleges no facts suggesting that anyone at VP ever contacted Hines or anyone else in Louisiana or had any particular focus on Louisiana. The Virality Project Report, incorporated into the complaint, does not mention Louisiana.

Attempting to rest personal jurisdiction on the theory that VP's non-Louisiana actions had an *effect* in Louisiana—that VP contacted a non-Louisiana social media company, the company moderated Hines's posts, and that affected Hines in Louisiana—fails as a matter of law. The Supreme Court's

decision in *Walden* and this Court's decision in *Sangha* foreclose any argument that personal jurisdiction can be based on Hines's own—or third parties'—contacts with Louisiana.

In *Walden*, a Georgia law enforcement officer seized cash from two Nevadans passing through Georgia. 571 U.S. at 279-80. The officer "knew his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada." *Id.* at 279. Nonetheless, the officer lacked minimal contacts with Nevada because "no part of [his] course of conduct occurred in Nevada." *Id.* at 288. He "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Id.* at 289. And "mere injury to a forum resident is not a sufficient connection to the forum." *Id.* at 290. That holding disposes of Hines's claim because she alleges, at most, injury suffered in Louisiana from conduct occurring entirely outside the State.

*Sangha* confirms that conclusion. *Sangha* held that communications sent by an out-of-state defendant to an out-of-state third party cannot give rise to personal jurisdiction—even where those communications concern the plaintiff's work in the forum or interfere with a contract the plaintiff entered into in the forum. The plaintiff in *Sangha* filed suit in Texas against his former

employer, citing (1) an employment contract the plaintiff and defendant "allegedly confected in Houston"; (2) the defendant's out-of-state "email communications [that] were targeted at"—and sought to interfere with—"a contract formed in Texas"; and (3) the fact "that the [defendant's] emails concerned [the plaintiff's] work that was to be performed in Texas." 882 F.3d at 103. Those facts were "legally insufficient to support a finding of specific jurisdiction," even though the defendant's emails concerned plaintiff and his work in Texas and "affect[ed] [him] while he was at the Port of Houston." *Id.*

That the plaintiff felt the "effects" of the conduct in Texas was irrelevant, this Court explained, because "[t]he proper question is not whether [the plaintiff] experienced an injury or effect in a particular location, but whether [the defendant's] conduct connects it to the forum in a meaningful way." *Id.* at 103-04. And the plaintiff's "presence in the Gulf of Mexico/Port of Houston [was] largely a consequence of *his* relationship with the forum, and not of any actions [the defendant] took to establish contacts with the forum." *Id.* at 104.

*Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020), confirms that action by the defendant targeting the forum is essential to establish jurisdiction. There, the New Jersey Attorney General sent a cease-and-desist letter to a Texas company threatening legal action unless the company stopped

publishing information about 3D print firearms. *Id.* at 488-89. This Court held that the cease-and-desist letter supported jurisdiction because the attorney general "intentionally mailed [it] into Texas," and had "selective[ly] … targeted" the defendant while ignoring "many similarly-situated persons" in other states, *id.* at 493, 495. Critically, this Court held that "[n]one of [the other] actions" taken by the attorney general—which included sending "letters to third-party internet service providers based in California urging them to terminate their contracts with Defense Distributed"—"represent[ed] direct contacts with Texas." *Id.* at 489, 492.

In short, even if Hines had adequately alleged facts suggesting that someone affiliated with VP flagged her posts to an out-of-state social media company, resulting in moderation of her posts in Louisiana, this Court's settled precedents foreclose jurisdiction. Out-of-state emails about Hines could not establish jurisdiction even if the sender knew such emails might affect Hines in Louisiana. And Aspen, again, is not even alleged to be a member of VP.

Moreover, there is no allegation that the VP focused on Louisiana in particular. To the contrary, Defendants allegedly engaged in a nationwide campaign "across all 50 states." ROA.23-30826.1657 (Am. Compl. ¶ 373); *see also*

ROA.23-30826.1642 (Am. Compl. ¶ 303 ("national efforts")).  Indeed, that is the premise of Plaintiffs' putative nationwide class of "social-media users" comprising "hundreds or thousands of speakers" and "millions of followers." ROA.23-30826.1667 (Am. Compl. ¶¶ 423-24).  Plaintiffs' allegations that Defendants equally "targeted the many similarly-situated persons who publish … on the internet," *Defense Distributed*, 971 F.3d at 493, forecloses jurisdiction.  Hines's presence in Louisiana was nothing more than a "fortuity." *Id.* at 495.

> b.    *The Court Lacks Personal Jurisdiction Over Hoft's Claims*

Hoft is a resident of Missouri and operates the news site The Gateway Pundit from that state.  Hoft asserts that he engaged in speech relating to the 2020 election, but his actions did not occur in Louisiana: he does not allege that he has ever posted on social media in or even about Louisiana.  Even if EIP had monitored election speech in Louisiana or contacted "state officials" in Louisiana about such speech, as Hoft alleges, and even if such contacts could constitute purposeful availment, they would be irrelevant because they have no relationship to Hoft's claims.  Hoft's claims simply do not in any way "'arise out of or relate to the defendant's contacts' with the forum." *Ford*, 592 U.S. at 359 (cleaned up).  Under *BMS*, Hoft's decision to join his suit with that of a

Louisiana resident who asserts similar injuries does not save his claim.  582 U.S at 265.

In any event, no well-pleaded facts suggest that EIP had any contacts with Louisiana at all.  Plaintiffs allege monitoring of Louisiana speech "on information and belief" based on a statement in EIP's 2020 report.  ROA.23-30826.1657-58 (Am. Compl. ¶¶ 377-78).  The report states that "each [EIP student] analyst was assigned to a specific state or interest group (see Section 3.3)."  ROA.23-30826.145 (EIP Report at 9).  The referenced Section 3.3, in turn, describes misinformation "narratives" that EIP tracked, including in various states like Pennsylvania, Wisconsin, and others.  ROA.23-30826.185-233 (EIP Report at 49-97).  Louisiana is not mentioned in Section 3.3 or anywhere in the EIP report.

An allegation that EIP assigned analysts to review online election disinformation relating to every state does not establish purposeful availment "of the privilege of conducting activities *within* [any particular] forum state." *Sangha*, 882 F.3d at 101 (emphasis added); *Def. Distributed*, 971 F.3d at 493.  Indeed, this Court has repeatedly "rejected this 'greater includes the lesser' theory" of personal jurisdiction: it is emphatically not the law that a Defendant who "targets the entire United States … necessarily targets Louisiana."

*Admar Int'l, Inc. v. Eastrock, L.L.C.*, 18 F.4th 783, 787 (5th Cir. 2021) (citing cases). If it were otherwise, Defendants would have minimum contacts with *all 50 states* for no other reason than that they analyzed election disinformation related to each state. Plaintiffs can point to no decision of this or any other court supporting this result.

Plaintiffs also allege that, "on information and belief, Defendants communicate both with Louisiana government officials and with social-media platforms" to silence speech in Louisiana. ROA.23-30826.1659 (Am. Compl. ¶ 382). But the only *fact* alleged in support of that claim is that "CISA officials" at the Department of Homeland Security communicated with Louisiana government officials. *Id.* The document the complaint cites contains a few email chains in which Louisiana government officials reached out to CISA officials about election misinformation. *Id.* (citing *Louisiana v. Biden*, Doc. 266-5, at 192-200). EIP is not mentioned or copied on any of those emails. Aspen, moreover, is not even alleged to be a member of EIP.

Because Hoft has nothing to do with Louisiana, he offers an even more far-fetched theory of personal jurisdiction. He alleges that "Defendants" flagged his Missouri website to non-Louisiana social media platforms "to

ensure that it would not reach his substantial audiences in Louisiana and else-where." ROA.23-30826.1659 (Am. Compl. ¶ 386).

Critically, Hoft does not allege that Defendants had any "contact *with* the forum," *Carmona*, 924 F.3d at 194 (emphasis added) (quoting *Walden*, 571 U.S. at 284), aimed at preventing his speech from reaching Louisiana. Nor does he allege that Defendants had any particular concern about his speech reaching Louisiana, as opposed to "elsewhere." If anything, the complaint alleges that Louisiana was *not* a focus because EIP "prioritize[d] … swing states." ROA.23-30826.1616 (Am. Compl. ¶ 173).

Regardless, an allegation that contacts with California social media companies relating to a Missouri website had an "effect" in Louisiana—because the internet is available in Louisiana—cannot establish personal jurisdiction. In *Sangha*, there was no jurisdiction even though the plaintiff worked in the forum and the defendant was aware that the effects of its communications would be felt *principally* in the forum. 882 F.3d at 103-04 & n.3. *A fortiori* there is no jurisdiction where the plaintiff does not live or work or speak in the forum and Defendants had no reason to believe their actions would affect Louisiana more than anywhere else.

Hoft's theory if taken seriously would mean that anyone who takes any action relating to the internet subjects themselves to personal jurisdiction in every state.  That is not the law.

### 4.   *Exercising Personal Jurisdiction Would Be Unfair and Unreasonable*

Even if Defendants had minimum contacts with Louisiana (they do not), the exercise of personal jurisdiction still must be consistent with "traditional notions of fair play and substantial justice."  *Sangha*, 882 F.3d at 101.  Exercising jurisdiction here would be unfair and unreasonable.

*First*, the "burden" on Defendants is great.  *Id.* at 102.  Defendants are located in places far from Louisiana, including California, Washington, Colorado, New York, and the District of Columbia; and their witnesses and the relevant evidence are located in those states.

*Second* and *third*, Louisiana's and Plaintiff's "interests" here are minimal.  *Id.*  Only one Plaintiff resides in Louisiana.  Plaintiffs' claims concern conduct that occurred entirely outside the State with alleged nationwide effects.  *See Burstein v. State Bar of California*, 693 F.2d 511, 522 (5th Cir. 1982) ("The cause of action here is essentially unrelated to [defendant's] contacts with Louisiana[.]").  Indeed, Plaintiffs seek to certify a nationwide class, the vast majority of which are non-residents.  Only one of the ten attorneys who

signed the complaint is barred in the state—seven are based in Washington, D.C., and two in Missouri.

*Fourth*, the "interstate judicial system[]" will be best served if this case is adjudicated in a different forum. *Id.* at 521. "[A]ny witnesses likely to be called, other than [Hines] herself, are located outside of Louisiana." *Id.* at 522.

*Finally*, the "shared interest of the several States in furthering fundamental substantive social policies" supports dismissal. *Id.* at 521. Plaintiffs ask the district court—which sits in a district and state that have essentially no connection to their claims—to issue orders and judgments with nationwide effects. That does a great disservice to the federalism and anti-forum-shopping principles that underlie the due process limitations on personal jurisdiction.

\* \* \*

For the foregoing reasons, this Court should vacate the decision denying arbitration and remand with instructions to dismiss for lack of personal jurisdiction. *PaineWebber*, 260 F.3d at 464.

## II.    If this Court Reaches the Question, It Should Reverse and Order the District Court to Compel Arbitration

If this Court reaches the arbitration question, it should reverse. The Federal Arbitration Act requires courts to compel arbitration if a valid

agreement to arbitrate exists, and the dispute falls within the scope of that agreement. *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 396 (5th Cir. 2006). Plaintiffs entered into arbitration agreements covering disputes arising from their use of the social media accounts at issue here, and Defendants are entitled to enforce these agreements under well-settled equitable estoppel principles.

### A.     Plaintiffs Entered into Binding Arbitration Agreements

Plaintiffs concede that they entered into terms of service agreements with the social media companies that include arbitration clauses.  ROA.23-30826.3800.  Plaintiffs specifically allege that they accepted the terms of service governing use of each social media platform, and that they entered into binding contractual agreements through those terms of service.  ROA.23-30826.1592 (Am. Compl. ¶ 50).  Plaintiffs allege that their posts or accounts were censored by Facebook (Hoft and Hines) and Twitter (Hoft) pursuant to the content moderation policies in those same terms of service.  ROA.23-30826.1595-97, 1610, 1637, 1674 (Am. Compl. ¶¶ 64-71, 141-42, 278, 456).  And both the Facebook and Twitter terms require arbitration of claims that "aris[e] out of or relat[e] to" the terms of service or the use of Facebook or Twitter.     ROA.23-30826.1430 (Facebook Terms §§ 5.b, 5.c); ROA.23-

30826.1440 (Twitter Terms, General Terms § 6.a); *see supra* Statement of the Case, Section C.

### B. Defendants Are Entitled to Enforce the Arbitration Agreements

Equitable estoppel doctrine allows Defendants to enforce Plaintiffs' arbitration agreements even though Defendants are non-signatories. "[W]henever the relevant state law would make a contract to arbitrate a particular dispute enforceable by a nonsignatory, that nonsignatory is entitled to" compel arbitration under the FAA. *Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 255, 257 (5th Cir. 2014) (applying equitable estoppel).

Here, federal law and California law apply to the equitable estoppel question. Plaintiffs did not dispute below that the federal law announced in *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524 (5th Cir. 2000), applies with respect to the Twitter Terms. Those terms contain a choice-of-law clause selecting federal law to govern interpretation and enforcement of the arbitration agreement, ROA.23-30826.1441 (Twitter Terms, General Terms § 6.k), and Louisiana contract law provides that the parties' choice-of-law clause governs, *Ottemann v. Knights of Columbus*, 36 F.4th 600, 605 (5th Cir. 2022); *see Crawford Pro. Drugs*, 748 F.3d at 255 (applying state law from agreement's

44

choice-of-law clause).[7]  California equitable estoppel principles apply with respect to the Facebook agreement.   ROA.23-30826.1430 (Facebook Terms § 5.c.ii).

As this Court explained in *Grigson*, signatories to an agreement containing an arbitration clause (like Plaintiffs here) cannot "'have it both ways': [they] cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Grigson*, 210 F.3d at 528.  Allowing a signatory to avoid arbitration "would be especially inequitable," this Court has emphasized, "where, as here, a signatory non-defendant is charged with interdependent and concerted misconduct with a non-signatory defendant." *Id.*

Under *Grigson* and subsequent decisions, a non-signatory may enforce an arbitration agreement against a signatory plaintiff under either of two independent tests: "(1) when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against a non-signatory; or (2) when the signatory raises allegations

---

[7]    In any event, Louisiana courts have "adopted" *Grigson*'s federal-law equitable estoppel principles. *See Acad. of Sacred Heart of New Orleans v. Certain Underwriters at Lloyd's London*, 51 F. Supp. 3d 822, 828 n.19 (E.D. La. 2023).

of substantially interdependent and concerted misconduct by both the non-signatory and one or more signatories to the contract." *Brown*, 462 F.3d at 398 (citing *Grigson*, 210 F.3d at 527); *see, e.g.*, *Noble Cap. Grp. v. US Cap. Partners, Inc.*, 2021 WL 3477481, at *3 (5th Cir. Aug. 6, 2021).

California likewise applies equitable estoppel if (1) the plaintiff's claims "rely" on or are "founded" or "intertwined" in the agreement containing the arbitration clause, or (2) if the plaintiff alleges "substantially interdependent and concerted misconduct" between the signatory and non-signatory that is connected to the obligations of the underlying agreement. *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128-29 (9th Cir. 2013) (quoting *Goldman v. KPMG LLP*, 173 Cal. App. 4th 209, 219, 221 (2009)).

The district court held that *Hernandez v. Meridian Management Services, LLC*, 87 Cal. App. 5th 1214 (2d Div. 2023), categorically eliminated equitable estoppel under California law. ROA.23-30826.3803. It did not and could not. As this Court held in compelling arbitration in *Crawford Professional Drugs*, California's equitable estoppel doctrine is "well-established" in multiple court of appeals decisions. 748 F.3d at 260-61. Since *Hernandez* was decided, California courts have continued to invoke and apply the doctrine. *E.g.*, *Beach Orangethorpe Hotel, LLC v. Evertrust Bank*, 2023 WL 7320584, at *4

(Cal. Ct. App. Nov. 7, 2023). *Hernandez* does not even appear to have addressed the form of equitable estoppel invoked here, and in any event at most the court there held only that equitable estoppel was not satisfied in that particular case.

Accordingly, under California law as under *Grigson*, non-signatories may enforce arbitration agreements, including where the plaintiff's claims "are based on the same facts and are inherently inseparable from arbitrable claims" that could be lodged "against signatory defendants" or are "intertwined with" the contract containing the arbitration provision. *Franklin v. Cmty. Reg'l Med. Ctr.*, 998 F.3d 867, 870-71, 875 (9th Cir. 2021) (quoting *Metalclad Corp. v. Ventana Env't Organizational P'ship*, 109 Cal. App. 4th 1705, 1713 (2003)).

Though either is sufficient, Defendants are entitled to compel arbitration under both tests outlined in *Grigson* and in California law.

### 1.  *Plaintiffs Rely on the Written Terms Containing the Arbitration Provision*

Plaintiffs rely on Facebook's and Twitter's terms of service—which contain the arbitration clauses—in asserting their claims against Defendants. The principal focus of this litigation is the social media platforms' content moderation policies, which are part of the terms of service. Plaintiffs allege the

existence of the terms of service in the very first substantive paragraph of the complaint.  ROA.23-30826.1592 (Am. Compl. ¶ 50).  Plaintiffs then allege that Defendants, through the EIP and the VP, "pushed social-media platforms" to alter their platform standards and content moderation policies, and then "pushed the platforms to enforce them" by "repeatedly flagg[ing] content for censorship" under the "more aggressive censorship practices" they had allegedly pushed platforms to adopt.  ROA.23-30826.1595-97, 1632-35 (Am. Compl. ¶¶ 63-71, 257-70).  These platform standards and content moderation policies are all expressly incorporated into, and part of, the terms of service that contain the arbitration agreements Defendants seek to enforce.[8]

Thus the underlying basis for every count in the complaint, including the claims that Defendants violated federal civil rights law and the First Amendment, is Plaintiffs' allegation that they had a right to post freely pursuant to

---

[8]   For example, Twitter's "Civic Integrity Misleading Information Policy," incorporated into the Twitter Terms, ROA.23-30826.1438, prohibits the spread of "false or misleading information" about elections and describes Twitter's right to label or delete posts or to block or "permanently suspend[]" accounts. ROA.23-30826.1457-58, 1461-64.  Facebook's content moderation policies are included in Facebook's Community Standards, which, for example, describe Facebook's policy of removing "[m]isinformation about vaccines" and misinformation about elections.  ROA.23-30826.1471-73 (Facebook Community Standards §§ II, III).  The Facebook Terms that contain the arbitration agreement incorporate (and require users to abide by) Facebook's Community Standards.  ROA.23-30826.1429, 1486.

their agreements with social media platforms; that Defendants interfered with that right by identifying Plaintiffs' social media posts as violating the platforms' content policies; and that Defendants flagged those posts to the platforms, which, in turn, applied (or misapplied, per Plaintiffs) these contractual policies, causing Plaintiffs' claimed injuries.    ROA.23-30826.1595-97, 1610, 1637, 1671, 1673-77 (Am. Compl. ¶¶ 64-71, 141-42, 278, 444-445, 452, 456, 461-63, 469-70).    Plaintiffs do not simply rely on the terms of service incorporating the content moderation policies—those terms and policies are critical to their claims.

In addition, Count Four specifically alleges tortious interference with the "contractual relations" between Plaintiffs and social media companies that were established when Plaintiffs accepted the terms of service.    ROA.23-30826.1674 (Am. Compl. ¶ 460).    And Count Five alleges that "Defendants and those acting in concert with them" have a "duty … not to interfere" with Plaintiffs' "rights" to "communicate freely on social media," and alleges that Defendants are "breach[ing] this duty" "without justification" by "procuring and inducing … censorship" of social media posts.    ROA.23-30826.1676-77 (Am. Compl. ¶¶ 469-70).    The alleged existence of a "duty" not to interfere with these "rights," and the allegations that Defendants are "without justification"

for flagging posts to social media companies, are necessarily grounded in the terms of service under which Plaintiffs are permitted to use social media platforms, and whether Plaintiffs' posts violated those terms and policies.

This Court has applied equitable estoppel to allow non-signatories to compel arbitration on a "reliance" theory on allegations analogous to (or more attenuated than) those here.  For example, in *Crawford Professional Drugs*, this Court applied California's equitable estoppel rule to compel arbitration at the behest of non-signatory pharmacy defendants who were alleged to have misused patient and prescription information.  Plaintiffs' claims were "founded in" the contract containing the arbitration clause because the allegedly misused information "would not have been provided but for the Plaintiffs'" agreement to the contract, and because use of the information was governed by the contract.  748 F.3d at 260-61.  Likewise, the plaintiffs' claims that they were improperly "denied access to and participation in" a pharmacy network were "founded in" the contract because the contract governed "terms of and eligibility to participate in" the network.  *Id.* at 261.

*Crawford*'s logic compels equitable estoppel here.  Plaintiffs' claims that they were improperly restricted from posting on Facebook and Twitter rely

on and are founded in the Facebook and Twitter terms of service because those terms govern the "terms of and eligibility to" use Facebook and Twitter.

Similarly, in *O'Conner v. AT&T Corporation*, plaintiffs' claims that non-signatory defendant Apple "unduly influenced" AT&T to throttle their wireless data service satisfied the "intertwined-claims test" because they necessarily relied on plaintiffs' service agreements with AT&T and required the court to "interpret" those agreements—even though plaintiffs' claims were cast in tort as well as contract. 2013 WL 3107496, at *1, *4 (M.D. La. June 18, 2013); *see In re Apple & AT&TM Antitrust Litig.*, 826 F. Supp. 2d 1168, 1178 (N.D. Cal. 2011) (requiring arbitration where non-signatory allegedly "jointly subverted rights" with signatory AT&T). And applying California law in *Uptown Drug Co. v. CVS Caremark Corp.*, 962 F. Supp. 2d 1172, 1184-85 (N.D. Cal. 2013), the court compelled arbitration with a non-signatory because the terms of the agreement "expressly addresse[d] the use, dissemination, and ownership of the customer information that Defendants allegedly misappropriated"—just as the terms of service here expressly incorporate the content moderation policies that Defendants allegedly flagged Plaintiffs' posts as violating.

In short, Plaintiffs allege that Defendants violated federal and state law by encouraging the platforms to adopt stricter content moderation policies and by encouraging enforcement by flagging content as violating those policies. Because those policies are contained within the written terms of service agreements, Plaintiffs are "rely[ing] on the terms of the written agreement" with the social media platforms "in asserting [their] claims against a non-signatory"—namely, Defendants—and Defendants are entitled to enforce the arbitration provision contained in that written agreement. *Brown*, 462 F.3d at 398 (quoting *Grigson*, 210 F.3d at 527).

The district court below did not address any of these arguments. Instead, the court stated that the reliance test was not satisfied for one reason: the amended complaint—filed after the original Defendants moved to compel arbitration—"specifically alleges that Plaintiffs do not seek to enforce the terms of service agreements." ROA.23-30826.3801 (citing Am. Compl. ¶ 50).

That was legal error. The test is whether Plaintiffs "rely" on the terms of service, not whether they seek to "enforce" them in the sense of bringing a breach of contract claim. The fact that claims "are cast in tort rather than contract" does not preclude equitable estoppel, and Defendants need not establish that Plaintiffs "exclusively" rely on the contract. *Boucher v. All. Title*

*Co.*, 127 Cal. App. 4th 262, 272 (2005). Indeed, the very point of the equitable estoppel inquiry is to decide when non-parties to the contract—against whom there could be no breach of contract claim—can invoke arbitration.

Moreover, "it is the substance of the plaintiff's claim that counts," not the self-serving manner in which the plaintiff describes a claim. *Franklin*, 998 F.3d at 875. A district court "abuse[s] its discretion" when it "uncritically accept[s]" a party's "conclusory assertions" instead of analyzing the relevant factual allegations or evidence. *Def. Distributed v. Bruck*, 30 F.4th 414, 434 (5th Cir. 2022). The district court abused its discretion by treating Plaintiffs' conclusory legal assertion about "enforcement" as dispositive without addressing the substance of the allegations.

### 2. *Plaintiffs Allege Substantially Interdependent and Concerted Misconduct*

This Court should enforce the arbitration agreement for the additional, independent reason that Plaintiffs "raise[] allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more signatories to the contract," *i.e.*, Facebook and Twitter. *Brown*, 462 F.3d at 398 (citing *Grigson*, 210 F.3d at 527). The alleged concerted misconduct is also "bound up with the terms and duties of the contract." *Goldman*, 173 Cal. App. 4th at 225.

a.   *The Amended Complaint Alleges Substantially Interdependent and Concerted Misconduct*

Plaintiffs' original complaint was replete with allegations that Defendants "collude[d]" with Facebook and Twitter "to monitor and censor disfavored speakers and content."   ROA.23-30826.31, 55 (Compl. ¶¶ 2, 127).   The complaint contained a section entitled "Social-Media Platforms Collaborate Closely with the EIP to Censor Speech," and asserted that the platforms "participate directly in the EIP" and that EIP has "privileged access" to the platforms.   ROA.23-30826.55 (Compl. 26, ¶¶ 127-29).   Another section alleged that "The Virality Project Collaborates and Colludes with Social-Media Platforms," ROA.23-30826.87 (Compl. 58); described "input" from the "platforms" as "crucial" to VP's activities, ROA.23-30826.81 (Compl. ¶ 254); and stated that "Twitter gave SIO … privileged access" to certain platform data "long before the VP officially launched," ROA.23-30826.88 (Compl. ¶ 294).

After the original Defendants moved to compel arbitration, Plaintiffs amended their complaint, deleted much—but not all—of the language alleging "collaboration" between the EIP and VP and social media platforms, and replaced it with language alleging that EIP and VP "coerce[d]" social-media platforms.   ROA.23-30826.1579 (Am. Compl. 2).

54

Plaintiffs' efforts to rewrite their complaint to evade arbitration fail. First, even ignoring the allegations that Plaintiffs strategically deleted, the facts alleged in the amended complaint belie its conclusory assertions of coercion and pressure. For example, Plaintiffs allege that only "35% of the URLs [that EIP] shared with Facebook, Instagram, Twitter, TikTok, and YouTube were either labeled, removed, or soft blocked." ROA.23-30826.1617 (Am. Compl. ¶ 179). That means the companies declined to act on 65% of URLs sent to them—demonstrating that they were exercising independent judgment. EIP internal emails reflecting on this figure note that the platforms' response "is ultimately up to the platforms and not the partnership." ROA.23-30826.2001 (Am. Compl., Ex. 19).

The amended complaint also contains extensive factual allegations recounting emails reflecting that the social media platforms worked with EIP and VP voluntarily, not as a result of coercion. ROA.23-30826.1632-36 (Am. Compl. ¶¶ 260-70). Indeed, the complaint still directly alleges that Defendants are "cooperating with social-media platforms." ROA.23-30826.1579 (Am. Compl. ¶ 2). Documents incorporated into the amended complaint make this clear as well. *See* ROA.23-30826.1167 (Compl., Ex. 16) (Twitter: "We would *LOVE* to partner closely on anything in the [Internet Observatory]

universe"); ROA.23-30826.1162 (Compl., Ex. 11) (email asking if Twitter "would be interested" in "collaborat[ing]" on VP project); ROA.23-30826.1943 (Am. Compl., Ex. 19) (Facebook is "grateful" for how VP "contributed to [Facebook's] policies on COVID-19 misinformation").

Plaintiffs' factual allegations thus leave no doubt that platforms worked with Defendants voluntarily and exercised their own judgment. Courts cannot credit conclusory allegations in a complaint—like Plaintiffs' refrain of "pressure and coercion" here—that are undercut by the complaint's own factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568-69 (2007) (conspiracy allegation not plausible when "the complaint itself gives reasons to believe" that a "conspiracy was not suggested by the facts"). Because Plaintiffs' claims depend entirely on the platforms' actions—they do not allege that Defendants could unilaterally take action on their posts—the claims necessarily allege interdependent and concerted misconduct. And that alleged misconduct is intimately related to the contractual agreement that contains both the arbitration agreement and the moderation policies at issue in this case.

Second, even if Plaintiffs had plausibly alleged that Defendants coerced platforms into moderating their posts, Plaintiffs' allegations would *still* "depend[], in some part, upon the nature of tortious acts allegedly committed by"

the signatory platforms. *Brown*, 462 F.3d at 399. Absent Plaintiffs' allegations that the signatory social media platforms wrongfully censored Plaintiffs' social media activity, Plaintiffs would—by the terms of their own amended complaint—have no alleged causes of action or injuries at all. Nothing about the interdependent misconduct test turns on *why* the signatories engaged in the alleged misconduct. If it did, plaintiffs could always defeat equitable estoppel merely by alleging coercion. The whole point of enforcing an arbitration clause is that disputes about the character and merits of the defendants' challenged actions should be for the arbitrator, not the court.

Courts in this Circuit and in California accordingly invoke equitable estoppel to enforce arbitration agreements at the request of non-signatories even where the non-signatories are alleged to bear primary responsibility for the conduct at issue. As discussed above, equitable estoppel required plaintiffs to arbitrate claims that non-signatory Apple "unduly influenced" signatory AT&T to throttle their wireless transfer speed. *O'Conner*, 2013 WL 3107496, at *4. Claims of undue influence, the court held, "clearly refer to 'concerted misconduct.'" *Id.*; *see, e.g.*, *Koenig v. Ritz-Carlton Hotel Co., LLC*, 2021 WL 5855608, at *4 (E.D. La. June 24, 2021) (requiring arbitration with non-signatory hotels because plaintiff's claims against those hotels were "predicated on

her ability" to prove misconduct by signatory hotel); *Salas v. Universal Credit Servs., LLC*, 2019 WL 1242448, at *3-4 (S.D. Cal. Mar. 18, 2019).

> b.     *Plaintiffs' Admissions in the Original Complaint Confirm That They Allege Substantially Interdependent and Concerted Misconduct*

Although this Court need not reach the issue because the amended complaint alleges concerted and interdependent misconduct, the Court may appropriately consider the original complaint's allegations that the social media platforms cooperated with Defendants. "Admissions in superseded pleadings may 'lose their binding force,' but they nevertheless retain value 'as evidentiary admissions.'" *Sanders v. Univ. of Texas Pan Am.*, 776 F. App'x 835, 837-38 (5th Cir. 2019) (quoting *White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 n.5 (5th Cir. 1983)).

Consideration of Plaintiffs' admissions is especially warranted because the amendment itself was driven by strategic considerations. "A party cannot amend pleadings to directly contradic[t] an earlier assertion made in the same proceeding." *Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 600 (9th Cir. 2014) (internal quotation marks omitted).

The Eastern District of Texas's decision in *Advanced Neuromodulation Sys., Inc. v. Advanced Bionics Corp.*, 2005 WL 8161795 (E.D. Tex. Jan. 28,

2005), is directly on point. There, as here, a plaintiff asserted various claims including tortious interference with a contract. *Id.* at *1. After the non-signatory defendant invoked equitable estoppel and moved to compel arbitration, the plaintiff amended its complaint to drop the tortious interference claims and to delete references to the contract. *Id.* at *1. The court explained that the amended complaint was, "at least in part, drafted in an effort to circumvent the arbitration provisions." *Id.* at *4. It compelled arbitration based on the original complaint, noting that the plaintiff's effort to "completely change its tune … is exactly the type of inequitable conduct the Fifth Circuit in *Grigson* sought to prevent by recognizing the equitable estoppel exception." *Id.* at *4. So too here.

> c.    *The District Court's Contrary Analysis Was an Abuse of Discretion*

The district court abused its discretion in concluding that the interdependent and concerted misconduct test was not satisfied because Plaintiffs alleged coercion, and therefore the "concerted misconduct is between Defendants and government officials," not the social media platforms. ROA.23-30826.3802. First, the court simply accepted Plaintiffs' conclusory allegation, but the law required it to analyze the "substance," *Franklin*, 998 F.3d at 875, *i.e.*, the actual facts asserted in the complaint relating to the platforms' work

59

with Defendants. Its failure to do so is an abuse of discretion. *Def. Distributed*, 30 F.4th at 433-34.

Second, the legal test is *whether* the signatories and the defendants engaged in interdependent and concerted misconduct, not *why*. The court made no effort to explain why contested allegations that the signatories worked with Defendants due to government pressure should affect the outcome. An error of law is always an abuse of discretion. *Grigson*, 210 F.3d at 528.

Third, the court did not explain its decision to disregard the evidentiary admissions in the original complaint. "[I]gnoring … relevant evidence" is an "abuse[] of discretion." *McKinney ex rel. N.L.R.B. v. Creative Vision Res., L.L.C.*, 783 F.3d 293, 298 (5th Cir. 2015).

### 3. The Court's Other Rationales for Denying Arbitration Are Foreclosed by Binding Precedent

The district court offered two additional rationales for denying arbitration, but each fails as a matter of law.

First, the district court noted that, "[a]ccording to the allegations," Plaintiffs were Defendants' "victims," and held that compelling arbitration would be "inequitable" under the "unclean hands" doctrine. ROA.23-30826.3802. This Court's decision in *Weber v. PACT XPP Techs., AG*, 811 F.3d 758 (5th Cir. 2016), forecloses that conclusion. *Weber* held that a contractual

forum selection clause was enforceable despite the plaintiffs' unclean hand claims because "the enforceability determination should be made without reference to the underlying merits." *Id.* at 775. "[T]he unclean-hands notion puts the cart before the horse: It would require this court to reach the merits of the dispute to determine whether to uphold the FNC dismissal." *Id.* Courts considering enforcement of arbitration clauses "have no business weighing the merits of the grievance [or] considering whether there is equity in a particular claim." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986).

That rule applies equally when the party invokes equitable estoppel to enforce a contract. *See In re Lloyd's Reg. N. Am., Inc.*, 780 F.3d 283, 293 (5th Cir. 2015) (rejecting the notion that a "plaintiff can deny a defendant access to equitable remedies just by alleging fraud").

Second, the court stated that compelling arbitration would be inequitable because Plaintiffs allege violations of a "fundamental right," the First Amendment. ROA.23-30826.3803. But "fundamental rights"—such as the constitutional right to a jury trial—are always at issue when arbitration agreements are enforced. *Cf. Kindred Nursing Centers Ltd. P'ship v. Clark*, 581

U.S. 246, 253 (2017). This theory would render the equitable estoppel doctrine a nullity.

### 4. The Arbitrator Should Decide the Enforcement Question

Under this Court's precedent, determining whether a non-signatory may enforce an arbitration clause is a question for the court. *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 399 (5th Cir. 2022). Defendants preserve for further review the position that such a question is for the arbitrator where (as here) an arbitration agreement delegates enforceability questions to the arbitrator. *E.g., Swiger v. Rosette*, 989 F.3d 501, 507 (6th Cir. 2021).

### C. Plaintiffs' Claims Fall Within the Broad Scope of the Arbitration Agreements

"Ordinarily, whether a claim is subject to arbitration is a question for a court." *Crawford Pro. Drugs*, 748 F.3d at 262. "However, if the parties have clearly and unmistakably agreed to arbitrate arbitrability, certain threshold questions—such as whether a particular claim is subject to arbitration—are for the arbitrator, and not a court, to decide." *Id.* (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Plaintiffs conceded below that the Twitter Terms "clearly and unmistakably" assign scope questions to the

arbitrator.  In any event, Plaintiffs' claims fall comfortably within the scope of both the Facebook and Twitter agreements.

### 1. The Twitter Agreement Assigns Scope Questions to the Arbitrator

The Twitter Terms clearly and unmistakably assign questions of scope to the arbitrator.  First, the plain text assigns questions about "whether a Dispute is subject to arbitration" to the "arbitrator."  ROA.23-30826.1440 (Twitter Terms, General Terms § 6.c).  Second, the Twitter Terms adopt the "AAA's Consumer Arbitration Rules."  *Id.*  And "the express adoption of [the AAA] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."  *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012).

Accordingly, the Court must order Plaintiff Hoft to arbitration without considering whether his claims fall within the agreement's scope.

### 2. Plaintiffs' Claims Fall Within the Arbitration Agreements' Scope

In any event, both Plaintiffs' claims fall squarely within the scope of the Twitter and Facebook arbitration provisions.  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983).  Even absent this strong presumption, Plaintiffs' claims would be arbitrable.

The Twitter arbitration provision applies to "any disputes, claims, or controversies arising out of or relating to these Terms, the marketing of Paid Services, and/or your participation in the Paid Services." ROA.23-30826.1440 (Twitter Terms, General Terms § 6.a). "Paid Service" includes "Twitter Blue." ROA.23-30826.1438 (Twitter Terms, Preamble). Plaintiff Hoft's claims arise out of and relate to the terms and to his participation in Twitter Blue because he alleges that his Twitter posts have been censored in violation of the terms.

The Facebook arbitration provision applies to any "claim, cause of action, or dispute that arises out of or relates to any access or use of the [Facebook] Products for business or commercial purposes ... between you and [Facebook]." ROA.23-30826.1430 (Facebook Terms § 5.b). Plaintiffs' claims that their Facebook posts were improperly censored arise out of and relate to their access or use of Facebook for business or commercial purposes. As explained, both Plaintiffs allege that they use Facebook for business or commercial purposes, including to manage "Pages," and their claimed damages here are purported "loss of profits" and "loss of business and economic opportunities." *Supra* Statement of the Case, Section C.

The arbitration provision's use of the phrase "between you and [Facebook]" does not render the claims here non-arbitrable. The dispute here *is*

between Plaintiffs and Facebook, notwithstanding that Plaintiffs elected to sue only Defendants rather than Facebook to try to avoid arbitration. The entire purpose of the equitable estoppel doctrine is to determine when arbitration agreements covering disputes between two parties apply to a third party—and to prevent plaintiffs from avoiding arbitration clauses by suing only non-signatories for conduct and claims that also run against a signatory to the agreement. *Grigson*, 210 F.3d at 528; *Franklin*, 998 F.3d at 875. Accordingly, if the claims at issue would fall within the scope of the arbitration clause if lodged against the signatory, the court must compel arbitration.

This Court has repeatedly compelled arbitration at the request of a non-signatory even where the arbitration agreement referred to claims between the plaintiff and the signatory. For example, in *Stinger v. Chase Bank, USA, NA*, 265 F. App'x 224, 225-28 (5th Cir. 2008), the *Grigson* equitable estoppel test compelled arbitration of claims against J.P. Morgan on the basis of an arbitration agreement covering claims "by either [plaintiff] or [Chase Bank] against the other … relating in any way" to plaintiff's Chase account. Because plaintiff's "claims against [J.P. Morgan] relate to his credit card issuer's obligations to him, those claims are dependent upon the contracts he entered into with Chase regarding the cards." *Id.* at 228.

Likewise, in *Jureczki v. Bank One Tex., N.A.,* 75 F. App'x 272, 275 (5th Cir. 2003), this Court held that a district court "correctly" applied *Grigson* to compel arbitration under an equitable estoppel theory in the context of an arbitration agreement covering claims "by either you or the Bank against the other" relating to the plaintiff's account with the bank. *Jureczki v. Bank One Tex., N.A.*, 252 F. Supp. 2d 368, 372 (S.D. Tex. 2003). This Court explained that all of the allegations related to the bank account, and held that the plaintiffs' claims against non-bank defendants were arbitrable because at the "heart of each of the [plaintiffs'] claims is the allegation that all Defendants acted in concert." 75 F. App'x at 275; *see, e.g., Ryan v. Thunder Restorations, Inc.*, 2011 WL 2680482, at *3, *8 (E.D. La. July 8, 2011) (holding that scope question turns on whether challenged acts of the "signatory … would themselves fall within the scope of the arbitration agreement" and invoking equitable estoppel where contract required arbitration of "disputes … between Customer and [the signatory]"); *Hardee v. CMH Homes, Inc.*, 2021 WL 2187932, at *1, *3 (E.D. La. May 28, 2021) (similar); *In re Apple & AT&TM Antitrust Litig.*, 826 F. Supp. 2d at 1170 (compelling arbitration as to non-signatory Apple where the clause covered claims "between the purchaser and [AT&T]").

**D.**     **This Court Should Strike the Class Claims and Order Individual Arbitration**

In addition to agreeing to arbitrate, Plaintiffs also agreed that they would not bring any disputes as part of a class action.   ROA.23-30826.1430, 1441.   That agreement is valid and binding, and the Court should order the district court to strike the purported class claims.   *E.g.*, *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 238-39 (2013).

## CONCLUSION

The Court should vacate and remand with instructions to dismiss for lack of jurisdiction.   Alternatively, the Court should reverse and remand with instructions to grant the arbitration motions.

Dated:  February 26, 2024

Respectfully submitted,

/s/ Mary E. Gately.

Mary E. Gately
Samantha L. Chaifetz
DLA PIPER LLP (US)
500 Eighth Street NW
Washington, DC 20004
(202) 799-4507
mary.gately@us.dlapiper.com

Marie Bussey-Garza
DLA PIPER LLP (US)
1650 Market Street, Suite 5000
Philadelphia, Pennsylvania 19103
(215) 656-3300
marie.bussey-garza@us.dlapiper.com

*Counsel for Graphika and Camille François*

/s/ John B. Bellinger III

John B. Bellinger III
Elisabeth S. Theodore
R. Stanton Jones
Stephen K. Wirth
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 20001
(202) 942-5000
john.bellinger@arnoldporter.com

*Counsel for Alex Stamos, Renée DiResta, the Board of Trustees of the Leland Stanford Junior University, and the Leland Stanford Junior University*

/s/ Andrew J. Pincus

Andrew J. Pincus
Archis A. Parasharami
Kevin S. Ranlett
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
apincus@mayerbrown.com

Elizabeth M. Carmody
COOK, YANCEY, KING & GALLOWAY
333 Texas Street, Suite 1700
P.O. Box 22260
Shreveport, LA 71120-2260
318-221-6277
elizabeth.carmody@cookyancey.com

*Counsel for the Aspen Institute*

/s/ Andrew B. Johnson
Andrew B. Johnson
BRADLEY ARANT BOULT
  CUMMINGS LLP
1819 Fifth Ave. N.
Birmingham, Alabama 35203
(205) 521-8000
ajohnson@bradley.com

Karl V. Hopkins
BRADLEY ARANT BOULT
  CUMMINGS LLP
JPMorgan Chase Tower
600 Travis Street, Suite 5600
Houston, Texas 77002
(713) 576-0310
khopkins@bradley.com

Jon K. Guice
HAMMONDS, SILLS, ADKINS, GUICE,
  NOAH & PERKINS, L.L.P.
1881 Hudson Circle
Monroe, Louisiana 71201
(318) 324-0101
jguice@hamsil.com

Shelton Dennis Blunt
PHELPS DUNBAR LLP
II City Plaza 400 Convention St.,
Suite 1100
Baton Rouge, Louisiana 70802
(225) 346-0285
dennis.blunt@phelps.com

*Counsel for the Atlantic Council and
Graham Brookie*

/s/ Alex B. Rothenberg
Alex B. Rothenberg
Makala L. Graves
GORDON, ARATA, MONTGOMERY,
  BARNETT, MCCOLLAM,
  DUPLANTIS & EAGAN, LLC
201 St. Charles Avenue, 40th Floor
New Orleans, Louisiana 70170-4000
(504) 582-1111
arothenberg@gamb.com

Robert M. McKenna
Daniel Dunne
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
(206) 839-4300
ddunne@orrick.com

Geoffrey Shaw
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
355 S. Grand Ave., Ste. 2700
Los Angeles, California 90071
(213) 629-2020
geoffreyshaw@orrick.com

*Counsel for Kate Starbird*

## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2024, the foregoing document was electronically filed with the Court via the appellate CM/ECF system, and that copies were served on counsel of record by operation of the CM/ECF system on the same date.

Dated:  February 26, 2024          /s/ *John B. Bellinger III*
                                   John B. Bellinger III

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 12,994 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fifth Circuit Rule 32.2. This brief complies with the typeface and type style requirements of Fifth Circuit Rule 32.1 and Fed. R. App. P. 32(a)(5) and 32(a)(6), respectively, because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in Century 14-point font.

Dated:  February 26, 2024                    _/s/ *John B. Bellinger III*_____
                                             John B. Bellinger III