**No. 23-30826**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

JILL HINES, on behalf of herself and others similarly situated; JIM HOFT, on behalf of himself and others similarly situated,

Plaintiffs-Appellees,

v.

ALEX STAMOS; RENEE DIRESTA; BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY; LELAND STANFORD JUNIOR UNIVERSITY; KATE STARBIRD, in her official and individual capacities; GRAPHIKA; CAMILLE FRANÇOIS; ATLANTIC COUNCIL; and GRAHAM BROOKIE,

Defendants-Appellants.

*consolidated with*,                **No. 23-30916**

JILL HINES, on behalf of herself and others similarly situated; JIM HOFT, on behalf of himself and others similarly situated,

Plaintiffs-Appellees,

v.

THE ASPEN INSTITUTE,

Defendant-Appellant,

———————————

On Appeal from the United States District Court
for the Western District of Louisiana

## BRIEF FOR APPELLEES

D. John Sauer
Michael E. Talent
JAMES OTIS LAW GROUP, LLC
13321 N. Outer Forty Rd., Ste. 300
St. Louis, MO 63017
(314) 562-0031
*Counsel for Plaintiffs-Appellees*
*(Additional Counsel listed on inside cover)*

Gene P. Hamilton
Reed D. Rubinstein
Nicholas R. Barry
Michael Ding
Juli Z. Haller
James K. Rogers
Andrew J. Block
AMERICA FIRST LEGAL
611 Pennsylvania Ave SE #231
Washington, DC 20003
(202) 964-3721
*Counsel for Plaintiffs-Appellees*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

No. 23-30916 – *Hines et al. v. Aspen Institute*
*consolidated with,*
No. 23-30826 – *Hines et al. v. Stamos et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

- Plaintiffs Jill Hines and Jim Hoft

- D. John Sauer, Michael Talent – James Otis Law Group, LLC (Counsel for Plaintiffs)

- James Otis Law Group, LLC, 13321 North Outer Forty Road, Suite 300, St. Louis, Missouri 63017

- Gene Hamilton, Reed Rubinstein, Nicholas Barry, Michael Ding, Julia Haller, James Rogers, Andrew Block – America First Legal (Counsel for Plaintiffs)

- America First Legal, 611 Pennsylvania Avenue SE, #231, Washington, DC 20003

- Julianna Parks – Langley & Parks, LLC (Counsel for Plaintiffs)

- Langley & Parks, LLC, 4444 Viking Drive, Suite 100, Bossier City, Louisiana 71111

- Defendants Alex Stamos, Renee DiResta, Board of Trustees of the Leland Stanford Junior University, Leland Stanford Junior University, Kate Starbird, Graphika, Camille Francois, Atlantic Council, Graham Brookie, Aspen Institute

- Devin Reid, James Brown (Counsel for Defendants Alex Stamos, Renee DiResta, Board of Trustees of the Leland Stanford Junior University, Leland Stanford Junior University)

- Liskow & Lewis, 701 Poydras St., Suite 5000, New Orleans, LA 70139

- Elisabeth Theodore, John Bellinger, R. Stanton Jones, Stephen Wirth (Counsel for Defendants Alex Stamos, Renee DiResta, Board of Trustees of the Leland Stanford Junior University, Leland Stanford Junior University)

- Arnold & Porter, 601 Massachusetts Avenue NW, Washington, DC 20001

- Alex Rothenberg, Ewell Eagan, Makala Graves (Counsel for Defendant Starbird)

- Gordon Arata, 201 St. Charles Avenue, Suite 4000, New Orleans, LA 70170

- Daniel Dunne, Geoffrey Shaw, Robert McKenna (Counsel for Defendant Starbird)

- Orrick, 401 Union St., Suite 3300, Seattle, WA 98101

- Camala Capodice, Gabrielle Broders, Quentin Urquhart (Counsel for Defendants Graphika, Francois)

- Irwin Fritchie, 400 Poydras St., Suite 2700, New Orleans, LA 70130

- Marie Bussey-Garza, Mary Gately, Samantha Chaifetz (Counsel for Defendants Graphika, Francois)

- DLA Piper, 500 8th St. NW, Washington, DC 20004

- Jon Guice (Counsel for Defendants Atlantic Counsel, Brookie)

- Hammonds Sills, 1500 N 19th St., Suite 301, Monroe, LA 71201

- Shelton Blunt (Counsel for Defendants Atlantic Counsel, Brookie)

- Phelps Dunbar, P.O. Box 4412, Baton Rouge, LA 70821

- Andrew Johnson, Karl Hopkins (Counsel for Defendants Atlantic Counsel, Brookie)

- Bradley Arant, 600 Travis St., Suite 5600, Houston, TX 77002

- Elizabeth Carmody (Counsel for Defendant Aspen Institute)

- Cook Yancey, P.O. Box 22260, Shreveport, LA 71120

- Andrew Pincus, Archis Parasharami, Kevin Ranlett (Counsel for Defendant Aspen Institute)

- Mayer Brown, 1999 K St. NW, Washington, DC 20006

*/s/ D. John Sauer*
D. John Sauer
Counsel for Plaintiffs

iii

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The Court should dispense with oral argument. Appellants are a group of mostly private entities who worked with the government officials to censor speech on social media. They seek to enforce arbitration agreements contained in contracts to which they are not parties—the very contracts with which they interfered. They appealed the district court's denial of their motion to compel arbitration on an equitable estoppel theory—necessitated by their status as non-signatories to the arbitration agreement between Appellees Hines and Hoft, and certain social media companies. Appellants' equitable estoppel arguments are so meritless that they devote the first half of their brief to a meritless issue—personal jurisdiction—that the district court did not address and that lies outside this Court's appellate jurisdiction. Appellants' arbitration motion and this appeal bear the hallmarks of delay tactics to avoid judicial resolution of their case. "Dispensing with oral argument" would therefore be "simply justice." *Sun Coast Res., Inc. v. Conrad (Sun Coast I)*, 956 F.3d 335, 341 (5th Cir. 2020). The Court should dispense with oral argument, affirm the district court's judgment, and issue the mandate immediately.

# <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS..........................................i

STATEMENT REGARDING ORAL ARGUMENT.............................iv

TABLE OF CONTENTS ...........................................................................v

TABLE OF AUTHORITIES....................................................................vii

INTRODUCTION .....................................................................................1

JURISDICTIONAL STATEMENT .........................................................2

STATEMENT OF ISSUES ......................................................................2

STATEMENT OF THE CASE..................................................................3

   I.   Appellants Create the EIP/VP as a Conduit for Government Censorship. .....3

   II.   Appellants Censor Hines and Hoft. ................................................5

   III.   Appellants' Attempts To Evade Judicial Review..........................7

SUMMARY OF ARGUMENT...............................................................10

STANDARD OF REVIEW ....................................................................12

ARGUMENT ..........................................................................................13

   I.   Appellants Cannot Force Hines and Hoft To Arbitrate Based on Agreements Appellants Did Not Sign. ...............................................13

      A.   Appellants Have Unclean Hands. ...........................................16

      B.   Equitable Estoppel Does Not Apply. ......................................22

         1.   Because Hines and Hoft have not sued a signatory, equitable estoppel does not apply. ...............................................22

         2.   Appellants do not satisfy equitable estoppel's two factors.................24

      C.   Most of Plaintiffs' Claims Fall Outside the Arbitration Agreements. .....35

         1.   Facebook's and Twitter's arbitration agreements do not extend to other platforms. ...............................................35

         2.   Facebook's arbitration agreement applies only to commercial claims.36

      D.   Counts One and Two are not arbitrable. .................................37

      E.   Appellants' Request To Strike the Class Claims Fails............40

      F.   If the Court believes the district court abused its discretion, it should not order arbitration but remand for arbitration-related discovery. ........................40

   II.   Appellants' Personal-Jurisdiction Argument Is Meritless. ...........................40

A.  This Court Lacks Jurisdiction to Address Personal Jurisdiction. ............40

B.  Appellants Waived Their Personal-Jurisdiction Argument.....................44

C.  There Is Personal Jurisdiction Over All Appellants................................48

III.  The Court Should Affirm and Immediately Release the Mandate. ...............56

CONCLUSION ................................................................................................56

CERTIFICATE OF SERVICE ........................................................................58

CERTIFICATION OF COMPLIANCE ...........................................................59

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013)..................................................................20

*Allen v. Okam Holdings, Inc.*,
    116 F.3d 153 (5th Cir. 1997)....................................................41

*Backpage.com, LLC v. Dart*,
    807 F.3d 229 (7th Cir. 2015)....................................................34

*Bank of Saipan v. CNG Fin. Corp.*,
    380 F.3d 836 (5th Cir. 2004)....................................................16

*Barnes v. Vroom Auto, LLC*,
    2023 WL 3025076 (S.D. Tex. Apr. 20, 2023).........................14

*Borel v. U.S. Cas. Co.*,
    233 F.2d 385 (5th Cir. 1956)....................................................15

*Borough of Duryea v. Guarnieri*,
    564 U.S. 379 (2011)..................................................................21

*Brammer Operating Co. v. Pathfinder Expl., LLC*,
    2008 WL 400352 (W.D. La. Jan. 31, 2008).............................46

*Brittania-U Nigeria, Ltd. v. Chevron USA, Inc.*,
    866 F.3d 709 (5th Cir 2017)....................................................19

*Brown v. Pac. Life Ins. Co.*,
    462 F.3d 384 (5th Cir. 2006)....................................................25

*Burnett v. Grattan*,
    468 U.S. 42 (1984)...............................................................38-39

*Caldor v. Jones*,
    465 U.S. 783 (1984)..................................................................51

*Catlin v. United States*,
324 U.S. 229 (1945)................................................................41

*CFPB v. All Am. Check Cashing, Inc.*,
33 F.4th 218 (5th Cir. 2022).......................................... 42-43

*Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*,
2020 WL 620294 (C.D. Cal. Jan. 9, 2020) .........................32

*Coinbase, Inc. v. Bielski*,
599 U.S. 736 (2023)................................................................56

*Coleman v. Lincoln Parish Detention Ctr.*,
858 F.3d 307 (5th Cir. 2017)................................................36

*CompuCredit Corp. v. Greenwood*,
565 U.S. 95 (2012)................................................................37

*Crawford Professional Drugs, Inc. v. CVS Caremark Corp.*,
748 F.3d 249 (5th Cir. 2014)................................................31

*Daimler AG v. Bauman*,
571 U.S. 117 (2014)..............................................................54

*Def. Distributed v. Grewal*,
971 F.3d 485 (5th Cir. 2020)................................. 12, 48-51

*Dykes v. Southern Star, Inc.*,
2006 WL 8436908 (N.D. Tex. July 6, 2006)........................46

*EEOC v. Waffle House, Inc.*,
534 U.S. 279 (2002)........................................................13, 39

*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates,*
*S.A.S.*,
269 F.3d 187 (3d Cir. 2001)................................................43

*Ford Motor Co. v. Montana Eighth Judicial District Court*,
592 U.S. 351 (2021)..............................................................48

*Franklin v. Community Regional Medical Center,*
   998 F.3d 867 (9th Cir. 2021) ...............................................................23

*Gen. Elec. Co. v. Deutz AG,*
   270 F.3d 144 (3d Cir. 2001) ................................................................46

*Gilmer v. Interstate/Johnson Lane Corp.,*
   500 U.S. 20 (1991) ...............................................................................37

*Goldman v. KPMG, LLP,*
   173 Cal. App. 4th 209 (2009) .....................................25, 29-30, 32-33

*Granite Rock Co. v. Int'l Bhd. of Teamsters,*
   561 U.S. 287 (2010) ........................................................................26, 36

*Griffin v. Breckenridge,*
   403 U.S. 88 (1971) ...............................................................................38

*Grigson v. Creative Artists Agency LLC,*
   210 F.3d 524 (5th Cir. 2000) ..............................3, 13, 16, 23-26, 28-29

*Grisham v. Valenciano,*
   93 F.4th 903 (5th Cir. 2024) ................................................................13

*Guidry v. U.S. Tobacco Co.,*
   188 F.3d 619 (5th Cir. 1999) ...............................................................53

*Guillot ex rel. T.A.G. v. Russell,*
   59 F.4th 743 (5th Cir. 2023) ................................................................39

*Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.,*
   921 F.3d 522 (5th Cir. 2019) ..........................................................12, 45

*Hawkins v. KPMG LLP,*
   423 F. Supp. 2d 1038 (N.D. Cal. 2006) .........................................17, 20

*Hernandez v. Meridian Management Services, LLC,*
   87 Cal. App. 5th 1214 (2023) .........................................................22-23

*Hill v. GE Powers Systems, Inc.*,
   282 F.3d 343 (5th Cir. 2002) ..........................................................25, 30

*Hinkle v. Phillips 66 Co.*,
   35 F.4th 417 (5th Cir. 2022) ................................................................43

*Hohe v. Casey*,
   956 F.2d 399 (3d Cir. 1992) .................................................................38

*In re Apple & AT & TM Antitrust Litigation*,
   826 F. Supp. 2d 1168 (N.D. Cal. 2011) ...............................................31

*In re Henson*,
   869 F.3d 1052 (9th Cir. 2017) .............................................................33

*In re Humana Inc. Managed Care Litig.*,
   285 F.3d 974 (11th Cir. 2002) ..................................... 25, 29, 33-34

*In re Lloyd's Register N. Am., Inc.*,
   780 F.3d 283 (5th Cir. 2015) ...................................................... 18-19

*Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*,
   456 U.S. 694 (1982) .............................................................................45

*InterGen N.V. v. Grina*,
   344 F.3d 134 (1st Cir. 2003) ................................................................46

*Int'l Energy Ventures Mgmt., LLC v. United Energy Grp., Ltd.*,
   999 F.3d 257 (5th Cir. 2021) ...............................................................42

*Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*,
   326 U.S. 310 (1945) .............................................................................48

*Janvey v. Alguire*,
   647 F.3d 585 (5th Cir. 2011) ...............................................................43

*Jefferson v. Delgado Cmty. Coll. Charity Sch. Of Nursing*,
   602 F. App'x 595 (5th Cir. 2015) ........................................................41

*Jennings v. Patterson*,
488 F.2d 436 (5th Cir. 1974) ..................................................... 37

*Jody James Farms, JV v. Altman Grp., Inc.*,
547 S.W.3d 624 (Tex. 2018) ...................................................... 19

*Johnson v. Walmart Inc.*,
57 F.4th 677 (9th Cir. 2023) ...................................................... 29

*Katherine P. v. Humana Health Plan, Inc.*,
959 F.3d 206 (5th Cir. 2020) ...................................................... 15

*Keeton v. Hustler Magazine, Inc.*,
465 U.S. 770 (1984) ................................................................. 51

*Keystone Driller Co. v. Gen. Excavator Co.*,
290 U.S. 240 (1933) ................................................................. 21

*Kramer v. Toyota Motor Corp.*,
705 F.3d 1122 (9th Cir. 2013) ............................................. 29, 33

*Leroy v. Great W. United Corp.*,
443 U.S. 173 (1979) ................................................................. 47

*Lim v. Offshore Specialty Fabricators, Inc.*,
404 F.3d 898 (5th Cir. 2005) ...................................................... 37

*Magi XXI, Inc. v. Stato Della Citta del Vaticano*,
714 F.3d 714 (2d Cir. 2013) ....................................................... 47

*McDonald v. City of W. Branch*,
466 U.S. 284 (1984) .............................................................. 37-38

*Melea Ltd. v. Jawer SA*,
511 F.3d 1060 (10th Cir. 2007) ................................................... 53

*Midwest Mech. Contractors, Inc. v. Commonwealth Constr. Co.*,
801 F.2d 748 (5th Cir. 1986) ...................................................... 45

xi

*Midwestern Cattle Mkt'g, LLC v. Legend Bank, N.A.*,
   999 F.3d 970 (5th Cir. 2021) .................................................................12

*Missouri v. Biden (Missouri I)*,
   2023 WL 4335270 (W.D. La. July 4, 2023) ......................................... 1

*Missouri v. Biden (Missouri II)*,
   83 F.4th 350 (5th Cir. 2023) ............................................. 1, 26, 33-35

*Mitchum v. Foster*,
   407 U.S. 225 (1972) .............................................................................37

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985) .............................................................................39

*Motorola Credit Crop. v. Uzan*,
   274 F. Supp. 2d 481 (S.D.N.Y. 2003) ...........................................16, 20

*MS Dealer Serv. Crop. v. Franklin*,
   177 F.3d 942 (11th Cir. 1999) ......................................25-26, 32-34

*Murphy v. DirecTV, Inc.*,
   724 F.3d 1218 (9th Cir. 2013) ...................................... 14, 29-30, 33

*Neb. Machinery Co. v. Cargotec Sols., LLC*,
   762 F.3d 737 (8th Cir. 2014) .............................................................14

*NetChoice, LLC v. Paxton*,
   49 F.4th 439 (5th Cir. 2022) .............................................................35

*New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*,
   56 F.4th 1026 (5th Cir. 2023) .......................................................15, 40

*Newman v. Plains All Am. Pipeline, L.P.*,
   23 F.4th 393 (5th Cir. 2022) .......................................................19, 24, 36

*Ngo v. BMW of N. Am., LLC*,
   23 F.4th 942 (9th Cir. 2022) .............................................................23

*Noble Cap. Fund Mgmt., LLC v. U.S. Cap. Glob. Inv. Mgmt., LLC*,
   31 F.4th 333 (5th Cir. 2022)....................................................43

*O'Conner v. AT&T Corp.*,
   2013 WL 3107496 (M.D. La. June 18, 2013).....................................31

*PaineWebber Inc. v. Chase Manhattan Private Bank*,
   260 F.3d 453 (5th Cir. 2001)...........................................43, 45-46

*Patsy v. Bd. of Regents of Fla.*,
   457 U.S. 496 (1982).........................................................37-38

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981)............................................................20

*Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*,
   139 F.3d 1061 (5th Cir. 1998)................................................13

*Pickett v. Tex. Tech Univ. Health Sci. Ctr.*,
   37 F.4th 1013 (5th Cir. 2022)................................................44

*Pollock v. Protect My Car Admin Servs., Inc.*,
   2023 WL 6324366 (S.D. Tex. Sept. 28, 2023)..................................46

*Precision Instrument Mfg. Co. v. Automotive Maint. Machinery Co.*,
   324 U.S. 806 (1945)...................................................16, 18, 22

*Reading Health System v. Bear Stearns & Co.*,
   900 F.3d 87 (3d Cir. 2018)...................................................46

*Rodriguez-Rivera v. Allscripts Healthcare Solutions, Inc.*,
   43 F.4th 150 (1st Cir. 2022).................................................46

*Rush v. Savchuk*,
   444 U.S. 320 (1980).......................................................53-54

*Sangha v. Navig8 ShipManagement Private Ltd.*,
   882 F.3d 96 (5th Cir. 2018)..........................................52, 54, 56

xiii

*Shearson/Am. Express Inc. v. McMahon*,
482 U.S. 220 (1987)......................................................................37

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
549 U.S. 422 (2007)......................................................................47

*Skin Consultants, LLC v. Textron Aviation, Inc.*,
2018 WL 4621904 (N.D. Miss. Sept. 26, 2018)................................46

*Snyder v. Phelps*,
562 U.S. 443 (2011)......................................................................22

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
542 F.3d 354 (2d Cir. 2008) .............................................. 18-19, 26

*Solar & Envtl. Techs. Corp. v. Zelinger*,
726 F. Supp. 2d 135 (D. Conn. 2009) ........................................ 18-19

*Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
559 U.S. 662 (2010)......................................................................47

*Stroman Realty, Inc. v. Wercinski*,
513 F.3d 476 (5th Cir. 2008).........................................................43

*Sun Coast Res., Inc. v. Conrad (Sun Coast I)*,
956 F.3d 335 (5th Cir. 2020)................................................2, 26, 56

*Tripp v. Renaissance Advantage Charter Sch.*,
2003 WL 22519433 (E.D. Pa. Oct. 8, 2003) ...................................39

*United Brotherhood of Carpenters and Joiners of America, Local 610 v. Scott*,
463 U.S. 825 (1983)................................................................38, 40

*Uptown Drug Co. v. CVS Caremark Corp.*,
962 F. Supp. 2d 1172 (N.D. Cal. 2013) ..........................................31

*Van Dusen v. Swift Transp. Co.*,
830 F.3d 893 (9th Cir. 2016)..........................................................41

*Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes*,
336 F.2d 354 (2d Cir. 1964) .................................................................46

*Volt Info. Scis., Inc. v. Bd. & Trustees of Leland Stanford Jr. Univ.*,
489 U.S. 468 (1989).............................................................................26

*Vujasinovic & Beckcom, PLLC v. Cubillos*,
2016 WL 5573712 (S.D. Tex. Sept. 29, 2016)....................................46

*Walden v. Fiore*,
571 U.S. 277 (2014).............................................................................52

*Webb v. Investacorp, Inc.*,
89 F.3d 252 (5th Cir. 1996) ............................................................ 35-36

*Weber v. PACT XPP Technologies, AG*,
811 F.3d 758 (5th Cir. 2016) .......................................................... 17-18

*Webster v. Doe*,
486 U.S. 592 (1988).............................................................................21

*Webster v. Kijakazi*,
19 F.4th 715 (5th Cir. 2021)................................................................44

*Westmoreland v. Sadoux*,
299 F.3d 462 (5th Cir. 2002).........................................................13, 20

*White v. ARCO/Polymers, Inc.*,
720 F.3d 1391 (5th Cir. 1983) ........................................................ 15-16

*Wien Air Alaska, Inc. v. Brandt*,
195 F.3d 208 (5th Cir. 1999)...............................................................54

*Williams v. Taylor Seidenbach, Inc.*,
958 F.3d 341 (5th Cir. 2020)...............................................................44

## Statutes and Other Sources

9 U.S.C. § 2 ...............................................................................................40

9 U.S.C. § 16 .................................................................................................41

42 U.S.C. § 1983 ...........................................................................................39

42 U.S.C. § 1985(3) .......................................................................................39

Act of April 20, 1871, ch. 22, §§ 1–2, 17 Stat. 18, 18–19 .......................39

Cal. R. Ct. 8.1115(a) ....................................................................................23

Cong. Globe, 42d Cong., 1st Sess., 476 (1871) .........................................37

Cong. Globe, 42d Cong., 1st Sess., App. 69 (1871) ..................................38

Cong. Globe, 42d Cong., 1st Sess., App. 188 (1871) ................................38

Fed. R. Civ. P. 41(b) .....................................................................................56

La. CONST. art. I, §7 .....................................................................................55

La. Rev. Stat. § 13:3201(B) .........................................................................48

**INTRODUCTION**

Appellants are mostly private entities who worked with federal officials to establish a massive, government-private consortium and launch "arguably … the most massive attack against free speech in United States' history." *Missouri v. Biden (Missouri I)*, 2023 WL 4335270, at \*1 (W.D. La. July 4, 2023), *aff'd in part, rev'd in part*, *Missouri v. Biden (Missouri II)*, 83 F.4th 350 (5th Cir. 2023) (per curiam), *cert. granted sub nom.*, *Murthy v. Missouri*, 144 S. Ct. 7 (2023).  Working hand-in-glove with government officials, Appellants pushed social-media companies to censor private speech on their platforms—backed by the threat of government regulation to coerce compliance.  Appellants have succeeded in censoring potentially millions of social-media posts constituting core political speech by ordinary Americans.  Vindicating the First Amendment rights of this censorship consortium's countless victims—including Appellees Jill Hines and Jim Hoft—is imperative.

But this suit is on pause.  Appellants filed a meritless motion to compel arbitration, claiming that equitable estoppel allows them to invoke arbitration agreements between their *victims*: Hines and Hoft and two social media companies, Facebook and Twitter.  No Appellant signed those agreements, and no Appellant is a party to any arbitration agreement here.  In fact, Appellants have been sued because they interfered with the very contracts whose protection they now seek to invoke.

1

Equity does not reward such inequitable conduct—something the district court emphasized and Appellants largely ignore.

A "tactic powerful economic interests sometimes use against the less resourced is to increase litigation costs in an attempt to bully the opposing party into submission by war of attrition." *Sun Coast Res., Inc. v. Conrad (Sun Coast I)*, 956 F.3d 335, 341 (5th Cir. 2020). Appellants' motion and this appeal bear the hallmarks of such dilatory tactics. This Court should affirm without oral argument and release its mandate immediately.

## JURISDICTIONAL STATEMENT

Hines and Hoft agree that the Court has jurisdiction over the district court's denial of Appellants' motion to compel arbitration. Br. Appellants 3–4. But for the reasons discussed below, *see infra* Argument §II.A, the Court does not have appellate jurisdiction over Appellants' pending motion to dismiss for want of personal jurisdiction.

## STATEMENT OF ISSUES

Because the Court lacks appellate jurisdiction over Appellants' personal-jurisdiction claims, the only issue is whether Appellants can invoke equitable estoppel to compel arbitration based on contracts to which they are not parties and with which they sought to tortiously interfere.

## STATEMENT OF THE CASE

**I.    Appellants Create the EIP/VP as a Conduit for Government Censorship.**

This case stems from Appellants' close collaboration "with federal, state, and local government officials to monitor and censor disfavored viewpoints on social media."  ROA.23-30916.1581.[1]  By laundering official censorship through the Election Integrity Partnership (EIP) and the Virality Project (VP) (together, EIP/VP), Appellants enabled governmental officials to push social-media platforms to censor private speech while trying to circumvent "the 'unclear legal authorities, including very real First Amendment questions' that would arise if the government took these actions directly."  ROA.23-30916.1581–82 (quoting DiResta).

The EIP came first.  A partnership between Stanford (including Stamos and DiResta), University of Washington (including Starbird), Graphika (including François), the Atlantic Council (including Brookie), and non-party CISA (a Department of Homeland Security subagency), "[t]he EIP was designed to fill a 'gap' in the government's ability to police … 'misinformation' and 'disinformation' about elections on social media," ROA.23-30916.1596—a "gap" derived from a lack

---

[1] As Appellants concede, the allegations in the complaint are treated as true for purposes of this appeal.  ROA.23-30916.1413 n.3; see also ROA.23-30916.3898-99 (using Rule 12(b)(6) standards in arguing interdependent misconduct); Br. Appellants 55-56 (relying on facts alleged in the amended complaint and applying Rule 12(b)(6) analysis); *see also, e.g., Grigson v. Creative Artists Agency LLC*, 210 F.3d 524, 536 (5th Cir. 2000).

of statutory authority to engage in such oversight as well as constitutional protections for the right to speak. Aspen plays a coordinating role in these efforts. *See* ROA.23-30916.1592–93. The EIP intertwined Appellants with federal and state officials and agencies, *see*, *e.g.*, ROA.23-30916.1601–10, 1643–47, for the purpose of bringing government pressure to bear on platforms and to monitor and censor speech on social media. The VP extends the EIP into the public health sphere. ROA.23-30916.1624–25. Both resulted in "dynamic coordination with state and local officials in pushing platforms to censor speech." ROA.23-30916.1611.

Government pressure is central to Appellants' scheme. "Left to their own devices, the social-media platforms engage in review and/or moderation of only a miniscule amount of such disfavored speech on their platforms." ROA.23-30916.1582. "Platforms exercise virtually no editorial control or judgment" over the content on their platforms. ROA.23-30916.1582 (quotations omitted). That means almost all non-spam, non-obscene content is posted without review. *See* ROA.23-30916.1582; *see also* ROA.23-30916.1603, 1922. Thus, as Stamos noted, the need for *government* pressure: To push "platforms to do stuff," they need the threat of "huge potential regulatory impact" in areas of "economically high[]" importance, such as the United States. ROA.23-30916.1599 (quoting Stamos). Pressure includes, for example, "threatening communications from senior federal officials." ROA.23-30916.1599; *see also* ROA.23-30916.1613–14, 1634.

4

Appellants thus "leveraged and benefitted from the pressure and coercion that federal officials … place on social-media platforms to censor disfavored speakers and viewpoints." ROA.23-30916.1668; *see also* ROA.23-30916.1646–47.

The numbers show the extent of that benefit. While censoring less than one percent of other content, social media platforms took action on 35 percent "of the URLs" Appellants and their government partners flagged. ROA.23-30916.1619. The censored speech was predominantly conservative in viewpoint, *see, e.g.,* ROA.23-30916.1616–18; often targeted for censorship on the basis of race, gender, or religion, *see* ROA.23-30916.1647–56; and contrary to the government's preferred narratives, *see* ROA.23-30916.1656–59. This censorship is ongoing. *See, e.g.,* ROA.23-30916.1621–24.

## II.    Appellants Censor Hines and Hoft.

Appellants' work through EIP/VP "involves [an] extensive, direct, and purposeful campaign to interfere with speech by Louisiana speakers … to Louisiana audiences, including Jill Hines and Jim Hoft's extensive audiences in Louisiana." ROA.23-30916.1659. Appellants "monitor and track speech on social media by Louisiana residents like" Hines. ROA.23-30916.1659. EIP/VP analysts, once they determine a communication constitutes so-called misinformation, "contact state officials," including Louisiana officials, "to verify or refute the claim." ROA.23-30916.1659–60 (emphasis and quotations omitted).

Thus, Appellants "communicate both with Louisiana government officials and with social media-platforms about" Hines's and Hoft's speech "occurring in Louisiana for the purpose of silencing that speech in Louisiana and preventing Louisianans from having access to it." ROA.23-30916.1661; *see also id.* (noting direct communications between CISA officials working with Appellants and Louisiana state officials). Appellants "and their federal allies [then] compel those third parties to censor that speech in Louisiana, thus intentionally preventing it from reaching Louisiana residents." ROA.23-30916.1661. That includes blocking elected officials from hearing from their constituents. *See* ROA.23-30916.1664 (noting censorship affecting Hines's "ability to organize like-minded supporters … to petition the [state] government").

Hines is a particular target of Appellants' censorship activities. Hines' "and her groups' speech that has been censored involves many topics flagged in the VP report." ROA.23-30916.1663; *see also* ROA.23-30916.1657–59. Hines's personal Facebook page and her groups' pages have experienced censorship for questioning prevailing COVID narratives. ROA.23-30916.1663–64. "Hines has also experienced social-media censorship of election-related speech of the sort discussed in the EIP report." ROA.23-30916.1664.

Hoft is likewise Appellants' particular target. He runs "the popular news website *The Gateway Pundit*," which has a multitude of readers and followers across

numerous platforms, including Twitter, Facebook, Instagram, and YouTube. ROA.23-30916.1665. "*The Gateway Pundit*'s social-media accounts experience censorship on major social-media platforms, including on topics specifically targeted by the EIP and the VP." ROA.23-30916.1665–66. "The EIP report mentions Hoft 47 times, identifies him as the '#2 superspreader' of misinformation on Twitter alone, and repeatedly flags his content as supposed 'misinformation.' Likewise, the [VP] … flags Hoft's COVID vaccine-related speech as 'misinformation.'" ROA.23-30916.1666. "Moreover, the EIP's blog posts from the 2022 election cycle indicate that the EIP continued to monitor and target Hoft's speech throughout the 2022 cycle." ROA.23-30916.1667.

Appellants' activities in conjunction with government officials infringe Hines's and Hoft's First Amendment rights. Appellants also violate the rights of Hines's and Hoft's audiences to receive information, *see* ROA.23-30916.1665, 1667; Hines's and Hoft's rights as audience members to receive others' speech, *see* ROA.23-30916.1664–65, 1667; and Hines's and Hoft's ability to speak to protected groups free from Appellants' invidious discrimination, ROA.23-30916.1663, 1665–66.

## III. Appellants' Attempts To Evade Judicial Review.

Hines and Hoft brought this class-action suit to end Appellants' interference with core speech rights. The operative complaint has five claims: (1) a 42 U.S.C.

§ 1985(3) claim resting on Appellants' violations of the First and Fourteenth Amendments; (2) a 42 U.S.C. § 1983 claim predicated on the same provisions; (3) a First Amendment claim; (4) a tortious interference with contractual and business relationships claim; and (5) a breach of duty claim.  ROA.23-30916.1671–79.

Before the amended complaint, Appellants in *Hines v. Stamos*, No. 23-30826 (the "*Stamos* Appellants"), filed a motion to compel individual arbitration under the Federal Arbitration Act, ROA.23-30916.1390; and a Rule 12 motion to dismiss, including a motion to dismiss for lack of personal jurisdiction, ROA.23-30916.1489. The *Stamos* Appellants requested that the district court decide their arbitration motion "before addressing any merits-based ground for dismissal" under Rule 12. ROA.23-30916.1400; *see also* ROA.23-30916.1390, 1489.

The *Stamos* Appellants' arbitration motion included only the Facebook and Twitter arbitration agreements.   *See* ROA.23-30916.1403–04.   California law applies to the Facebook agreement, ROA.23-30916.1432; and federal common law applies to Twitter's, ROA.23-30916.1443.  Because the *Stamos* Appellants were not signatories to the agreement, they relied on the doctrine of equitable estoppel.  *See* ROA.23-30916.1406–07.   Hines and Hoft opposed the motions and filed the amended complaint.  *See* ROA.23-30916.25.

The district court denied the motion to compel arbitration without ruling on other motions.  The court noted that Appellants "worked closely and/or collaborated

with state and federal government officials to urge, pressure, and coerce social media platforms to monitor and censor disfavored speakers and content." ROA.23-30916.3799. The court also observed that "Hines and Hoft … do not seek to enforce [social-media platforms'] terms of service … but … instead intend to challenge the pressure, coercion, cooperation, and entwinement of these outside persons and entities working with government officials to suppress and/or remove free speech from social media platforms." ROA.23-30916.3800–01.

The district court provided three reasons for denying the motion: "First, Hines and Hoft are not relying on the terms of the Facebook and/or Twitter terms of service agreement to assert their claims. Second, Hines and Hoft have not named either Facebook or Twitter in their lawsuit as the lawsuit only alleges that Defendants have worked closely with and collaborated with state and federal government officials to urge, pressure, and coerce the social media platforms to censor disfavored speakers and content. Third, because the application of equitable estoppel is discretionary and based upon equitable fairness considerations, the Court finds that Defendants do not have the 'clean hands' required for the application of equitable estoppel." ROA.23-30916.3802–03. In analyzing the last issue, the district court held that Appellants were attempting to take advantage of an arbitration agreement between their "victims of … collusion and pressure to violate [Hines's and Hoft's] free speech rights," ROA.23-30916.3804; that the "fundamental constitutional right of free

speech" at issue here militated against granting the motion, ROA.23-30916.3805; and that equitable estoppel does not apply "where a signatory to an arbitration agreement sues a non-signatory," ROA.23-30916.3805.

On November 16, 2023, the *Stamos* Appellants appealed.  ROA.23-30916.3807.

Aspen—who was added as a Defendant in the amended complaint—filed a similar battery of motions.  In asking the district court to stay proceedings on its motions, Aspen said its motions made "arguments similar to those advanced by the" *Stamos* Appellants.[2]  ROA.23-30916.4055; *see also* ROA.23-30916.4056–57.  On December 21, 2023, the district court denied the motion to compel arbitration "for the same reasons" it denied the *Stamos* Appellants' motion.  ROA.23-30916.4063. Aspen appealed the next day.  ROA.23-30916.4065.  Aspen's motion to dismiss for lack of personal jurisdiction, ROA.23-30916.4018, is still pending.

## SUMMARY OF ARGUMENT

I. Appellants' attempt to compel arbitration is meritless.  Appellants are not parties to the contracts whose protection they invoke, and their own inequitable behavior bars their attempts to compel arbitration.

First, as the district court held, Appellants have unclean hands, which forecloses their attempt to invoke the doctrine of equitable estoppel.  Appellants

---

[2] Aspen also attached Instagram's terms of service.  ROA.23-30916.3913.

extensively interfered with the very contracts whose protection they now seek to invoke, as they pressured platforms like Facebook and Twitter to abuse their agreements with Hines and Hoft and wrongfully censor Hines' and Hoft's speech. Appellants cannot obtain the protection of a contract between their victims.

Second, even if Appellants did not have unclean hands, the doctrine of equitable estoppel does not apply where, as here, a signatory to an agreement sues only non-signatories. And even if it did apply, Appellants cannot satisfy the two factors required to justify its application. Hines' and Hoft's claims do not arise from, and are not based on, their contracts with Facebook and Twitter. They do not assert claims based on those contracts; rather, they sue to block Appellants from unlawfully *interfering* with those contracts. For similar reasons, Hines' and Hoft's claims are not founded upon and inextricably intertwined with the obligations imposed by the underlying contracts, *i.e.*, Facebook's and Twitter's terms of service. If those terms of service were different, or did not exist at all, Hines and Hoft would still pursue claims against Appellants for coercing the platforms to censor them.

Finally, even if *some* claims were arbitrable—which they are not—the majority of Hines' and Hoft's claims lie outside the plain terms of the arbitration agreements.

II.     Appellants' attempt to transform this interlocutory appeal about arbitrability into an appeal about personal jurisdiction is meritless. This Court lacks

appellate jurisdiction to rule on this issue that the district court never addressed or decided—a point Appellants' own cases make.

Even if this Court had jurisdiction to address it, Appellants' personal-jurisdiction argument fails on the merits. Appellants censored Hines and Hoft specifically to limit their speech in Louisiana to Louisiana listeners. Appellants deliberately targeted Louisiana residents to silence Louisiana-specific core political speech (such as Hines' efforts to organize Louisiana citizens to petition the Louisiana legislature regarding Louisiana's public policies) and to prevent that speech from reaching Louisiana audiences. Appellants succeeded in this aim by dramatically reducing the circulation of disfavored viewpoints in Louisiana, and their scheme to do so involved direct contact with Louisiana state officials to "debunk" specific claims. All this is amply sufficient to establish personal jurisdiction.

## STANDARD OF REVIEW

Rulings on motions to compel arbitration are subject to plenary review. *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 529 (5th Cir. 2019). Application of equitable doctrines, like equitable estoppel or unclean hands, is reviewed for abuse of discretion. *Midwestern Cattle Mkt'g, LLC v. Legend Bank, N.A.*, 999 F.3d 970, 971 (5th Cir. 2021).

Personal jurisdiction questions receive *de novo* review. *Def. Distributed v. Grewal*, 971 F.3d 485, 490 (5th Cir. 2020).

12

This Court can affirm based "on any ground supported by the record, even if it is different from that relied on by the district court." *Grisham v. Valenciano*, 93 F.4th 903, 907 (5th Cir. 2024) (quotations omitted).

## ARGUMENT

### I.     Appellants Cannot Force Hines and Hoft To Arbitrate Based on Agreements Appellants Did Not Sign.

"Arbitration is a matter of contract between the parties." *Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1064 (5th Cir. 1998). Thus, "the language of the contract … defines the scope of disputes subject to arbitration." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002). "[N]othing in the [FAA] authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement." *Id.* As a result, arbitration cannot, "in general, be required for a matter involving [a] … non-signatory." *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 528 (5th Cir. 2000).

Appellants concede they are strangers to the arbitration agreements. They rely on the doctrine of equitable estoppel to take advantage of them. This is an extraordinary request. "An agreement to arbitrate is a waiver of valuable rights that are both personal to the parties and important to the open character of our state and federal judicial system." *Westmoreland v. Sadoux*, 299 F.3d 462, 465 (5th Cir. 2002). Permitting strangers to take advantage of arbitration agreements undermines the agreement by permitting them to receive something (the waiver of a judicial forum)

13

for nothing. Courts are thus rightly "wary of choices imposed after the dispute has arisen and the bargain has long since been struck," and so "allow a nonsignatory to invoke an arbitration agreement only in rare circumstances." *Id.* at 465; *see also Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1229 (9th Cir. 2013) ("[E]quitable estoppel … is narrowly confined.").

Summary judgment standards apply to the analysis. While "[t]he Fifth Circuit has not articulated the appropriate procedure [to evaluate a defendant's motion to compel arbitration], … district courts within it have used the Rule 56 standard." *Barnes v. Vroom Auto, LLC*, 2023 WL 3025076, at *2 (S.D. Tex. Apr. 20, 2023). Here, Appellants have conceded that the complaint's allegations must be taken as true for purposes of this appeal, but they have also relied on documents besides the complaint in their motions. *See* ROA.23-30916.1428–1488, 3912–4015. "Given that … , a summary judgment standard—viewing the evidence and resolving all factual disputes in the nonmoving party's favor—should [be] used to evaluate the motions." *Neb. Machinery Co. v. Cargotec Sols., LLC*, 762 F.3d 737, 742 (8th Cir. 2014).

On appeal, Appellants continue to take the allegations in the amended complaint as true. They consistently cite them and, indeed, claim their veracity is irrelevant. Br. Appellants 1. They do suggest (at 54–55) there is some inconsistency between the original and amended complaint because the latter eliminated some

14

references to "collaboration" and "replaced it with" "coercion." There is no inconsistency. The amended complaint clarified the original allegations by underscoring that any such "collaboration" was *coerced*: Appellants "push[ed] the platforms" to censor disfavored viewpoints by leveraging their fear of losing "economically highly important" markets and of "huge potential regulatory impact[s]." ROA.23-30916.1613 (emphasis omitted).

Thus, the original complaint's value as "evidentiary admissions" is minimal, and Appellants' claim that only "strategic considerations"—as opposed to clarification—drove the amendments is unsupported. *Contra* Br. Appellants 58. Because the amended complaint did not incorporate the original complaint's allegations except its exhibits, *see* ROA.23-30916.1588 n.9, the original complaint "is a legal nullity." *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries (ACTG)*, 56 F.4th 1026, 1033 (5th Cir. 2023). Moreover, even if there was some contradiction, that would only create a fact issue. *See Borel v. U.S. Cas. Co.*, 233 F.2d 385, 388 (5th Cir. 1956). Under summary judgment rules, a fact dispute requires the denial of Appellants' motions. *See Katherine P. v. Humana Health Plan, Inc.*, 959 F.3d 206, 209 (5th Cir. 2020).

In any event, Appellants waived this point. "[I]nstead of arguing when this issue came up that" there was inconsistency, *White v. ARCO/Polymers, Inc.*, 720 F.3d 1391, 1396 (5th Cir. 1983), the *Stamos* Appellants asked the district court to deny

their motion as moot, *see* ROA.23-30916.3788, and Aspen did not address it in its subsequently filed motion, *see* ROA.23-30916.3898–99. "By failing to contend that" the original complaint barred or is inconsistent with the amended complaint, Appellants "effectively waived the argument." *White*, 720 F.3d at 1396.

## A.    Appellants Have Unclean Hands.

"[T]he equitable maxim that 'he who comes into equity must come with clean hands[,]' … closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Precision Instrument Mfg. Co. v. Automotive Maint. Machinery Co.*, 324 U.S. 806, 814 (1945). This maxim applies to claims of equitable estoppel. "The linchpin" of equitable estoppel "is equity—fairness." *Grigson*, 210 F.3d at 528. As a doctrine "rooted in equity, [it] is therefore subject to the" defense of unclean hands. *Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481, 505 (S.D.N.Y. 2003) (citation omitted), *affirmed in part, vacated in part* 388 F.3d 39 (2d Cir. 2004); *see Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004) ("[A]ll equity-oriented actions[ ] carr[y] with [them] the affirmative defense of 'unclean hands' ").

Appellants have unclean hands for three reasons:

1. Appellants cannot take advantage of the arbitration agreements because the signatories "are victims of [Appellants] and government collusion and pressure to violate [Hines's and Hoft's] free speech rights." ROA.23-30916.3804. Hines and

16

Hoft agreed to arbitration with private media companies as part of an agreement whereby they could post content subject to Facebook's and Twitter's independent content moderation. *See*, *e.g.*, ROA.23-30916.1432, 1442. Appellants hijacked that agreement by using "pressure from federal officials," *see* ROA.23-30916.1613, such as "threatening communications from senior federal officials," ROA.23-30916.1599, and the "threat of 'huge regulatory impact,'" ROA.23-30916.1599, to coerce Facebook and Twitter to censor Hines' and Hoft's content. *See also* ROA.23-30916.1613–14, 1634. In short, Appellants "leveraged and benefitted from the pressure and coercion that federal officials … place on social-media platforms to censor disfavored speakers and viewpoints." ROA.23-30916.1668.

Appellants claim they can take advantage of an arbitration agreement between their *victims* on the basis of their wrongful acts towards those victims. As the district court noted, "[t]o allow [Appellants] to take advantage of an arbitration agreement against the two alleged victims would be inequitable." ROA.23-30916.3804.

Appellants don't dispute they are doing just that. Instead, pointing (at 60–61) to *Weber v. PACT XPP Technologies, AG*, 811 F.3d 758 (5th Cir. 2016), Appellants suggest this is a merits issue. But *Weber* did not "consider[] the use of unclean hands to defeat a claim of equitable estoppel which itself is a predicate to arbitration." *Hawkins v. KPMG LLP*, 423 F. Supp. 2d 1038, 1053 (N.D. Cal. 2006).

Moreover, unlike *Weber*—which involved inequitable conduct relating to the contract as a whole, *see* 811 F.3d at 775—Appellants' wrongdoing is what they say brings them "within the scope of the" arbitration agreements, *In re Lloyd's Register N. Am., Inc.*, 780 F.3d 283, 293 (5th Cir. 2015) (discussing direct-benefits estoppel), and so relates "to the controversy in issue," *Precision Instrument Manufacturing*, 324 U.S. at 814–15.  That bars their resort to equity.  *See id.*; *Solar & Envtl. Techs. Corp. v. Zelinger*, 726 F. Supp. 2d 135, 151 (D. Conn. 2009).

The Second Circuit has endorsed that reasoning by linking equitable estoppel to "the black letter rule that the obligation to arbitrate depends on consent." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361 (2d Cir. 2008).  Equitable estoppel "simply extend[s] [consent's] contours somewhat by establishing that the consent need not always be expressed in a formal contract made with the party demanding arbitration." *Id.* at 361–62.  Thus, the Second Circuit denied equitable estoppel to a non-signatory who "came into its close relationship with [the signatory] by wrongfully inducing [the signatory] to breach his contract … ." *Id.* at 362.  In such cases, "there [is] no unfairness in allowing *x,* the victim of the tortious interference, to insist that, while he agreed to arbitrate with his contractual counterparty *y,* he in no way consented to extend that agreement to an entity which tortiously subverted his rights under the agreement." *Id.*

18

*Sokol* tracks this Court's precedent. Looking at Texas law, which this Court held mirrors *Grigson*, this Court held that "[t]he test is one of 'consent, not coercion.' Would a reasonable signatory to the arbitration agreement anticipate being forced to arbitrate claims against the nonsignatory?" *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 405 (5th Cir. 2022) (quoting *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 639 (Tex. 2018) (discussing Second Circuit law)); *see also Brittania-U Nigeria, Ltd. v. Chevron USA, Inc.*, 866 F.3d 709, 715 (5th Cir 2017) ("Who is actually bound by an arbitration agreement is a function of the intent of the parties, as expressed in the terms of the agreement") (quotations and alteration omitted).

So too here. Appellants "wrongfully induce[d]" social media companies to censor Hines and Hoft, so there is "no unfairness" in concluding that they, as victims of that behavior, did not consent to arbitrate their claims with Appellants. *Sokol*, 542 F.3d at 362.

*Sokol* underscores the inequity of extending equitable estoppel to entities, like Appellants, who have wrongfully forced their way into a contract. *See Zelinger*, 726 F. Supp. 2d at 151 & n.6 (noting the close link between *Sokol* and the unclean-hands doctrine). That would permit Appellants "to hide … inequitable behavior behind a shield of equity." *In re Lloyd's*, 780 F.3d at 293. Appellants argue that every tortfeasor who wrongfully interferes with a contract can take advantage of an

arbitration agreement in that contract, and thus "effectively carr[y] their [wrongdoing] right into the courtroom." *Uzan*, 274 F. Supp. 2d at 505. This would advance the entire wrongful purpose of the EIP/VP: evasion of "the restrictions imposed on government officials" by the Constitution and laws. ROA.23-30916.1677. "What [Appellants] ask … would make a mockery of [the] court's equitable powers." *Hawkins*, 423 F. Supp. 2d at 1052–53.

2.   That evasion takes on constitutional dimension because Appellants' wrongful acts constitute state action, *see* ROA.23-30916.1675, and Appellant Starbird is a state official accused of First Amendment violations, *see* ROA.23-30916.1586. Appellants' request for arbitration seeks to impose conditions upon Hines's and Hoft's exercise of their free speech rights. But it would do so after "the bargain has long been struck." *Westmoreland*, 299 F.3d at 465.

The Constitution permits the government to condition a contractual benefit on a person giving up his rights only if the person could refuse the deal, *see Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013)—that is, if they "voluntarily and knowingly" agree to the condition, *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). That cannot happen where the person "is unaware of the conditions" that the benefit carries. *Id.* Imposing arbitration *ex post* by equitable estoppel is antithetical to that limit, and—for the constitutional claims in Counts I, II, and III, *see* ROA.23-30916.1671–1676—incorrectly uses the

FAA to preclude "judicial review of constitutional claims" absent a clear statement, *Webster v. Doe*, 486 U.S. 592, 603 (1988). Layered on top of that is the "right of access to courts for redress of wrongs," which "is an aspect of the First Amendment right to petition the government." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) (quotations omitted).

Nothing gave Hines and Hoft warning that they were conditioning their First Amendment rights to post and review speech on social media on giving up their First Amendment right to access the courts. The arbitration agreements and terms of service are between only users ("you") and Facebook and Twitter. *See*, *e.g.*, ROA.23-30916.1432, 1441. Facebook's terms of service "do not confer any third party beneficiary rights." ROA.23-30916.1433. And Twitter's agreement to pay the arbitration filing fee, *see* ROA.23-30916.1442, makes little sense if the agreement benefits third parties.

Leveraging governmental authority, Appellants altered "the equitable relations" between them and Hines and Hoft. *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933). But instead of complying with constitutional restrictions on contract conditions, Appellants request the Court to treat them as private entities and apply equitable estoppel. "[C]onsiderations … of right and justice" militate against that. *Id.*

<u>3.</u> "[W]here a suit … concerns the public interest as well as the private interests of the litigants this doctrine assumes even wider and more significant proportions." *Precision Instrument Mfg.*, 324 U.S. at 815.  In such cases, correct application of "the maxim … not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public." *Id.*

It does so here.  "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quotations omitted).  Appellants' wrongdoing thus affects "issues of great moment to the public." *Precision Instrument Mfg.*, 324 U.S. at 815 (discussing patents).  To deny their request for equity vindicates the public's "paramount interest" in ensuring that the government does not censor speech. *Id.* at 816.

## B.    Equitable Estoppel Does Not Apply.

Even if Appellants did not have unclean hands, equitable estoppel would still not apply.  As Appellants note, federal and California law govern this case and are similar. *See* Br. Appellants 47.

### 1.    Because Hines and Hoft have not sued a signatory, equitable estoppel does not apply.

The district court correctly concluded that "[i]n *Hernandez v. Meridian Management Services, LLC*, 87 Cal. App. 5th 1214 [(2023)], the California court held that where a signatory to an arbitration agreement sues a non-signatory, there is

no unfairness in allowing the suit to proceed." ROA.23-30916.3805. Appellants' response is to misconstrue (at 46) the district court, saying it held *Hernandez* "categorically eliminated equitable estoppel under California law." That is plainly not so.[3] *Hernandez* is consistent with equitable-estoppel doctrine in California and in this Circuit.

The question in *Hernandez* was whether non-signatories to a contract "should be able to enforce a contract they did not sign" under, *inter alia*, equitable estoppel. 87 Cal. App. 5th at 1218. The holding rested on the view that "the linchpin of the estoppel doctrine is fairness." *Id.* at 1219. By not suing the signatory, the plaintiff avoided "trying to have it both ways—to appear in court, she has completely given up her claims against" the signatory. *Id.* That reflects equitable estoppel rules; indeed, it mirrors *Grigson*. *See* 210 F.3d at 528 (using the same language). From claim to holding, *Hernandez* is an equitable estoppel case, which refutes Appellants' suggestion (at 47) that its holding is restricted to its facts.[4]

---

[3] Appellants cite a California Court of Appeal opinion that does not discuss *Hernandez*, thus rendering it unhelpful. It is, moreover, an unpublished decision and thus "must not be cited or relied on … in any other action." Cal. R. Ct. 8.1115(a).

[4] Appellants cite (at 47) *Franklin v. Community Regional Medical Center*, 998 F.3d 867 (9th Cir. 2021). *Franklin* involved a signatory suing only a non-signatory. *See id.* at 875. And, as the district court noted, *Franklin* "was decided prior to *Hernandez* and was admittedly an *Erie* guess." ROA.23-30916.3805. That a later Ninth Circuit opinion is inconsistent with *Franklin* further undermines its relevance. *See Ngo v. BMW of N. Am., LLC*, 23 F.4th 942, 950 (9th Cir. 2022).

*Hernandez* applies here.  Hines and Hoft are not "trying to have it both ways." They have not sued Facebook and Twitter in this case; nor have they attempted to sue Appellants on their contracts with those companies.  As in *Hernandez*, there is no unfairness here.

That conclusion applies to Twitter, even though federal law governs its arbitration agreement.  ROA.23-30916.1443.  As Appellants note, "the California equitable estoppel test mirrors *Grigson*'s," ROA.23-30916.1408; *see also*, *e.g.*, Br. Appellants 47; and as discussed, *Hernandez* and *Grigson* are in accord.  Moreover, this Court has held that the fact that the plaintiff "has not even sued" the signatory cuts against applying equitable estoppel.  *Newman*, 23 F.4th at 405 (discussing Texas law).  *Grigson*, to be sure, did not involve a signatory defendant—but a prior case did; indeed, two of the original defendants switched sides.  210 F.3d at 526, 530. The two cases were "[i]n reality … the same." *Id.* at 530.  That cannot be said about this case.

### 2.     Appellants do not satisfy equitable estoppel's two factors.

Two factors are relevant to the estoppel analysis:  "First, when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory.  Second, when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and

one or more of the signatories to the contract." *Hill v. GE Powers Systems, Inc.*, 282 F.3d 343, 348 (5th Cir. 2002) (footnotes omitted). Appellants fail to satisfy either factor.

Most fundamentally, Appellants' request is inconsistent with the purpose of equitable estoppel: fairness. A signatory to a contract with an arbitration clause "cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement … but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Grigson*, 210 F.3d at 528 (citing *MS Dealer Serv. Crop. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)); *see also Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 221 (2009) (similar); *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 398 (5th Cir. 2006) (similar). "The plaintiff's actual dependance on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the *sine qua non* of an appropriate situation for applying equitable estoppel." *In re Humana Inc. Managed Care Litig.*, 285 F.3d 974, 975 (11th Cir. 2002), *overruled in different part sub nom. PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401 (2003).

Here, Hines and Hoft are not seeking to hold Appellants liable for duties imposed by their agreements with Facebook and Twitter; rather, they seek to hold Appellants liable for violations of other duties, such as those imposed by the First Amendment, federal civil rights laws, and state tort law. That accords with "the first

principle that underscores all … arbitration decisions:  Arbitration is strictly 'a matter of consent.' " *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (quoting *Volt Info. Scis., Inc. v. Bd. & Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989)).  Equitable estoppel ensures a party cannot revoke its consent to the disadvantage of another.  It does not, however, extend to where a non-signatory would not "predictably become … affiliated or associated with [the signatory] in such a manner as to make it unfair to allow" a party to avoid arbitration. *Sokol*, 542 F.3d at 361.  Indeed, doing so undermines a main point of arbitration—reducing costs, *see Sun Coast I*, 956 F.3d at 341—by requiring contracting parties to expend time and effort drafting agreements to forestall strangers from taking advantage of them.  *See supra* Argument § I.A.

### a.     Hines and Hoft do not rely on the terms of service.

"Equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory." *Grigson*, 210 F.3d at 527 (quoting *MS Dealer*, 177 F.3d at 947).  But here, Hines and Hoft "are not seeking to enjoin [Facebook's or Twitter's] content moderation policies;" they are "challenging [Appellants'] *interference with* those social-media companies' independent application of their policies." *Missouri II*, 83 F.4th at 369; *see* ROA.23-30916.1594. They therefore do not rely on any rights or duties in the terms of service.

26

Hines's and Hoft's constitutional claims, for example, rest on Appellants' encouragement and coercion of "social-media platforms to censor" Hines and Hoft. ROA.23-30916.1675; *see also* ROA.23-30916.1672 (Count One); ROA.23-30916.1676 (Count Three).  That claim does not seek to enforce Twitter and Facebook's terms of service against Appellants—on the contrary, the claim alleges that Appellants coerced the platforms to adopt *more onerous* terms of service and to enforce those against Hines and Hoft.  *See, e.g.,* ROA.23-30916.1596–97, 1600–12, 1625–33, 1642–46, 1648–62.

Likewise for the state law counts.  Both rest on Appellants "procuring and inducing the censorship and suppression of speech on social media on the basis of viewpoint and discriminatory animus."  ROA.23-30916.1679; *see* ROA.23-30916.1677 (Appellants "induc[ed] social-media platform(s) to censor or suppress … speech or content on social media").  Counts Four and Five do not seek to enforce Facebook's and Twitter's terms of service against Appellants.  Count Four, for example, points to interference with Hines's and Hoft's relationship with social media companies plus "third parties."  ROA.23-30916.1677.  And Count Five involves interference with "those rights and interests" plus "inducing the censorship and suppression of speech on social media on the basis of viewpoint and discriminatory animus."  ROA.23-30916.1679.

27

Moreover, entire swaths of the amended complaint fall outside the terms of the arbitration agreements. The Facebook terms of service, for example, apply "to access or use of the Meta Products, for a business or commercial purpose." ROA.23-30916.1431; *see also* ROA.23-30916.1432. Hines, however, sued over far more than "business or commercial" use of Facebook; she alleges censorship of her "personal Facebook page," ROA.23-30916.1664, involving speech with no business or commercial focus. In addition, Appellants provide no evidence that Hines' deplatformed Facebook groups, *see* ROA.23-30916.1664, were "[p]ages" within the meaning of the Facebook commercial terms, *see* ROA.23-30916.1431. Hines and Hoft also allege harm as audience members of *others*' speech. *See* ROA.23-30916.1664, 1667. Neither Facebook's nor Twitter's terms of service reference or regulate users as consumers of speech. ROA.23-30916.1431 (Facebook); ROA.23-30916.1441 (Twitter).

Thus, none of Hines's and Hoft's claims is "dependent upon" the Facebook or Twitter terms of service in the relevant sense. *Grigson*, 210 F.3d at 529. Appellants, working with government officials, coerce and significantly encourage Facebook and Twitter to censor Hines and Hoft by pushing them to adopt more onerous terms of service and to enforce them against Hines and Hoft. The claims remain the same regardless of the specific provisions of the terms of service, which is why Appellants do not point to a single contractual provision as case-dispositive. Indeed, Hines and

Hoft do not need to show that Facebook or Twitter breached the terms of service to establish any of their claims—that fact merely strengthens Hines' and Hoft's case. These claims are thus "independent of" the terms of service in the relevant sense. *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1131 (9th Cir. 2013); *see also Johnson v. Walmart Inc.*, 57 F.4th 677, 683 (9th Cir. 2023) (finding two contracts between the same parties separate because finding a breach of one does not require finding a breach, or interpreting, the other). "That being so, the basis for equitable estoppel—relying on an agreement for one purpose while disavowing the arbitration clause of the agreement—is completely absent." *Goldman*, 173 Cal. App. 4th at 230; *see also Grigson*, 210 F.3d at 528 (similar); *see also*, *e.g.*, *In re Humana*, 285 F.3d at 976.

   *Murphy v. DirecTV, Inc.*, 724 F.3d 1218 (9th Cir. 2013), is on-point. There, the Ninth Circuit—applying California law—rejected Best Buy's attempt to take advantage of DirecTV's arbitration agreement with customers who leased television equipment from Best Buy. *See* 724 F.3d at 1223. Best Buy allegedly misrepresented that a customer was buying certain equipment as opposed to leasing it. *See id.* at 1230. That misrepresentation, however, had "nothing to do" with the agreements the plaintiffs made with DirecTV. *Id.* That was so "[e]ven if Best Buy is correct that Plaintiffs' claims on some abstract level require the existence of" those agreements. *Id.* "In California, equitable estoppel is inapplicable where a plaintiff's 'allegations

reveal no claim of any violation of any duty, obligation, term or condition imposed by the [customer] agreements.'" *Id.* (quoting *Goldman*, 173 Cal. App. 4th at 230).

Likewise, Hines's and Hoft's complaint rests on Appellants' coercion of censorship—something that is not based on "any violation of any duty, obligation, term or condition imposed by" Twitter's and Facebook's terms of service, even if the censorship does, in some sense, "require the existence of" the terms of service, because those terms were one of the vehicles by which Appellants pushed Facebook and Twitter to censor Hines and Hoft or because Hines and Hoft had to agree to them to create accounts. *Id.*[5] If no terms of service existed, and Appellants coerced the platforms to censor Hines and Hoft through some other means, Plaintiffs' claims would be little changed, because they arise from rights and duties imposed by the Constitution, federal statutes, and state tort law—not from rights and duties imposed by the terms of service—and so a breach of those terms is not necessary to establish Appellants' liability.

Appellants' caselaw underscores that the signatory's claims must arise from and be based upon rights and duties in the underlying contract. *Crawford Prof'l*

---

[5] *Murphy* also undermines Appellants' suggestion that equitable estoppel applies because the terms of service are somehow a but-for cause of Hines's and Hoft's claims. "[T]his is not enough for equitable estoppel." *Murphy*, 724 F.3d at 1230; *see Hill*, 282 F.3d at 349 (noting that "'touching matters' is not the appropriate test" and that just because claims "are dependent" on a contract's existence does not mean they are based on the contract).

*Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249 (5th Cir. 2014) (cited at 50–51), and *Uptown Drug Co. v. CVS Caremark Corp.*, 962 F. Supp. 2d 1172 (N.D. Cal. 2013) (cited at 51), involved claims arising from contractual rights to use information. *See Crawford*, 748 F.3d at 260–61; *Uptown Drug Co.*, 962 F. Supp. 2d at 1185–86. There, unlike here, the plaintiff "would have no claims" absent the contract. *Uptown Drug Co.*, 962 F. Supp. 2d at 1186. Similarly, *O'Conner v. AT&T Corp.*, 2013 WL 3107496 (M.D. La. June 18, 2013) (cited at 51), applied equitable estoppel because "Plaintiffs cannot state a claim against Apple without reference to the wireless service agreements[,] [and] to address Plaintiffs' claims against Apple would necessarily require the Court to interpret the contracts between Plaintiffs and AT&T." *Id.* at *4.[6] Appellants never say how Hines's and Hoft's claims require interpretation of the terms of service or point to any duty created by the Facebook or Twitter terms of service that Hines and Hoft seek to vindicate. To be sure, Appellants say the terms of service "are critical to the[] claims," Br. Appellants 49, and that Count Five is "necessarily grounded in the terms of service," *id.* at 50. But they do not say how, and mere assertion is not enough.

---

[6] In *In re Apple & AT & TM Antitrust Litigation*, 826 F. Supp. 2d 1168 (N.D. Cal. 2011), "Plaintiffs themselves have contended throughout this litigation that their antitrust and related claims against [defendants] arise from their respective … service contracts." *Id.* at 1178. Hines and Hoft make no such contention.

Appellants claim (at 52) that they are just "encouraging" social media companies to censor content.  Not so.  Appellants "urge, pressure, and coerce social-media platforms" to censor speakers.  ROA.23-30916.1581, 1614.  And, in any event, this mischaracterization cuts against Appellants.  Pushing Facebook and Twitter to change their content policies and to censor content is a step before what Facebook and Twitter must do under the terms of service.

Thus, Hines's and Hoft's claims are, in the relevant sense, "independent of the existence of" the terms of service and the arbitration agreements.  *Kramer*, 705 F.3d at 1131.

### b. There is no intertwined misconduct founded in the terms of service.

The second factor requires that the "interdependent misconduct … be founded in or intimately connected with the obligations of the underlying agreement." *Goldman*, 173 Cal. App. 4th at 219; *see id.* at 225; *see also MS Dealer Serv. Corp.*, 177 F.3d at 948 (similar).  This factor is inapplicable for virtually the same reasons as the first factor.

"[T]he fundamental point" is still the contract: The concerted wrongdoing must be part of a complaint that is based on the underlying contractual agreements. *Goldman*, 173 Cal. App. 4th at 233.  Thus, "[t]he analysis here is much the same as under the first" prong—though it does not require an "explicit assertion of contractual rights." *Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*, 2020 WL

620294, at *7 (C.D. Cal. Jan. 9, 2020) (citing *Goldman*, 173 Cal. App. 4th at 221); *see Brown*, 462 F.3d at 398–99.  Thus, meeting only "*Grigson*'s second prong" is insufficient to reverse the denial of equitable estoppel—as happened in *Hill*.  282 F.3d at 349.  *Hill* alone justifies affirmance.  In any event, as the district court noted, "[t]he alleged concerted misconduct is between [Appellants] and government officials, not between [Appellants] and Facebook and/or Twitter."   ROA.23-30916.3804.

Appellants, for their part, point (at 54–58) only to collusion between them and Facebook and Twitter.  "Mere allegations of collusion are insufficient to trigger equitable estoppel."  *Murphy*, 724 F.3d at 1232.  "[S]uch allegations support an application of estoppel only when they 'establish that the claims against the nonsignatory are intimately founded in and intertwined with the obligations imposed by the contract containing the arbitration clause.'"  *In re Humana*, 285 F.3d at 975 (quoting *MS Dealer*, 177 F.3d at 948); *see also In re Henson*, 869 F.3d 1052, 1061 (9th Cir. 2017); *Kramer*, 705 F.3d at 1128–29.  Nor could Appellants establish such an inextricable interconnection.  A party's attempt to coerce the creation and "enforcement of" more draconian content moderation policies is separate from the policies themselves.  *Missouri II*, 83 F.4th at 370.  Thus, Hines and Hoft do *not* require "the signatory social media platforms [to have] wrongfully censored them" to make their claims, *contra* Br. Appellants 57; they require showing that Appellants

used coercion or significant encouragement to force Facebook and Twitter to censor them. Whether Hines' and Hoft's speech violated the platforms' policies is not an element of any claim against *Appellants*. Indeed, for the constitutional claims, Hines and Hoft do not even need to show Appellants succeeded. *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) ("[A] threat is actionable and thus can be enjoined even if it turns out to be empty—the victim ignores it, and the threatener folds his tent."); *see also Missouri II*, 83 F.4th at 381 ("[A] credible threat may violate the First Amendment even if the victim ignores it.") (quotations omitted).

In short, Facebook and Twitter are not the wrongdoers, and Hines' and Hoft's claims are not " 'founded in and intertwined with the obligations imposed by' " their terms of service. *In re Humana*, 285 F.3d at 975 (quoting *MS Dealer*, 177 F.3d at 948).

In any event, Appellants' argument that the platforms voluntarily cooperated with their efforts is wrong. The amended complaint contains numerous allegations that Appellants improperly pressured Facebook and Twitter to censor Hines and Hoft. *See*, *e.g.*, ROA.23-30916.1581, 1598–99, 1613–15, 1634–38. Finally, the fact that "only '35% of the URLs' " that EIP/VP flagged " 'were either labeled, removed, or soft blocked,' " Br. Appellants 55 (quoting ROA.23-30916.1619), demonstrates the astonishing *success* rate for Appellants' censorship efforts. "Left to their own

34

devices, the social-media platforms" take no action against over 99 percent of non-obscene, non-spam posts. ROA.23-30916.1582 (quoting *NetChoice, LLC v. Paxton*, 49 F.4th 439, 459 (5th Cir. 2022), *cert. granted* 144 S. Ct. 477 (2023); *see also* ROA.23-30916.1603, 1922. That the content Appellants flagged was *thirty-five times* more likely to be censored than other content is "*some* indication that the [censorship] decision resulted from the threat." *Missouri II*, 83 F.4th at 381. Further, that 35 percent censorship rate was achieved across potentially *millions* of posts. The First Amendment is violated even if government—and its hand-in-glove partners, Appellants here—succeed in censoring core political speech "only" one-third of the time.

### C.     Most of Plaintiffs' Claims Fall Outside the Arbitration Agreements.

Appellants thus cannot compel arbitration. But even if they could, Appellants are not entitled to compel arbitration of all of Hines's and Hoft's claims because most do not all "fall[ ] within the scope of [the Facebook and Twitter] arbitration agreement[s]." *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996).

### 1.     Facebook's and Twitter's arbitration agreements do not extend to other platforms.

Hines and Hoft allege that Appellants' activities extend beyond Facebook and Twitter to companies like YouTube, Pinterest, Tiktok, Reddit, Nextdoor, Discord, and Instagram. *See* ROA.23-30916.1598, 1612, 1618, 1619, 1639. Indeed, the EIP professes that it monitors *The Gateway Pundit*'s YouTube and Instagram accounts

for misinformation.   ROA.23-30916.1620.   Thus, Hines and Hoft have alleged "censorship of activity" on other platforms.  *Contra* Br. Appellants 12 n.4.

Appellants, however, provided only the Facebook and Twitter arbitration agreements.  *See*, *e.g.*, Br. Appellants 10–11.  And while Aspen provided the district court with the Instagram terms of service, *see* ROA.23-30916.3967–73, Appellants do not mention or even cite them in their brief, and so have "abandoned" any argument relating to Instagram.  *Coleman v. Lincoln Parish Detention Ctr.*, 858 F.3d 307, 309 (5th Cir. 2017) (per curiam).  Appellants thus have not shown "a valid agreement to arbitrate" with platforms besides Facebook and Twitter.  *Webb*, 89 F.3d at 258.

### 2. Facebook's arbitration agreement applies only to commercial claims.

As noted above, many claims fall outside the scope of Facebook's terms of service and arbitration agreements.  *See supra* Argument § B.2.a.[7]  Those include Hines's claims related to her personal use of Facebook, and Hines's and Hoft's claims as audience members.  Those claims are not arbitrable.

---

[7] Hines and Hoft agree that the question of whether a claim is arbitrable under the Twitter agreement is for the arbitrator.  *See* ROA.23-30916.1442.  Whether Appellants can enforce that agreement, however, "remains a question for courts." *Newman*, 23 F.4th at 398; *see also Granite Rock Co.*, 561 U.S. at 297; Br. Appellants 62.

### D.     Counts One and Two are not arbitrable.

Counts One and Two are not arbitrable.  Parties can agree to arbitrate federal statutory claims "unless the FAA's mandate has been 'overridden by a contrary congressional command.'"  *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (quoting *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 226 (1987)).  That command is "discoverable in the text" of the federal law, "its legislative history, or an 'inherent conflict' between arbitration and the [law]'s underlying purposes."  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) (quoting *McMahon*, 482 U.S. at 227)); *see also Lim v. Offshore Specialty Fabricators, Inc.*, 404 F.3d 898, 907 (5th Cir. 2005).

Starting with Count Two and 42 U.S.C. § 1983: "The very purpose of § 1983 was to interpose the *federal courts* between the States and the people."  *McDonald v. City of W. Branch*, 466 U.S. 284, 290 (1984) (emphasis added) (quoting *Mitchum v. Foster*, 407 U.S. 225, 242 (1972)); *Jennings v. Patterson*, 488 F.2d 436, 441 (5th Cir. 1974) ("It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts … .").  In enacting § 1983, "Congress assigned to the federal courts a paramount role in protecting constitutional rights."  *Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 503 (1982).  "There is no tribunal so fitted" to evaluate § 1983 claims.  *Id.* (quoting Cong. Globe, 42d Cong., 1st Sess., 476 (1871) (statement of Rep. Dawes)); *see also id.* at 504–05.

Section 1983 claims are therefore the exclusive province of federal courts. *Patsy* concluded that "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983." *Id.* at 516. That would be inconsistent with the federal courts' "paramount role in protecting constitutional rights." *Id.* at 503. The Third Circuit has concluded that *Patsy* means States cannot mandate arbitration of § 1983 claims. *See Hohe v. Casey*, 956 F.2d 399, 408–09 (3d Cir. 1992). *McDonald* held it inappropriate to accord "preclusive effect to an arbitration award in a subsequent § 1983 action" because doing so "would undermine that statute's efficacy in protecting federal rights." 466 U.S. at 290. And *Burnett v. Grattan*—citing *McDonald*—said that applying "an administrative statute of limitations" to § 1983 claims "ignores the dominant characteristic of civil rights actions: they belong in court." 468 U.S. 42, 50 (1984).

Likewise for the § 1985(3) claims in Count One. Congress enacted § 1985 "'to enforce'" constitutional rights. *Griffin v. Breckenridge*, 403 U.S. 88, 100 (1971) (quoting Cong. Globe, 42d Cong., 1st Sess., App. 69 (1871) (statement of Rep. Shellaberger). The law was intended to "combat the prevalent animus against [African-Americans] and their supporters" in the South, *United Brotherhood of Carpenters and Joiners of America, Local 610 v. Scott*, 463 U.S. 825, 836 (1983), and to ensure the "'equal protection of the laws and ... equal privileges and immunities under the laws,'" *Griffin*, 403 U.S. at 100 (Cong. Globe, 42d Cong., 1st

Sess., App. 188 (1871) (statement of Rep. Willard)).  As a result, § 1985 claims, like § 1983 claims, "exist independent of any other legal or administrative relief that may be available as a matter of federal or state law.  They are judicially enforceable in the first instance," and their "dominant characteristic" is that they "belong in court." *Burnett*, 468 U.S. at 50.

Thus, in enacting 42 U.S.C. § 1983 and § 1985(3), Congress intended "to preclude a waiver of judicial remedies for" those claims. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985).  Claims brought under those laws are "uniquely judicial." *Tripp v. Renaissance Advantage Charter Sch.*, 2003 WL 22519433, at *8 (E.D. Pa. Oct. 8, 2003) (discussing § 1983).  It would "dilute [their] effectiveness … to require such claims to be resolved in binding arbitration … ." *Id.* at *10.  "Accordingly, an inherent conflict exists between the purposes of [those laws] and arbitration," *id.*, and the latter must give way.

These laws have remained substantively unchanged to the present day, *compare* Act of April 20, 1871, ch. 22, §§ 1–2, 17 Stat. 18, 18–19, *with* 42 U.S.C. §§ 1983, 1985(3), which indicates Congress did not intend to abrogate them through the FAA, which serves to "ensure[] the enforceability of *private* agreements to arbitrate." *Waffle House, Inc.*, 534 U.S. at 289 (emphasis added).  That focus on private agreements contrasts with the focus of public rights and duties in 42 U.S.C. §§ 1983 and 1985.  *See Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 751 (5th

Cir. 2023), *see also United Brotherhood*, 463 U.S. at 830 (requiring, under § 1985(3), plaintiff to "prove[] that the state is involved in the conspiracy or that the aim of the conspiracy is to influence the activity of the state"). A law meant to enforce private commercial agreements, *see* 9 U.S.C. § 2, does not extend to civil-rights litigation involving official acts.

### E.   Appellants' Request To Strike the Class Claims Fails.

Appellants' argument (at 67) to strike the class claims assumes they can enforce the arbitration agreement. Because they cannot, their request is meritless.

### F.   If the Court believes the district court abused its discretion, it should not order arbitration but remand for arbitration-related discovery.

Even if the Court disagrees and concludes the district court should not have denied Appellants' motions, it should not order arbitration; it should order discovery for the reasons Hines and Hoft identified in the district court. *See* ROA.23-30916.2977–79.

## II.   Appellants' Personal-Jurisdiction Argument Is Meritless.

### A.   This Court Lacks Jurisdiction to Address Personal Jurisdiction.

Appellants' personal jurisdiction arguments are not properly before the Court. That is certainly true of the *Stamos* Appellants' motion, which was mooted by the filing of the amended complaint. *See ACTG*, 56 F.4th at 1034 (filing an amended complaint renders a prior complaint "nullified"). Aspen's motion, to be sure, is

directed at the first amended complaint, *see* ROA.23-30916.4018–19, but the district court has not yet ruled on it, and Appellants do not differentiate between the two.

Regardless, there is no appellate jurisdiction over either motion. Section 16 of the FAA is an exception to the final-judgment rule of 28 U.S.C. § 1291. Like all "statutes permitting" interlocutory appeals, it "must be strictly construed." *Allen v. Okam Holdings, Inc.*, 116 F.3d 153, 154 (5th Cir. 1997). Thus, "the scope of 9 U.S.C. § 16 is confined to the specific, limited set of orders set forth in the statute." *Van Dusen v. Swift Transp. Co.*, 830 F.3d 893, 899 (9th Cir. 2016) (collecting cases). Nothing in Section 16's text purports to authorize interlocutory appeals of personal-jurisdiction questions—let alone those that the district court has not yet decided. 9 U.S.C. § 16(a)-(b). Section 16 does not abrogate the rule that denials of motions to dismiss raising personal jurisdiction are reviewable only on appeal from final judgments. *See, e.g., Catlin v. United States*, 324 U.S. 229, 236 (1945) ("But denial of a motion to dismiss, even when the motion is based upon jurisdictional grounds, is not immediately reviewable."); *Jefferson v. Delgado Cmty. Coll. Charity Sch. Of Nursing*, 602 F. App'x 595, 597 (5th Cir. 2015) (per curiam) ("[A] defendant may not appeal the denial of a motion to dismiss based on a lack of personal jurisdiction under the collateral order rule.").

Thus, Appellants cannot bootstrap the Court's jurisdiction over the orders denying arbitration into jurisdiction over Appellants' not-yet-ruled personal

jurisdiction motions.  Neither arbitration order addresses personal jurisdiction.  *See* ROA.23-30916.3798-3806;  ROA.23-30916.4063-4064.  And Appellants did not raise personal jurisdiction in their motions to compel arbitration.   Because Appellants' personal-jurisdiction arguments do not relate to any order within the scope of § 16, the Court lacks appellate jurisdiction to consider them.

Appellants futilely attempt (at 24–26) to evade that open-and-shut result. Section 16 does permit interlocutory review of certain "orders" that—like certification under 28 U.S.C. § 1292(b)—give the Court "jurisdiction to review the … entire order." *Int'l Energy Ventures Mgmt., LLC v. United Energy Grp., Ltd.*, 999 F.3d 257, 263 n.1 (5th Cir. 2021).  That, as Appellants note, means the Court's jurisdiction extends to "any other questions, although themselves interlocutory and not otherwise appealable, that underlie and that are inextricably involved with the order being appealed."  Br. Appellants 24–25 (quoting *CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 220 n.2 (5th Cir. 2022) (en banc) (quotation omitted). But the same *All American Check Cashing* footnote states:  "While the circuit court may address any issue necessary to decide the case before it, *the circuit court may not reach beyond the certified order to address those not yet ruled on by the district court*."  *Id.* (quotation and alteration omitted) (emphasis added).

Appellants' personal-jurisdiction arguments are "not yet ruled on by the district court." *Id.*  Thus, under Appellants' own cases, the Court lacks jurisdiction

to address them. *Id.*; *see also Janvey v. Alguire*, 647 F.3d 585, 603 (5th Cir. 2011) ("Because there is no order, there is also no statutory basis for interlocutory review.").[8]

Nor can Appellants invoke pendent appellate jurisdiction. *Contra* Br. Appellants 25. Pendent appellate jurisdiction does not turn on whether something is a threshold issue, but whether the case involves "'rare and unique circumstances where a final appealable order is 'inextricably intertwined' with an unappealable order." *Hinkle v. Phillips 66 Co.*, 35 F.4th 417, 421 (5th Cir. 2022) (quoting *Noble Cap. Fund Mgmt., LLC v. U.S. Cap. Glob. Inv. Mgmt., LLC*, 31 F.4th 333, 336–37 (5th Cir. 2022) (quotations omitted)). Indeed, the Third Circuit has held that that is the *only* time an appellate court can address a personal jurisdiction question in a § 16 appeal. *See E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 203–04 (3d Cir. 2001) (citing, *inter alia*, *PaineWebber Inc. v. Chase Manhattan Private Bank*, 260 F.3d 453 (5th Cir. 2001)). Appellants do not even attempt to show that the circumstances for pendent appellate jurisdiction exist here.

In fact, Appellants raised numerous threshold issues in the district court, such as subject-matter jurisdiction and venue, *see* ROA.23-30916.1390, 1489, 4018–19.

---

[8] *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476 (5th Cir. 2008) (cited at 26), is even further afield. There, the Court addressed personal jurisdiction after an appeal from a final judgment and as an alternative basis for affirmance. *See id.* at 481–82.

Under Appellants' logic, this Court has jurisdiction over all of them.  That Appellants argue only personal jurisdiction implies that they do not believe their own argument.

That leaves Appellants' factually and legally erroneous efficiency argument (at 26).  The personal-jurisdiction issue here involves hundreds of factual allegations in a 100+ page complaint.  Reviewing it without the benefit of the district court's analysis and narrowing of issues is anything but efficient.  In any event, the Court "may not expand [its] appellate jurisdiction for efficiency's sake." *Pickett v. Tex. Tech Univ. Health Sci. Ctr.*, 37 F.4th 1013, 1028 (5th Cir. 2022) (quotations omitted); *see also Williams v. Taylor Seidenbach, Inc.*, 958 F.3d 341, 345 (5th Cir. 2020) (en banc).

## B.    Appellants Waived Their Personal-Jurisdiction Argument.

Appellants claim (at 20–24) that the district court was required to address personal jurisdiction before arbitration.   Appellants waived this argument. "[A]rguments not raised before the district court are waived and cannot be raised for the first time on appeal," *Webster v. Kijakazi*, 19 F.4th 715, 720 (5th Cir. 2021) (quotation omitted), and Appellants never argued that the district court had to resolve personal jurisdiction before arbitration.  *See* ROA.23-30916.1390-1429; ROA.23-30916.1489-1561.  That is not for want of opportunity.  The *Stamos* Appellants addressed sequencing, telling the district court to "decide [the separately filed arbitration motion] before addressing any merits-based ground for dismissal, *i.e.*,

before deciding whether the Complaint states a claim upon which relief may be granted under Rule 12(b)(6)." ROA.23-30916.1400. Aspen similarly said that "[i]f the claims against it are not dismissed on jurisdictional or venue grounds or compelled to arbitration, Aspen will" file a motion to dismiss. ROA.23-30916.4049 n.10. At no point did Appellants say the district court must decide personal jurisdiction first.

Regardless, the argument is meritless. Where, as here, a party requests that the federal court compel arbitration, he or she is seeking affirmative relief. *See Midwest Mech. Contractors, Inc. v. Commonwealth Constr. Co.*, 801 F.2d 748, 752 (5th Cir. 1986). "[W]hen a party seeks affirmative relief from a court, it normally submits itself to the jurisdiction of the court with respect to the adjudication of claims arising from the same subject matter." *PaineWebber Inc.*, 260 F.3d at 460–61 (quotations omitted). Thus, "a defendant can subject itself to the court's jurisdiction for the limited purpose of compelling arbitration without waiving challenges to personal jurisdiction for other purposes." *Halliburton*, 921 F.3d at 529 n.2 (quotation omitted). Appellants did just that, and so consented to the district court's *in personam* jurisdiction for purposes of deciding their arbitration claim.

Appellants appear to argue (at 22) that *Halliburton* does not apply to litigation conduct. But a party can voluntarily subject itself to personal jurisdiction in multiple ways, including by contract and by litigation conduct. *See, e.g., Ins. Corp. of Ir. v.*

45

*Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982). *Halliburton* did not abrogate that rule—and Appellants' circuit caselaw does not suggest otherwise. In *PaineWebber Inc.* (cited at 22), the party seeking to compel arbitration was the plaintiff; the party objecting to personal jurisdiction was the defendant. *See* 260 F.3d at 458. *Reading Health System v. Bear Stearns & Co.*, 900 F.3d 87 (3d Cir. 2018) (cited at 23) is distinguishable for the same reason. *See id.* at 92. Two other cases (cited at 23) merely resolved personal jurisdiction before resolving arbitrability without suggesting that the sequence was required. *Rodriguez-Rivera v. Allscripts Healthcare Solutions, Inc.*, 43 F.4th 150 (1st Cir. 2022); *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144 (3d Cir. 2001).[9] And *InterGen N.V. v. Grina* (cited at 23) did not involve personal jurisdiction. *See* 344 F.3d 134, 141–42 (1st Cir. 2003). In the remaining out-of-circuit case (cited at 23), the court did not address arbitrability or the order in which a court must resolve jurisdiction and arbitrability. *Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes*, 336 F.2d 354 (2d Cir. 1964).

---

[9] The same is true of four district-court cases cited by Appellants (at 22–23). *See Pollock v. Protect My Car Admin Servs., Inc.*, 2023 WL 6324366, at *1 (S.D. Tex. Sept. 28, 2023); *Skin Consultants, LLC v. Textron Aviation, Inc.*, 2018 WL 4621904, at *1–4 (N.D. Miss. Sept. 26, 2018); *Vujasinovic & Beckcom, PLLC v. Cubillos*, 2016 WL 5573712, at *3 (S.D. Tex. Sept. 29, 2016); *Brammer Operating Co. v. Pathfinder Expl., LLC*, 2008 WL 400352, at *2 (W.D. La. Jan. 31, 2008). The other district-court case (at 23)—*Dykes v. Southern Star, Inc.*—did not involve personal jurisdiction. *See* 2006 WL 8436908, at *2 (N.D. Tex. July 6, 2006).

More generally, Appellants' sequencing argument implicitly rests on the general principle that courts must resolve jurisdictional issues before the merits. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007). But district courts have flexibility to address non-jurisdictional threshold issues before addressing jurisdiction like *forum non conveniens*, *id.* at 431–32, or the application of a forum selection clause, *Magi XXI, Inc. v. Stato Della Citta del Vaticano*, 714 F.3d 714, 720 n.6 (2d Cir. 2013). Indeed, they may decide venue questions before personal jurisdiction. *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979). Neither "is fundamentally preliminary in the sense that subject-matter jurisdiction is, for both are personal privileges of the defendant, rather than absolute strictures on the court, and both may be waived by the parties." *Id.*

"Arbitration provisions … are a species of forum-selection clauses." *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 698 (2010). Thus, under *Sinochem*, district courts have discretion to address arbitration before resolving questions of personal jurisdiction. Like other non-subject-matter jurisdiction issues, arbitration is a waiveable "personal privilege[ ] of the defendant … ." *Leroy*, 443 U.S. at 180. It is not "fundamentally preliminary in the sense that subject-matter jurisdiction is." *Id.* And here, there is a "sound prudential justification for doing so": "[I]t is so clear that" Appellants' arbitration request is meritless. *Id.* at 180-81; *see supra* Argument § I.

### C.     There Is Personal Jurisdiction Over All Appellants.

The Court should not reach the personal-jurisdiction issue.  But if it does, personal jurisdiction exists.  "The constitutional requirement for specific jurisdiction is that the defendant has 'minimum contacts' with the forum state such that imposing a judgment would not 'offend traditional notions of fair play and substantial justice.'"  *Def. Distributed v. Grewal*, 971 F.3d 485, 490 (5th Cir. 2020) (quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)).[10]  The inquiry has three steps: (1) "whether the defendant has minimum contacts with the forum state;" *id.* (2) whether the claims "arise out of or relate to the defendant's contacts with the forum," *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351, 362 (2021) (quotations and emphasis omitted); and (3) "whether the exercise of personal jurisdiction is fair and reasonable," *Grewal*, 971 F.3d at 490 (quotation omitted).

Appellants challenge the first and last considerations.  At this stage, Hines's and Hoft's "uncontroverted, nonconclusional factual allegations" are assumed true and "controverted allegations" are resolved in their favor.  *Id.* (quotations omitted).

---

[10] Personal jurisdiction requires both that "the forum state's long-arm statute extends to the nonresident defendant and the exercise of jurisdiction comports with due process."  *Grewal*, 971 F.3d at 490 (quotations omitted).  Here, Louisiana's long-arm statutes authorizes the exercise of personal jurisdiction to the extent permitted by the Due Process Clause.  *See* La. Rev. Stat. § 13:3201(B).  Thus, "the two inquiries merge."  *Grewal*, 971 F.3d at 490.

**Minimum Contacts**: *Grewal* is on-point. There, a Texas-based online publisher of firearm-related materials sued the New Jersey Attorney General, alleging that that the Attorney General had engaged in conduct outside Texas designed to silence the publisher's speech to other Texas residents. *See* 971 F.3d at 489. Personal jurisdiction existed even though "[t]he totality of [the defendant's] contacts with Texas involves a cease and desist order sent to" the plaintiff. *Id.* at 491 (quotations and original alterations omitted). The reason: "First, many of plaintiffs' claims are based on Grewal's cease-and-desist letter. … Second, and more important, … [Grewal] demands that the plaintiffs cease publications of their materials generally." *Id.* at 492. "He [thus] projected himself across state lines and asserted a pseudo-national executive authority … ." *Id.* at 493. In doing so, he "intended effects on the plaintiffs and, by extension … Texas residents who would benefit from plaintiffs'" First Amendment activities. *Id.* Grewal's actions chilled plaintiffs which, "in turn" caused them to cease publication and reduced Texans' access to the materials the plaintiffs seek to publish." *Id.* at 495. That "[c]ensorship, like libel, is damaging not just to the speaker, but to surrounding audiences. And like libel, censorship's harm occurs not just where it originates, but where it arrives." *Id.* at 495 n.9.

So also here. Appellants constructed a complex, wide-ranging enterprise to identify and censor individuals with disfavored views, including Hines and Hoft.

*See* ROA.23-30916.1584, 1619-21, 1659, 1665-69.    They censored Hines' and Hoft's speech, with the intent that others would not read it—including others in Louisiana.   The result, like in *Grewal*, is harm in Louisiana, which Appellants fully intended and brought about.   For example, Appellants targeted Hines's speech of specific interest to Louisiana residents, such as lobbying the State legislature.   *See* ROA.23-30916.1660–61.    That "interfere[d] with [Hines's] ability to reach Louisiana audiences"—including State officials.   ROA.23-30916.1660.   Appellants likewise targeted Hoft's speech to stop him from reaching his Louisiana audiences. *See* ROA.23-30916.1661–62.   The EIP, for example, said it "repeatedly flags his content as supposed 'misinformation.'"   ROA.23-30916.1666.   Appellants also restricted "free expression between and among Louisiana residents" by limiting what "tens or hundreds of thousands of Louisianans" could post and read.   ROA.23-30916.1662.

Appellants did what this Court found "important" in *Grewal*—they reached out to silence Hines's and Hoft's speech to Louisiana residents.   *See* 971 F.3d at 492. Indeed, they did *more* than that.   Appellants "communicate[d] both with Louisiana government officials and with social-media platforms about Plaintiffs' and others' speech occurring in Louisiana for the purpose of silencing that speech in Louisiana and preventing Louisianans from having access to it."   ROA.23-30916.1661. Indeed, they assigned analysts to do just that.   ROA.23-30916.1660; *see* ROA.23-

30916.1661 (citing evidence in the *Missouri* litigation showing contact between CISA officials, "with whom [Appellants] are completely intertwined, and Louisiana state officials").

*Grewal* is binding here.   It—and numerous other precedents, *see*, *e.g.*, *Caldor v. Jones*, 465 U.S. 783, 789–90 (1984); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984)—show that Hines and Hoft have alleged sufficient minimum contacts.  Appellants' actions "had a chilling effect on the exercise of … First Amendment rights…. That chilling effect, in turn, caused [Hines and Hoft] to cease publication and reduced [Louisianans'] access to the materials the plaintiffs seek to publish. …  In this sense, [Appellants] created contacts with [Louisiana] and not just the plaintiffs." *Grewal*, 971 F.3d at 495 (footnote omitted).  Appellants' "[c]ensorship … is damaging not just to the speaker, but to surrounding audiences. [Its] harm occurs not just where it originates, but where it arrives." *Id.* at 495 n.9.

Appellants argue that the basis of *Grewal*'s holding is that Grewal targeted a Texas company "while ignoring many similar-situated persons."  Br. Appellants 36 (quotations omitted).  Not so.  That conduct *confirmed* Grewal's intent to reach beyond New Jersey into Texas.  *See Grewal*, 971 F.3d at 492.  Nothing in *Grewal* suggests that engaging in numerous enforcement actions in other forums precludes personal jurisdiction any of those forums; rather, it suggests the opposite.  Personal

jurisdiction exists in each forum where the defendant attempted to assert "authority" and "intended effects on the plaintiffs" and forum residents. *Id.* at 492–93.

Appellants discuss (at 33–34) *Walden v. Fiore*, 571 U.S. 277 (2014), and *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96 (5th Cir. 2018). In *Walden*, a Georgia-based law enforcement officer seized cash from Nevada residents passing through Georgia and allegedly submitted false information to prosecutors to justify retaining the cash. *Id.* at 279–81. The only impact of defendant's conduct on Nevada was that, after their cash was seized, plaintiffs traveled to Nevada and thus felt their injury (loss of money) there. *Id.* There was nothing Nevada-directed or Nevada-specific about that conduct; plaintiffs would have felt that same injury (deprivation of money) if they had traveled to any other State in the Union. *Id.* Here, Appellants targeted a Louisiana-based speaker and Louisiana-based listeners—and communicated with Louisiana officials to do so—to suppress speech within Louisiana.

In *Sangha*, a Texas-based mariner sued his former employer for contacting his new employer. 882 F.3d at 98-99. The communication's only connection to Texas was that it related to conduct by the plaintiff in the Gulf of Mexico *near* Texas. *Id.* Under those circumstances, the defendant's conduct was "legally insufficient to support a finding of specific jurisdiction," because it was "merely fortuitous" that it impacted the plaintiff in Texas. *Id.* at 103. Here, Appellants sought to censor speech

in Louisiana, including Louisiana-specific speech, and communicated with Louisiana officials to do so.

Ignoring a host of specific allegations, Appellants claim (at 29–31) "group pleading." But Hines and Hoft describe in detail the specific role that each Appellant played in the EIP/VP. *See* ROA.23-30916.1583-1662. Hines and Hoft are not "aggregating [Appellants'] forum contacts" such that "the assertion of jurisdiction over [one is] based solely on the activities of" another. *Rush v. Savchuk*, 444 U.S. 320, 331 (1980). Rather, they allege that activities of all Appellants were targeted towards censoring and limiting speech in Louisiana. Thus, showing that at least *some* Appellants had in-state contacts raises the compelling inference that they all did—as happened in *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619 (5th Cir. 1999), where facts pertaining to some defendants established "a prima facie showing" of minimum contacts as to each defendant. *Id.* at 626. Nor do Hines and Hoft rely solely on a conspiracy to impute contacts amongst co-conspirators. *Contra* Br. Appellants 30–31. Rather, the conspiracy is relevant because Appellants, through it, targeted Louisiana and caused the effects in Louisiana described above. And that is a valid method of establishing personal jurisdiction. *See Melea Ltd. v. Jawer SA*, 511 F.3d 1060, 1070 (10th Cir. 2007) (holding that a co-conspirator's contacts can establish jurisdiction "if the conspiracy is directed towards the forum, or substantial steps in furtherance of the conspiracy are taken in the forum"); *Guidry*, 188 F.3d at

629 (noting a State has jurisdiction where a tort done elsewhere causes in-State effects); *cf. Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014) ("Agency relationships ... may be relevant to the existence of *specific* jurisdiction."); *Rush*, 444 U.S. at 332 ("Naturally, the parties' relationships with each other may be significant in evaluating their ties to the forum.").

**Fairness and Reasonableness**:  Appellants contend (at 41–42) that it would be unfair and unreasonable to subject them to jurisdiction in Louisiana.  "To show that an exercise of jurisdiction is unreasonable once minimum contacts are established, the defendant must make a compelling case against it." *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999) (quotation omitted).  "It is rare to say the assertion [of personal jurisdiction] is unfair after minimum contacts have been shown." *Id.*

"In determining whether the exercise of jurisdiction is fair and reasonable, the court must balance: (1) the burden on the nonresident defendant of having to defend itself in the forum, (2) the interests of the forum state in the case, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in the most efficient resolution of controversies, and (5) the shared interests of the states in furthering fundamental social policies." *Sangha*, 882 F.3d at 102.  All these factors weigh in favor of personal jurisdiction.

(1) Appellants are highly sophisticated, well-resourced entities with elite counsel from major law firms that routinely engage in national practice across the country. Litigating in Louisiana federal court will be no more burdensome for them than litigating in any other federal district court.

(2) Louisiana has substantial interests at stake. Hines and Hoft seek to vindicate their own injuries and the free-speech rights of thousands of Louisianans. And Louisiana has a fundamental policy favoring freedom of speech within its borders. *See* LA. CONST. art. I, § 7. Moreover, as discussed above and contra Appellants (at 41), Appellants' censorship causes harm in Louisiana.

(3) Unlike Appellants, Hines and Hoft have far more limited resources. The burden of litigating in a distant forum is thus comparably greater for them.

(4) The case is currently pending before the same district judge who is presiding over *Louisiana and Missouri, et al. v. Biden, et al.*, No. 3:22-cv-01213-TAD-KDM (W.D. La.), which involves related challenges to federal officials' involvement in the EIP/VP. Having related disputes litigated in the same forum promotes consistency and efficiency.

(5) Louisiana has a profound interest in advancing its fundamental policy favoring the freedom of speech—a policy agreed to by all jurisdictions in the United States. It does not detract from "the shared interests of the states in furthering" those

55

"fundamental social policies," *Sangha*, 882 F.3d at 102, to litigate these claims in Louisiana.

## III.    The Court Should Affirm and Immediately Release the Mandate.

This appeal is another example of "powerful economic interests" using the appellate process "to increase litigation costs" and maximize "the expense of litigating." *Sun Coast I*, 956 F.3d at 341.  Appellants devote half their argument to an issue that is not before this Court—personal jurisdiction—raising concerns about delay tactics and scorched-earth litigation.

The Court should use its "robust tools to prevent unwarranted delay and deter frivolous interlocutory appeals." *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 745 (2023).  Summary affirmance and immediate release of the mandate is thus proper.  *See id.*; *see also* Fed. R. Civ. P. 41(b) (allowing courts to shorten the time to issue the mandate).  Here, as in *Sun Coast I*, "[d]ispensing with oral argument where the panel unanimously agrees it is unnecessary, and where the case for affirmance is so clear … is simply justice." *Id.* at 341.

## <u>CONCLUSION</u>

Hines and Hoft respectfully request that this Court dispense with oral argument, affirm the district court's judgment, and immediately release the mandate.

Dated: March 27, 2024                    Respectfully submitted,

America First Legal                      James Otis Law Group, LLC

Gene P. Hamilton                         */s/ D. John Sauer*
Reed D. Rubinstein                       D. John Sauer
Nicholas R. Barry                        Michael E. Talent
Michael Ding                             13321 N. Outer Forty Road,
Juli Z. Haller                           Suite 300
James K. Rogers                          St. Louis, MO 63017
Andrew J. Block                          (314) 562-0031
611 Pennsylvania Ave SE #231             john.sauer@james-otis.com
Washington, DC 20003
(202) 964-3721

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 27, 2024, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

## <u>CERTIFICATION OF COMPLIANCE</u>

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,938 words, excluding those portions pursuant to Federal Rule of Appellate Procedure 32(f), according to Microsoft Word.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface in Microsoft Word utilizing 14-point Times New Roman font.

*/s/ D. John Sauer*