# Arnold & Porter

**Elisabeth Theodore**
+1 202.942.5891 Direct
Elisabeth.Theodore@arnoldporter.com

July 1, 2024

**VIA CM/ECF**

Hon. Lyle W. Cayce
Clerk of the Court
United States Court of Appeals for the Fifth Circuit
F. Edward Hebert Building, 600 S. Maestri Place
New Orleans, LA 70130-3408

      Re:    *Hines v. Stamos*, No. 23-30826; *Hines v. Aspen Institute*, No. 23-30916

Dear Mr. Cayce:

*Murthy v. Missouri*, No. 23-411 (U.S. June 26, 2024), held that the two Plaintiffs here, Jill Hines and Jim Hoft, lacked standing to sue government officials and agencies for allegedly coercing social media platforms to suppress their speech. *Murthy* determined that Plaintiffs lacked evidence that government coercion caused or will cause platforms to take action on their posts.

*Murthy* forecloses Plaintiffs' claims here. This suit is premised entirely on Plaintiffs' claim that Defendants' exercise of their own First Amendment rights to speak to platforms on matters of public concern is actionable because it was "intertwined" with the government's coercion. *Murthy* rejects an essential component of that theory. Plaintiffs' brief on appeal and amended complaint relied heavily on the now-reversed decisions in *Missouri v. Biden*.

*Murthy* requires rejection of many of Plaintiffs' arguments about personal jurisdiction and arbitration. It also confirms that Plaintiffs lack standing, an independent basis for dismissal.

**I.**    *Murthy* **Rejects Fundamental Premises of Plaintiffs' Arguments Here**

***First***, the amended complaint—and in particular its coercion allegations—rely on findings from the decisions that *Murthy* reversed. *See, e.g.*, ROA. 23-30916.1588 n.1 (stating that complaint "incorporates and includes" now-reversed opinion); ROA.23-30916.1668 (citing "federal coercion … detailed in" *Missouri* opinions to support allegations that platform "cooperat[ion]" with Defendants results from "federal coercion and pressure"). Plaintiffs' allegations that rely on now-reversed opinions rather than well-pleaded facts must be disregarded. *See* slip op. 12 n.4 ("many" of the district court's factual findings "unfortunately appear to be clearly erroneous").

For example, *Murthy* forecloses Plaintiffs' repeated contentions here that platforms "exercise virtually no editorial control or judgment" and moderated posts only as a result of coercion. *E.g.*, Opps.4-5, 34-35. As *Murthy* found, "[f]or years, the platforms have targeted speech they judge to be false or misleading," citing election and health-related examples in 2016, 2018, and 2019—before the platforms' discussions with the government and before the EIP and VP projects began. Slip op. 2-3; *see id.* at 12 ("[T]he platforms moderated similar content long before any of the Government defendants engaged in the challenged conduct."). The platforms began "enforc[ing] their policies" against COVID-19 misinformation in early January 2020 (Facebook) and March

2020 (Twitter), *id.* at 2-3—before VP was formed in 2021, ROA.23-30916.1624.

**Second**, *Murthy* confirms that the amended complaint necessarily relies on the platforms' terms of service containing the arbitration agreements and involves allegations of substantially interdependent and concerted misconduct—which supports application of equitable estoppel, and thus arbitration. Br.44-60; Reply 15-25. *Murthy* held that Plaintiffs' "theories" of injury and standing "*depend* on the *platform*'s actions." Slip op. 9 (first emphasis added). In assessing causation—which is as critical to the merits and the estoppel analysis as it is to standing—*Murthy* discussed at great length the platforms' application of their own misinformation policies and assessments of whether posts violated those policies. *Id.* at 2-3, 12, 14, 16-19, 23, 26-27.

To find causation, the finder of fact here—as in *Murthy*—will be required to consider "the platform's independent incentives to moderate content." Slip op. 14. And critically, Plaintiffs will be required to prove that the platform acted in response to a Defendant, *"rather than in keeping with its own content-moderation policy."* *Id.* at 23 (emphasis added). *Murthy* thus makes clear that proving causation requires establishing what the terms of service independently required, and that the platform breached or changed them in response to a Defendant—meaning the claims here rely on the terms of service. Likewise, Plaintiffs must prove that the platforms' activities were interdependent with Defendants' activities, not independent. *E.g.*, *id.* at 14. *Murthy* thus rejects Plaintiffs' argument that, "[if] no terms of service existed," prosecution of their claims "would be little changed," Opp.30, and their arguments that the claims do not require "interpretation of the terms of service," rely on the terms of service, or assert interdependent misconduct, Opp.31.

**Third**, *Murthy* forecloses Plaintiffs' misplaced unclean hands argument—which relies on allegations that Defendants "collud[ed]" with the government and "hijacked" Plaintiffs' terms of service "agreement by using 'pressure from federal officials." Opp.16-17 (citing ROA.23-30916.1599, 1613-14, 1634, 1668). These allegations rest on now-reversed findings from the *Missouri* opinions. *Murthy*'s result also highlights why this Court has correctly refused to permit denial of arbitration simply because a plaintiff alleges fraud or unclean hands. Br.60-61; Reply 26. Doing so would require assuming the truth of coercion allegations that turned out to lack any basis.

**Fourth**, *Murthy* precludes Hoft's argument that—though he spoke exclusively outside of Louisiana about issues not involving Louisiana—the Court has personal jurisdiction on the theory that Defendants wanted to prevent Louisiana audiences from reading his posts. That theory is meritless for multiple reasons, including that no well-pleaded facts support it and that mere forum effects cannot support personal jurisdiction. *Murthy* additionally establishes that Hoft's claims cannot arise from or relate to any effects on Louisiana audience members—his only claimed basis for personal jurisdiction. Opp. 50. Under *Murthy*, he cannot legally assert the rights of his (theoretical, unidentified) Louisiana listeners, and those listeners have no "cognizable injury" absent allegations of a "concrete, specific connection" with him. Slip op. 27-28.

**Fifth**, *Murthy* forecloses Plaintiffs' arguments that their alleged harms as "audience members of *others'* speech" fall outside the Facebook agreement's scope and entitle them to litigate in federal court. Opp.28, 36. *Murthy* holds that such harms are non-actionable. Slip op. 16-17, 27-28.

**Sixth**, *Murthy* forecloses Plaintiffs' argument that they've alleged censorship on platforms other than Facebook and Twitter that might not be subject to arbitration. Opp.35-36. Plaintiffs

point to no specific allegations that any account on another platform was moderated, which *Murthy* holds means they cannot raise claims about another platform. Slip op. 13 (standing requires particularized showing about particular instances of content moderation on "particular platform[s]").

## II. *Murthy* Requires Vacatur With Instructions to Dismiss For Lack of Standing

*Murthy* confirms that Plaintiffs lack standing. If this Court does not vacate and order dismissal for lack of personal jurisdiction, it should vacate and order dismissal for lack of standing.

### A. The District Court and this Court Must Address Standing Before Arbitration

"Unless a federal court possesses subject-matter jurisdiction over a dispute … any order it makes (other than an order of dismissal or remand) is void. This principle applies to cases involving federal court orders of arbitration." *Shirley v. Maxicare Texas, Inc.*, 921 F.2d 565, 568 (5th Cir. 1991). *Shirley* held that a district court that lacked subject-matter jurisdiction erred by deciding a defendant's arbitration motion. *Id.* This Court expressly "disagree[d]" with the argument "that in disputes governed by contractual arbitration clauses, a lack of subject-matter jurisdiction does not preclude the district courts from ordering the parties to arbitrate." *Id.*; *see also Lower Colorado River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916, 921-22 (5th Cir. 2017) (even if ripeness was not "adequately raise[d]" below, "we still must consider whether the district court had jurisdiction to compel arbitration"); *Roman v. AutoNation Ford Gulf Freeway*, 669 F. App'x 281 (5th Cir. 2016) (vacating denial of arbitration and remanding for consideration of subject-matter jurisdiction, even though no party raised it).

Unless the Court disposes of this matter on the ground of lack of personal jurisdiction, it must either address standing or vacate and remand for the district court to address standing prior to arbitration. This Court has jurisdiction to do so. In *Daves v. Dallas County*, 22 F.4th 522 (5th Cir. 2022) (en banc), the district court issued a preliminary "injunction without first ruling on several motions that presented significant threshold questions, including abstention, judicial and legislative immunity, and standing." *Id.* at 528. This Court held that 28 U.S.C. § 1292(a)(1)—which like 9 U.S.C. § 16 confers interlocutory appellate jurisdiction over an "order"—required it to consider the issues the district court didn't address. "[I]ssues relating to whether there is a proper suit at all can be decided, such as the existence of subject-matter and personal jurisdiction and questions regarding abstention," because such issues are "necessary to determine the propriety of the interlocutory order itself." *Id.* (quotation marks omitted). The en banc Court addressed certain jurisdictional issues on its own, vacated and remanded for the district court to address *Younger* abstention—an issue the parties' en banc briefs had not addressed—and stated that the case would "return" to this Court once those findings were made. *Id.* at 548.

Standing was fully briefed in the district court below. On appeal, Defendants mentioned it only in passing in light of this Court's decision in *Missouri*, Br.3, and flagged that they might raise the issue after *Murthy* was decided, Reply 8 n.1. In any event, standing is not waivable.

### B. Plaintiffs Lack Standing Under *Murthy*

Plaintiffs lack standing under *Murthy*. To show traceability for harm from past content moderation, Plaintiffs must allege facts supporting "specific causation … with respect to any discrete instance of content moderation." Slip op. 11. The allegations cannot "treat[] the defendants,

Case: 23-30826   Document: 141   Page: 4   Date Filed: 07/01/2024

Page 4

plaintiffs, and platforms each as a unified whole." *Id.* at 13. Plaintiffs must allege facts showing that "a particular defendant pressured a particular platform to censor a particular topic *before* that platform suppressed a particular plaintiff's speech on that topic." *Id.* at 13. The factual allegations must also plausibly support a conclusion that a specific instance of censorship resulted from specific conduct by Defendants and not from the platforms' "exercise [of] independent judgment." *Id.* at 12. "[E]ven where the plaintiff, platform, time, content, and defendant line up, the links must be evaluated in light of the platform's independent incentives to moderate content." *Id.* at 14. Although *Murthy* involved an evidentiary record, its legal analysis is fully applicable here; the difference is that Plaintiffs must plead specific facts plausibly supporting the showings *Murthy* required.

Starting with Jill Hines, the amended complaint contains no factual allegations that any particular Defendant took any action against her or her groups or had any communication with platforms linked to any moderation of her posts. Instead, it alleges that, in general, VP "tracks and flags 'medical freedom' groups" across the country and "push[es] [social media] platforms to censor them." ROA.23-30916.1659 (Am. Compl. ¶ 374). Based on that alleged general practice and without alleging further factual support, the amended complaint asserts, "[o]n information and belief, Defendants' conduct successfully targeted and continues to target Ms. Hines, Health Freedom Louisiana, and her social-media groups for censorship." ROA.23-30916.1659 (*Id.* ¶ 375). Hines specifically alleges that her Facebook account was "restricted" twice in 2022, and that one of her Facebook posts "was censored" in April 2023. ROA.23-30916.1663-64 (*Id.* ¶¶ 394, 397).

These allegations cannot support standing under *Murthy*. First, Hines impermissibly treats the Defendants as a "unified whole." Slip op. 13. Moreover, Plaintiffs allege that VP started monitoring and flagging work in February 2021 and stopped in August 2021, *see* ROA.23-30916.1640 (Am. Compl. ¶ 281); ROA. 23-30916.965 (Compl., Ex. 10 at 34 (27)), refuting any notion that any "restriction" on Hines' social media activity in 2022 or 2023 is traceable to any conduct by any Defendant. Hines lacked standing in *Murthy* because she could not trace her alleged censorship in 2023 to communications between White House officials and Facebook two years prior. Slip op. 18. The "link" between the alleged censorship in 2023 and the government action in 2021 was simply too "weak" and "tangential" to support standing. *Id.* So too here regarding any link between any Defendant and the alleged adverse actions months and years after VP ended in 2021.

More fundamentally, Hines does not allege that the censorship she allegedly suffered resulted from or followed the flagging of any of her posts by any Defendant, because she does not allege that VP read or flagged any of her posts or communicated about her at all—much less that any Defendant did so. Hines and her groups are not mentioned in VP's final report. Plaintiffs' allegations thus "do not permit the court to infer more than the mere possibility," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), that any Defendant ever alerted Facebook to Hines' posts—especially when the alleged censorship occurred months after VP stopped monitoring social media activity.

Nor does Hines plead any facts suggesting that any specific change in Facebook's COVID-19 misinformation policy was both prompted by any Defendant and resulted in any moderation of her account. Slip op. 16. Indeed, allegations in and incorporated into the amended complaint reflect that Facebook and Twitter were taking action on anti-vaccine misinformation in the late 2010s, and on COVID-19 misinformation specifically in 2020—well before VP existed. ROA.23-30916.947, 1064 (Compl., Ex. 10 at 16 (9), 133 (126) & fig. 5.1 ("Timeline of major platform policies on vaccine misinformation")). That precludes standing here. And while Hines strategically

omits such allegations here, this Court can take judicial notice of her claims, recounted in *Murthy*, that Facebook fact-checked her content in 2020, before VP existed. Slip op. 18-19. Finally, the fact that Hines came the closest to establishing standing in *Murthy, id.* at 17, does not help her here against different defendants as to whom she alleges no qualifying communications at all.

The amended complaint likewise lacks sufficient allegations to establish Hoft's standing. There are no allegations that identify any communications between any "particular defendant" and any "particular platform" that is plausibly linked to any specific action on Hoft's posts. Slip op. 13. Although the amended complaint alleges that EIP "repeatedly flagged" Hoft's website The Gateway Pundit in its database and "mentioned" the website in its report "47 times," ROA.23-30916.1620 (Am. Compl. ¶¶ 183-84), there are no specific factual allegations about communications to Twitter or Facebook relating to Hoft's posts. Allegations that Hoft was described as a repeated spreader in EIP's public report in June 2021 does not plausibly allege causation because he does not allege with any specificity *when* any of his accounts or posts were moderated. *E.g.*, ROA.23-30916.1655 (alleging "censorship" but not saying *when* any of it took place). Moreover, Hoft offers no facts rendering it plausible that this unspecified moderation did not result from "the platform's independent incentives to moderate content." Slip op. 14. And, like Hines, he does not allege with specificity any *change* in content moderation policy that was caused by any Defendant and that plausibly affected any specific moderation decision involving him. *Id.* at 16 (Hoft lacks standing because he lacks evidence that any policy affecting him was "in response to the FBI's warnings"). Indeed, he alleges that "all of the major platforms made significant changes to election integrity policies, both as the campaigns kicked off"—*i.e.*, long before EIP began its work in July 2020—"and through the weeks after Election Day." ROA.23-30916.1598 (Am. Compl. ¶ 66).

As in *Murthy*, Plaintiffs "do not point to any specific instance of content moderation that caused them identifiable harm" and thus have "failed to establish an injury that is sufficiently 'concrete and particularized.'" Slip op. 28 (citation omitted). Plaintiffs' allegation that social media platforms overwhelmingly declined to take action against posts or users that EIP identified also refutes any notion that Defendants' conduct plausibly had the requisite "determinative or coercive" effect. *Bennett v. Spear*, 520 U.S. 154, 169-71 (1997). Plaintiffs plead that only "35% of the URLs [EIP] shared with Facebook, Instagram, Twitter, TikTok, and YouTube were either labeled, removed, or soft blocked." ROA.23-30916.1619 (Am. Compl. ¶ 179). Most were labeled; only 14% were removed or soft blocked. ROA.23-30916.178. As in *Murthy*, "[t]his evidence indicates that the platforms … often exercised their own judgment." Slip op. 12.

*Murthy* also forecloses Plaintiffs' arguments that standing can be based on their own "self-censorship" to avoid "penalties" imposed by the platforms. ROA.23-30916.1664, 1666 (Am. Compl. ¶¶ 400, 407). As the Supreme Court explained, "even before the [government] defendants [in *Murthy*] entered the scene, the plaintiffs 'had a similar incentive to engage in' self-censorship, given the platforms' independent content moderation." Slip op. 25 (citation omitted). So too here. Finally, *Murthy* rejected Plaintiffs' "right to listen" theory of standing. *Id.* at 16-17, 27.

The Court should vacate and order dismissal for lack of personal jurisdiction. Or, in light of *Murthy*, it should vacate and order dismissal for lack of standing or vacate and direct the district court to address the issue. Alternatively, the Court should compel arbitration.

Respectfully submitted,

*/s/ Elisabeth S. Theodore*

Elisabeth S. Theodore